**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 7 |
| GLASSHOUSE TECHNOLOGIES, INC., | ) | Case No. 14-41352-CJP |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| JONATHAN R. GOLDSMITH, TRUSTEE | ) | |
| IN BANKRUPTCY FOR GLASSHOUSE | ) | |
| TECHNOLOGIES, INC., AND WF FUND | ) | |
| IV LIMITED PARTNERSHIP (c/o/b as | ) | AP No. 17-04022-CJP |
| WELLINGTON FINANCIAL LP, | ) | |
| WELLINGTON FINANCIAL FUND III, | ) | |
| AND WELLINGTON FINANCIAL | ) | |
| FUND IV), | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARSH USA, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

Before the Court is the Motion to Dismiss (the "Motion") filed by the defendant Marsh

USA, Inc. ("Marsh" or the "Defendant"), the prepetition insurance broker of the debtor

GlassHouse Technologies, Inc. (the "Debtor" or "GlassHouse").[1] Pursuant to Fed. R. Civ. P.

12(b)(6), as made applicable to this proceeding by Fed. R. Bankr. P. 7012(b), Marsh seeks

dismissal of the complaint (the "Complaint") filed by the plaintiffs Jonathan R. Goldsmith, the

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11
U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code").

Chapter 7 trustee appointed in the Debtor's case (the "Trustee"), and WF Fund IV Limited

Partnership c/o/b Wellington Financial LP, Wellington Financial Fund III, and Wellington

Financial Fund IV (collectively, "Wellington," and together with the Trustee, the "Plaintiffs").

The Complaint contains three counts—breach of contract (Count I), negligence (Count II), and

violations of Mass. Gen. Laws ch. 93A, §§ 2 and 11 ("Chapter 93A") and ch. 176D, § 3

("Chapter 176D") (Count III). The claims arise from Marsh's alleged acts and omissions in

procuring extended discovery period coverage (the "Tail") with respect to GlassHouse's

directors and officers ("Directors and Officers" or "D&O") liability insurance, which the

Plaintiffs contend resulted in an unauthorized reduction of the aggregate liability limit for claims

noticed prior to the expiration of the original policy. The Defendant argues that the Complaint

sets forth an "implausible theory that [the Plaintiffs] have suffered actionable harm." Def. Br. 1.

For the reasons set forth below, the Court concludes that the Plaintiffs have stated

plausible claims for certain of the relief set forth in the Complaint, but not others, and GRANTS

in part and DENIES in part the Motion.

## I.     FACTS ALLEGED AND PROCEDURAL HISTORY

In determining this Motion, the Court must assume the truth of all well-pleaded facts set

forth in the Complaint. The Court has also considered certain matters of record on the dockets in

this adversary proceeding and the main case, documents referenced in the Complaint, and other

matters of which the Court may take judicial notice.[2]  The relevant facts alleged are recited

---

[2] Typically, a court may not consider any documents that are outside the complaint in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). If, however, "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998); *see also Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). Additionally, the First Circuit permits consideration of "'matters of public record[] and other

below with any inferences made in favor of the Plaintiffs.

GlassHouse, which provided information technology, infrastructure consulting and managed services, filed for protection under Chapter 7 of the Bankruptcy Code on June 16, 2014 (the "Petition Date"). The Plaintiffs in this adversary proceeding are the Trustee, as the representative of GlassHouse's bankruptcy estate (the "Estate"), and Wellington, a creditor of GlassHouse that was assigned the Estate's claims against Marsh, among others, pursuant to a Settlement and Joint Prosecution Agreement (the "Prosecution Agreement"). Compl. ¶ 21. Under the Prosecution Agreement, which was previously approved by the Court (Hoffman, J.) with certain modifications, the Plaintiffs agreed to pool various causes of action against Marsh and GlassHouse's Directors and Officers and its insurers, American International Group, Inc. and certain of its subsidiaries (collectively, "AIG"), that Wellington would prosecute. The Plaintiffs agreed to divide any recoveries on account of Estate claims and any direct claims possessed by Wellington. *Id*. at ¶¶ 20–21.

### A. **The Policy**

Marsh was GlassHouse's insurance broker and risk management consultant pursuant to an engagement agreement dated April 24, 2013 (the "Engagement Agreement"). Compl. Ex. 1. The Engagement Agreement provided that Marsh would "assist [GlassHouse] in assessing [its] risks and in developing insurance specifications which Marsh will submit to insurers," Engagement Agreement ¶ 1(b), and "[u]se best efforts to place insurance for [GlassHouse], but only after [GlassHouse has] authorized Marsh to bind coverage" for it, *id*. at ¶ 1(g). Furthermore, the agreement provided that "[i]n performing Services, Marsh and its affiliates are not acting as a

---

matters susceptible to judicial notice.'" *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (quoting *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 20 (1st Cir. 2003)).

fiduciary . . . , except to the extent required by applicable law." *Id*. at ¶ 7.

Prior to the Petition Date, Marsh assisted GlassHouse in procuring PrivateEdge Plus Policy No. 02-420-51-20 from AIG (the "Policy"), which included Directors, Officers and Private Company Liability Insurance (the "D&O Coverage Section") and had a shared liability limit of $15 million. Compl. Ex. 2; *see also id*. at ¶¶ 30, 33, 36. The Policy had an effective date of June 1, 2013, and provided that the coverage period would end on June 1, 2014 (the "Initial Policy End Date"). *Id*. at ¶ 35. It also included a non-cancellation endorsement, whereby AIG could not cancel the policy except for non-payment of premiums. *Id*.

The Policy provided indemnification and defense to "Insureds" for certain types of "Loss" arising from their "Wrongful Acts." Compl. Ex. 2, at D&O Coverage Section ¶¶ 1, 2; *see also id*. at ¶ 33. The Policy defines an "Insured" as (i) the "Company," which is further defined as the named entity on the declarations page of the Policy, GlassHouse, and its subsidiaries, and (ii) "Individual Insureds," who are defined as "Executives" or "Employees" of the "Company" or "Outside Entity Executives." Compl. Ex. 2, at Declarations, Part 1, General Terms and Conditions ¶ 2(b), D&O Coverage Section ¶ 2(s)–(t). In the event of a bankruptcy filed by GlassHouse, "the term 'Company' shall also mean the resulting debtor-in-possession[,]" but excludes a bankruptcy trustee. *Id*. at General Terms and Conditions ¶ 2(b), D&O Coverage Section ¶ 4(i). Specifically, the Policy insured GlassHouse's Directors and Officers for losses as defined under "Side A" coverage, the Individual Insured coverage, and also insured GlassHouse for losses as defined under "Side B" coverage, private company insurance. *Id*. at D&O Coverage Section ¶ 1. Side A coverage "pay[s] the Loss of an Individual Insured of the Company arising from a Claim made against such Individual Insured for any Wrongful Act of such Individual Insured[s]." *Id*.; *see also* Compl. ¶ 33. Side B coverage "Loss" arises from a:

(i)    Claim made against the Company, or

(ii)    Claim made against an Individual Insured, for any Wrongful Act, but in the
case of Coverage B (ii) above, only when and to the extent that the Company
has indemnified the Individual Insured for such Loss . . . .

*Id*. at D&O Coverage Section ¶ 1. The definition of "Loss" under the Policy includes

"damages, judgments, settlements, pre-judgment and post-judgment interest" against

GlassHouse and its Directors and Officers relating to "Wrongful Acts," defined as "any

breach of duty, neglect, error, misstatement, misleading statement, omission or act." *Id*. at

¶ 2(u), (cc).

## B.  <u>Wellington's Collateral and Alleged Misrepresentations Made by Directors and Officers</u>

Wellington had extended credit to GlassHouse since approximately January 2010, and

ultimately purchased certain senior secured debt held by Bridge Bank on June 11, 2013. Compl.

¶¶ 37, 40. After the debt purchase, Wellington possessed an all asset lien covering GlassHouse's

assets, which Wellington alleges included a lien attaching to GlassHouse's interest in the Policy.

*Id*. at ¶ 40.

Based upon disclosures by GlassHouse's CEO on October 11, 2013, Wellington learned

that prior representations and warranties made by the Directors and Officers were false,

including that GlassHouse had paid "all other Taxes to the extent that they have become due." *Id*.

at ¶¶ 39, 41–43. Wellington had relied on these representations in making lending decisions and

the decision to purchase the senior debt from Bridge Bank. *Id*. at ¶¶ 38–39.

The disclosures revealed that a subsidiary of GlassHouse that generated half of its

revenue, GlassHouse UK, owed withholding taxes starting in 2009 and had defaulted on

repayment plans in 2010, 2011, and a later repayment plan. *Id*. at ¶ 42. Additionally, the United

Kingdom's HM Revenue & Customs had initiated a "wind-up proceeding" as of September 2013

5

with respect to GlassHouse UK due to its latest default. *Id*. at ¶ 43. In connection with this wind-up process, a petition to the High Court of Justice was filed on February 14, 2014, and public notice of the petition was filed on March 19, 2014. *Id*. at ¶¶ 42–43, 46, 50–51, Ex. 3. GlassHouse notified Marsh of the wind-up petition on February 27, 2014. *Id*. at ¶ 51, Ex. 3.

GlassHouse owed Wellington approximately $14 million and had defaulted on its debt. *Id*. at ¶¶ 40, 44. Wellington initiated secured party sales of GlassHouse's assets, which ultimately only satisfied a portion of the outstanding debt. *Id*. at ¶¶ 46–47. GlassHouse informed Marsh that Wellington had commenced such asset sales. *Id*. at ¶ 52, Ex. 4. An e-mail dated April 11, 2014, between Marsh representatives, Shawn Donaher and Bethany Greenwood, noted confirmation by a representative of GlassHouse that Wellington "now owned" a majority of GlassHouse "in phased sell off (not done yet but by division)." *Id*.

By March 2014, as reflected in the proofs of claim ultimately filed in its bankruptcy case, GlassHouse had incurred over $45 million in liabilities, including Wellington's senior secured claim of over $12 million. Compl. ¶ 49; Pls. Opp. Ex. 2, Decl. of David F. Olsky in Support of Opp. ("Olsky Decl."), Exs. 3, 4; Def. Reply Ex. A, 2nd Decl. of Jonathan I. Handler in Support ("2nd Handler Decl."). By at least March 2014, GlassHouse was insolvent as its liabilities exceeded its assets. Compl. ¶ 48.

Wellington had obtained a copy of a binder from GlassHouse regarding its D&O liability insurance, which reflected that the Policy had a $15 million limit on liability and would be expiring as of the Initial Policy End Date. *Id*. at ¶¶ 54–55. Wellington timed the filing of its claims against GlassHouse and its Directors and Officers to ensure that the claims were asserted prior to the Initial Policy End Date. *Id*. at ¶¶ 55, 102–03, Ex. 10.

**C. <u>Tail Coverage Under the Policy and Communications with Marsh</u>**

"By April 6, 2014, Glasshouse understood that it was likely to be sued by Wellington." *Id*. at ¶ 56. "Knowing that the company was near collapse and the assets of the company insufficient to satisfy a judgment," the Directors and Officers sought Marsh's advice regarding the sufficiency of GlassHouse's D&O insurance coverage "to pay outstanding creditors (including Wellington)." *Id*. at ¶ 57. Marsh advised GlassHouse that if no "tail coverage" was purchased the $15 million liability limit would remain through the Initial Policy End Date for all claims arising from acts that occurred and were reported prior to that date. *Id*. at ¶¶ 67, 81, Ex. 7.

Clause 8 of the Policy's general terms and conditions authorized GlassHouse to extend the reporting period at the conclusion of the Policy period. *Id*. at ¶ 64. Marsh recommended that GlassHouse purchase tail coverage to extend the reporting period under the Policy. *Id*. at ¶ 62. Marsh further advised GlassHouse that it needed to bind tail coverage as of April 11, 2014, the date GlassHouse sold its U.S. consulting business to Signature Technology Group. *Id*. at ¶¶ 65, 74, 76–79, 98. Marsh apparently viewed that transaction as potentially triggering a change in control under Clause 9 of the Policy that would cause a gap in coverage. *Id*. at ¶¶ 77–79. If there were a change in control of the Debtor, however, the Policy provided that the $15 million limit of liability would remain through the Initial Policy End Date for all claims arising from acts that occurred prior to the effective date of the change in control. Compl. ¶ 67, Ex. 2, General Terms and Conditions ¶ 9.

Marsh never communicated to GlassHouse or Wellington that purchase of the recommended tail coverage would affect the $15 million liability limit for claims that might be reported prior to the Initial Policy End Date. Compl. ¶¶ 65, 74, 76–79, 98. The Tail set forth in Endorsement No. 13 to the Policy, which Marsh negotiated on behalf of GlassHouse, reduced the limits of the Policy to $5 million, effective April 11, 2014, and extended the Policy term and

discovery period to April 11, 2017. *Id*. at ¶ 85. Instead of bridging a perceived coverage gap,

"Marsh's actions created a coverage gap" in that, where there was once $15 million in coverage

until the end of the initial reporting period, the liability limit was reduced to $5 million. *Id*. at ¶¶

87, 90.

GlassHouse only authorized Marsh to purchase tail coverage that did not alter the $15

million limit of liability for claims reported before the Initial Policy End Date. *Id*. at ¶¶ 75, 84.

GlassHouse intended that claims for conduct occurring prior to the purchase of the Tail continue

to have $15 million limit of liability coverage through the end of the Initial Policy End Date. *Id*.

at ¶ 66. Neither GlassHouse nor Wellington sanctioned Marsh to bind tail coverage that changed

existing Policy Period coverage for claims reported before the Initial Policy End Date. *Id*. at ¶¶

86–87. Wellington also never authorized any amendment or change to its collateral, which

included the Policy. *Id*. at ¶¶ 68, 86. Marsh's actions in procuring the supplemental Tail reduced

the limits of liability under the existing Policy by $10 million, and Marsh received a commission

for binding the coverage. *Id*. at ¶¶ 89, 92.

Further, Marsh's subsequent communications provided false assurances to GlassHouse

that claims noticed prior to the Initial Policy End Date were subject to the original $15 million

cap. *Id*. at ¶¶ 93–96, 106. Specifically, Endorsement No. 13, which memorialized the Tail, made

no reference to a change in limits of liability for claims noticed between April 11, 2014 and the

Initial Policy End Date. *Id*. at ¶¶ 93–94. Additionally, the Confirmation of Binding Instructions

created by Marsh dated April 15, 2014 provides that the D&O liability "Layers/Limit was

$15,000,000, with a note referencing "3 Year Tail Coverage effective 4/11/2014." *Id*. at ¶ 95, Ex.

8. The letter transmitting the Tail dated May 1, 2014, states that Marsh has "reviewed the

endorsements and found them to be consistent with negotiated terms," *Id*. at ¶ 96, Ex. 9, and

described Endorsement No. 13 as "[a]mend[ing] the policy to provide a period of three (3) years in which to give written notice to the Company of any claim(s) first made against the Insured during the Extended Reporting Period for any Wrongful Act(s) occurring on or prior to April 11, 2014[,]" *id*. at Ex. 9. By May 1, 2014, when Marsh sent the transmittal letter, Wellington had taken control of GlassHouse's bank accounts and GlassHouse's officers had resigned and moved on to other positions. *Id*. at ¶ 99.

Wellington did not receive any of the foregoing communications and only learned of the Tail months after it had commenced litigation. *Id*. at ¶ 97. The Insureds first learned of the reduction in coverage on June 2, 2014. *Id*. at ¶ 107. At a lunch meeting between a representative of Marsh, Kerri Petri, and GlassHouse's Chief Financial Officer, Jeffrey R. Wakely ("Wakely"), who was one of two GlassHouse officers who authorized Marsh to procure the Tail, "Petri informed [Wakely] for the first time at that meeting that in fact Marsh had agreed with AIG to reduce the Policy limits of liability to $5 million for [claims noticed between April 11, 2014 and the Initial Policy End] (such as those claims asserted by Wellington)." *Id*. at ¶¶ 107–08. AIG "soon thereafter" notified the Insureds under the Policy that Wellington's claims were subject to a $5 million limit of liability. *Id*. at ¶ 109.

### D. <u>Litigation Against Directors and Officers and AIG</u>

Unaware of the change in coverage, on May 9 and May 19, 2014, Wellington sent notice to GlassHouse's Board of Directors and Wakely, respectively, of its claims against Directors and Officers. *Id*. at ¶ 103, Ex. 10; *see also* Decl. of Jonathan I. Handler in Support of Opp. ("Handler Decl.") Ex. A. Marsh was copied on the May 19, 2014 notice. Compl. ¶ 103, Ex. 10. On May 27, 2014, Wellington filed a complaint against four of GlassHouse's Directors and Officers for negligent misrepresentation, negligent failure to disclose, and financial mismanagement in the

United States District Court for the District of Massachusetts, Case No. 14-cv-12305-LTS (the "District Court Action"). *Id*. at ¶ 104, Ex. 11; *see also* Handler Decl. Ex. A.

Several months after the Petition Date, the Trustee commenced Adversary Proceeding No. 14-04128, seeking to stay Wellington's District Court Action. The Plaintiffs ultimately resolved that proceeding by entering into the Prosecution Agreement. In relevant part, the Prosecution Agreement provided for the assignment to Wellington of certain of the Estate's claims and interests that included all claims and causes of action that the Estate may have against GlassHouse's Directors and Officers and Marsh. *See* Handler Decl. Exs. C, D.

In accordance with the Prosecution Agreement, the Plaintiffs filed suit against AIG in Adversary Proceeding No. 15-04048 for, among other things, declaratory judgment as to the liability limits of the Policy, fraudulent transfer claims, and violations of Chapters 93A and 176D, ultimately settling with AIG on behalf of itself and its insureds for $6 million and a release of the Debtor and its Directors and Officers (the "Settlement"). Compl. ¶ 114; *see also* Settlement, Bankr. Doc. No. 195. The Settlement with AIG was not allocated among specific claims. *Id*. The Plaintiffs allege that their ability to settle with certain of the Directors and Officers was frustrated by the reduced scope of coverage and that they had to sue AIG prior to settling the claims for $6 million. Compl. ¶¶ 113–14.

## II.    DISCUSSION

### A.    Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). Allegations contained in "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 554, 570 (2007)). Sufficient pleading "[does] not require heightened fact

pleading of specifics," *Twombly*, 550 U.S. at 569, "[f]actual allegations must [simply] be enough

to raise a right to relief above the speculative level . . . on the assumption that all the allegations

in the complaint are true (even if doubtful in fact)[,]" *id*. at 555 (internal citations omitted). "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556); *see also Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the . . . court to draw on its own judicial experience and common

sense." *Iqbal*, 556 U.S. at 679.

While factual allegations are accepted as true, legal conclusions need not be credited.

*García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). Moreover, a complaint must

contain factual allegations sufficient to satisfy each element of an alleged cause of action. *See*

*Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005). The focus

of a Fed. R. Civ. P. 12(b)(6) inquiry, however, "is not whether plaintiffs will ultimately prevail,

but whether they are entitled to offer evidence to support their claims." *Day v. Fallon Cmty.*

*Health Plan, Inc.,* 917 F. Supp. 72, 75 (D. Mass. 1996). The Court should not attempt to forecast

a plaintiff's likelihood of success on the merits; "a well-pleaded complaint may proceed even

if . . . a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation

marks omitted); *see also id.* at 563 n.8 ("[W]hen a complaint adequately states a claim, it may

not be dismissed based on a … court's assessment that the plaintiff will fail to find evidentiary

support for his allegations or prove his claim to the satisfaction of the fact-finder."). "The

relevant inquiry focuses on the reasonableness of the inference of liability that the Plaintiffs are

asking the Court to draw from the facts alleged in the Complaint." *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 13 (1st Cir. 2011). If it is clear that the Plaintiffs cannot, as a matter of law, recover under any set of facts alleged in the Complaint, then the respective count at issue must be dismissed under Fed. R. Civ. P. 12(b)(6). If the Plaintiffs have stated enough facts to "nudge[] their claims across the line from conceivable to plausible," however, then the count must survive dismissal. *Twombly*, 550 U.S. at 569.

### B. <u>Choice of Law</u>

The parties disagree as to whether New York or Massachusetts law should apply to the breach of contract and negligence claims in this matter.[3] In evaluating which state's law applies to the claims at issue, the Court employs the choice of law framework of Massachusetts as the forum state.[4] *See Klaxon*, 313 U.S. at 496; *Putnam Resources v. Pateman*, 958 F.2d 448, 464 (1st Cir. 1992). The Court must analyze the law that applies to each claim independently.[5]

"The first step in performing a choice of law analysis is to determine whether there is a conflict between the substantive laws of the interested jurisdictions." *Millipore Corp. v.*

---

[3] The parties do not address the choice of law issue with respect to the Chapter 93A claim in Count III and appear to assume that Massachusetts law governs.

[4] "'Federal courts are divided on whether the federal choice of law rules or the forum state's choice of law rules apply in bankruptcy proceedings. *Compare In re Gaston & Snow*, 243 F.3d 599, 605–06 (2d Cir. 2001) (using choice of law rules for forum state) with *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995) (using federal choice of law rules).' The issue does not appear to have been resolved in this circuit." *Whittaker v. Whittaker (In re Whittaker)*, 564 B.R. 115, 142 (Bankr. D. Mass. 2017) (quoting *In re Kaiser Group Int'l, Inc.*, No. 00-02263, 2010 WL 3271198, at *4 (D. Del. Aug. 17, 2010)). However, the Supreme Court in *Klaxon* also made clear that federal law may not be applied to questions which arise in federal court, but whose determination is a matter of state law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[5] Application of the choice of law framework is not an all or nothing proposition. A plaintiff may bring claims under Massachusetts law even where other claims in the same case are governed by the law of a different jurisdiction. *See Putnam*, 958 F.2d at 465 (describing the principle of depecage as "the framework under which different issues in a single case . . . may be decided according to the substantive law of different states") (citations omitted).

12

*Travelers Indem. Co.*, 115 F.3d 21, 29 (1st Cir. 1997). If a conflict is found in the substantive

law, in the absence of an express choice of law provision, Massachusetts applies "functional"

choice of law principles and looks to the Restatement (Second) of Conflict of Laws, "with which

those principles generally are in accord." *Hodas v. Morin*, 814 N.E.2d 320, 324 (Mass. 2004)

(citing *Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 668 (Mass. 1985)). Massachusetts

takes a flexible, interest-based approach to such choice of law issues. *See Millipore*, 115 F.3d at

30.

      "Where the parties have expressed a specific intent as to the governing law, [however,]

Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public

policy." *Hodas*, 814 N.E.2d at 324–25 (quotation omitted); *see also N. Parent, Inc. v. Cotter &*

*Co. (In re N. Parent, Inc.)*, 221 B.R. 609, 619–20 (Bankr. D. Mass. 1998) (determining that

"[c]ontractual stipulations concerning choice of law clauses ordinarily are honored [and

b]ankruptcy courts have . . . upheld choice of law provisions so long as the law [that] was

reasonably chosen by the parties . . . does not seriously conflict with public policy").

      The Plaintiffs contend that Massachusetts law applies to their contract claim in this case

because the credit agreement between GlassHouse and Wellington, which established

Wellington's asserted secured interest in, and related rights with respect to, the Policy and its

proceeds, contains a clause requiring the application of Massachusetts law. Olasky Decl., Ex. 2

Loan and Security Agreement dated March 29, 2010, § 9.03 ("This Agreement shall be

exclusively (without regard to any rules or principles relating to conflicts of laws) governed by,

enforced and construed in accordance with the laws of the Commonwealth of Massachusetts and

the federal laws of the United States applicable therein"). Further, the Plaintiffs argue that

employing the choice of law framework of the forum state overwhelmingly favors applying

Massachusetts law to this matter.

Marsh argues that New York law applies to the contract claims because of the choice of law provision in the Engagement Agreement, which provides that "the laws of the State of New York govern this agreement." *See* Engagement Agreement ¶ 8. Marsh asserts, however, that despite any purported dispute, there is no choice of law issue because "'Massachusetts law . . . like New York law comports with the third party beneficiary rules in Restatement (Second) of Contracts § 302.'" Def. Br. 9 n.9 (quoting *Palmer/Kane LLC v. Houghton Mifflin Harcourt Publ'g Co.*, No. 13-11030-GAO, 2014 WL 183774, at *2 (D. Mass. Jan. 16, 2014)).

The Court must first determine whether the substantive law of New York and Massachusetts differs with respect to the claim of third-party beneficiary status pursuant to the Engagement Agreement. For a third-party beneficiary to succeed on a breach of contract claim under New York law, "a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006) (quoting *County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir. 1984)). The non-party "must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his or her benefit, and (3) that the benefit to him or her is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *Synovus Bank of Tampa Bay v. Valley Nat'l Bank*, 487 F. Supp. 2d 360, 368 (S.D.N.Y. 2007) (internal quotations omitted). "In determining whether the parties intended to benefit the third party, a court 'should consider the circumstances surrounding the transaction as well as the actual language of the contract.'" *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012) (quoting *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d

119, 124 (2d Cir. 2005)). "An intended third party beneficiary will be found when it is

appropriate to recognize a right to performance in the third party and the circumstances indicate

that the promisee intends to give the third party the benefit of the promised performance."

*Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991)

(citing Restatement (Second) of Contracts § 302 (1981)).

While a third-party beneficiary does not have to establish that it is explicitly named in the

contract, New York law generally requires that the parties' intent to benefit a third-party be

gleaned from the face of the contract. *See Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.,* 807

F. Supp. 1007, 1020 (S.D.N.Y. 1992) (determining that "[a]lthough the parties' intention to

benefit the third-party must be gleaned from the face of the contract, the defendant's obligation to

the third-party beneficiary need not be explicitly stated in the contract itself.") (internal

quotations and citations omitted).

Similarly, "[u]nder Massachusetts law, only intended beneficiaries, not incidental

beneficiaries, can enforce a contract." *Harvard Law Sch. Coal. for Civil Rights v. President &*

*Fellows of Harvard Coll.*, 595 N.E.2d 316, 319 (Mass. 1992); *Flattery v. Gregory*, 489 N.E.2d

1257, 1260 (Mass. 1986). To prevail on a third-party beneficiary claim, a party must show that

the two contracting parties intended to give the third party the benefit of the contract. *See*

*Anderson v. Fox Hill Vill. Homeowners Corp.*, 676 N.E.2d 821, 822 (Mass. 1997); *see also*

*Cooper v. Charter Commc'ns Entertainments I, LLC*, 760 F.3d 103, 109 (1st Cir. 2014)

(determining that "to prevail on a third-party beneficiary claim, a plaintiff must establish that the

language and circumstances of the contract show that the parties to the contract clearly and

definitely intended the beneficiary to benefit from the promised performance") (internal

quotations and citations omitted). Courts examine the "the language and circumstances of the

contract for indicia of intention" and that "intent must be clear and definite." *Anderson*, 676
N.E.2d at 822.

While both jurisdictions rely on the Restatement (Second) of Contracts to determine
whether a party is an intended beneficiary versus an incidental beneficiary of a contract,[6] courts
interpreting New York law have not as been as expansive in applying the restatement to
determine that unnamed third parties constitute third party beneficiaries of professional services
contracts so as to allow those parties to maintain actions for breach of contract. *Compare Henry
v. Michael P. Guastella & Assocs., Inc.*, 496 N.Y.S.2d 591, 593 (N.Y. App. Div. 1985)
(determining that the promised performance to acquire adequate motor liability coverage does
not extend to a member of the public who was injured because the contract was only intended to
benefit the insured, and not the general public, and holding that "[u]nder New York law, a duty
directly assumed to benefit one person does not extend to third parties who are not intended
beneficiaries of the undertaking to perform, even if it is foreseeable that someone else might be
damaged by the nonfeasance") *with Flattery*, 489 N.E.2d at 1262 (holding that "[t]he parties to
the insurance policy, or, as in this case, to a contract to procure such a policy, intend the injured

---

[6] *Cf. Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 600 (2d Cir. 1991) ("New York law
follows the Restatement (Second) of Contracts § 302 . . . in allowing a third party to enforce a contract if
that third party is an intended beneficiary of the contract"); *Fourth Ocean Putnam Corp. v. Interstate
Wrecking Co.*, 485 N.E.2d 208, 212 (N.Y. 1985) (examining third-party beneficiary claim and concluding
that the "Restatement [(Second) of Contracts] formulations state the essence of the prior holdings of this
court while clearing away some of the unnecessary differentiations and circuitous language set forth in
some of those decisions"); *Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172, 180–81 (D. Mass.
2011) (recognizing that "both Massachusetts law and federal common law follow the Restatement
(Second) of Contracts to assess the rights of third-party beneficiaries" and holding that "[w]hile an
intended beneficiary of a promise has standing to enforce a duty of performance, an incidental beneficiary
acquires no rights against the contracting parties"); *Rae v. Air–Speed, Inc.*, 435 N.E.2d 628, 632–33
(Mass. 1982) (adopting the rule set forth in the Restatement (Second) of Contracts § 302, with regard to
both creditor and other types of intended beneficiaries and recognizing the principle of law that, "'when
one person, for a valuable consideration, engages with another, by simple contract, to do some act for the
benefit of a third, the latter, who would enjoy the benefit of the act, may maintain an action for the breach
of such engagement'") (quoting *Brewer v. Dyer*, 7 Cush. 337, 340 (Mass. 1851)).

third-party judgment holder to benefit from their contract [and i]t makes no difference, therefore, whether the insurance is compulsory or optional"). Thus, despite the general reliance on the Restatement (Second) of Contracts in both jurisdictions, application of New York and Massachusetts third party beneficiary decisional law could, nonetheless, lead to different outcomes. *See id*. Given this, the Court looks to whether there is an express choice of law provision that would govern the breach of contract claim. *See, e.g., Hodas*, 814 N.E.2d at 324 (Massachusetts will uphold the express intent of contracting parties if not contrary to public policy).

In this case, the breach of contract claim arises from the Engagement Agreement and services provided under that agreement. In that agreement, the parties agreed that New York law would govern the agreement. There is no compelling reason not to apply the law of New York, as agreed by the parties to the Engagement Agreement, because Massachusetts does not have a materially greater interest than New York as to the determination of the breach of contract claim. *See* Restatement (Second) of Conflict of Laws, § 187(2)(b) (The parties' choice-of-law provision will not be honored if its application "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties."). Further, GlassHouse and Marsh were each sophisticated parties, and there are no allegations of fraud or coercion in entering into the Engagement Agreement. *See, e.g., Shipley Co. v. Clark, Inc.*, 728 F. Supp. 818, 826 n.23 (D. Mass. 1990) ("noting the unfairness that would result from permitting defendants to escape a contract provision that they presumably adopted in good faith" and stating that "the most important factors to consider in any choice-of-law analysis are the protection of justified expectations and predictability of result") (citations

17

omitted). Marsh was not a party to the Security Agreement, and the nexus of the Security

Agreement to the breach of contract and third party beneficiary claims is attenuated at best.

Accordingly, the agreement between GlassHouse and Marsh that New York law will govern the

contract controls the breach of contract claims asserted by the Trustee, who stands in the shoes of

GlassHouse with respect to the Engagement Agreement and who is explicitly named as a

potential beneficiary under the Policy, and by Wellington, as a purported third party beneficiary

of the Engagement Agreement.

With respect to the negligence claim, the parties appear to acknowledge that a conflict

exists between New York and Massachusetts law. *Compare Sykes v. RFD Third Ave. 1 Assocs.,*

*LLC*, 884 N.Y.S.2d 745, 748 (N.Y. App. Div. 2009) (dismissing professional negligence claim

by third-party plaintiff for lack of duty because could not demonstrate "near privity" with a

professional services firm) with *Nycal Corp. v. KPMG Peat Marwick LLP*, 688 N.E.2d 1368,

1371 (Mass. 1998) (holding that near-privity test is inconsistent with the standard Massachusetts

courts have previously applied to other professionals in the absence of privity and stating that

while "the first two elements of the near-privity test–reliance by the third party and knowledge

that the party intended to rely-have analogs in our case law–the third element, conduct by [the

professional] providing a direct linkage to the third party, does not").

The choice of law provision in the Engagement Agreement does not govern the asserted

tort claim. By its terms, that contract's choice of law provision is limited to disputes arising out

of the contract itself, not all disputes and potential claims between the parties. *See L'Oreal USA,*

*Inc. v. RG Shakour, Inc.*, No. 08-40064-FDS, 2010 WL 3504140, *5 (D. Mass. Sept. 3, 2010)

(holding that choice of law clause providing that "[t]his Agreement shall be construed in

accordance with and all disputes herein shall be governed by the internal laws of the State of

18

New York" only applied to contract claims); *EchoMail, Inc. v. Am. Express Co.*, 529 F. Supp. 2d

140, 146-47 (D. Mass. 2007) (applying Massachusetts law to non-contract torts, despite

contractual choice of law provision specifying the applicability of New York law, because the

choice of law provision did not control and Massachusetts choice-of-law rules dictated

application of the laws of the jurisdiction where the tort allegedly occurred).

As such, the Court must apply Massachusetts choice of law rules to determine which law

applies to the negligence claims asserted in the Complaint. "[T]ort claims are governed by the

law of the state where the alleged injury occurred, unless another state has a more significant

relationship to the cause of action." *Dunfey v. Roger Williams Univ.*, 824 F. Supp. 18, 21 (D.

Mass. 1993). "The place where the injury occurred is the place where the last event necessary to

make an actor liable for an alleged tort takes place." *Id.* (internal quotations and citations

omitted). Courts also look to Restatement (Second) of Conflict of Laws §§ 6 and 145 for

guidance to determine which state has the "most significant relationship to the occurrence and

the parties." *Cosme v. Whitin Mach. Works, Inc.*, 632 N.E.2d 832, 834 (Mass. 1994) (quoting

Restatement (Second) of Conflict of Laws § 145 (1971)).

Section 145 of the Restatement (Second) of Conflict of Laws "provides the general

principle 'applicable to all torts and to all issues in tort." *Id.* The Restatement factors include

"where the injury occurred," "the place where the conduct causing the injury occurred," and

where the parties' relationship is centered, Restatement (Second) of Conflict of Laws, § 145.[7] As

---

[7] Section 145 of the Restatement states that:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined
> by the local law of the state which, with respect to that issue, has the most significant
> relationship to the occurrence and the parties under the principles stated in § 6.

noted in Restatement (Second) of Conflict of Laws § 145, the Court also must consider the

"choice influencing factors" found in Section 6 of the Restatement (Second) of Conflict of Laws

when analyzing a choice-of-law issue. *See Cosme*, 632 N.E.2d at 835 n.6. Section 6(2) provides

that the "factors relevant to the choice of the applicable rule of law include (a) the needs of the

interstate and international systems, (b) the relevant policies of the forum, (c) the relevant

policies of other interested states and the relative interests of those states in the determination of

the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying

the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the

determination and application of the law to be applied." *St. Paul Fire & Marine Ins. Co. v. Birch,*

*Stewart, Kolasch & Birch, LLP*, 233 F. Supp. 2d 171, 176–77 (D. Mass. 2002) (quoting

Restatement (Second) of Conflict of Laws § 6(2)).

In this case, although the "domicil, residence, nationality, place of incorporation and

place of business of the parties" factor is split among various jurisdictions, on balance, the

relevant factors under § 145 of the restatement favor application of Massachusetts law as the

relationship between the parties was centered in Massachusetts and the acts alleged in the

---

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145.

Complaint occurred primarily in Massachusetts, where GlassHouse's principal place of business was located. The Marsh representatives responsible for the Policy and Tail procurement were based in Massachusetts, even though Marsh's principal place of business is New York. Wellington is a foreign corporation with a principal place of business in Toronto, Ontario, Canada, which did business in Massachusetts with GlassHouse, pursuant to a credit agreement containing a clause requiring the application of Massachusetts law. Accordingly, tort-based claims in this matter are more appropriately governed by Massachusetts law, which is the jurisdiction with the most significant relationship to the tort claims and the parties involved with respect to those claims.

With respect to the Chapter 93A and related Chapter 176D claims, the parties do not specifically address applicable choice of law and appear to assume that Massachusetts law governs those claims. The Court will, therefore, apply Massachusetts law regarding Count III of the Complaint.[8]

C. **Breach of Contract (Count I)**

---

[8] To the extent the Court is required to reach this this issue, the Court rules that Massachusetts law is the appropriate law to apply to Count III. Generally, the choice-of-law analysis for Chapter 93A claims centers on whether the claim is analogous to a tort or a contract claim, *see Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 11 (1st Cir. 1994) ("hold[ing] that, at minimum, when a chapter 93A claim and the requested remedy are highly analogous to a tort claim and remedy, the chapter 93A claim should be considered as a tort for choice-of-law purposes."); *Northeast Data Sys., Inc. v. McDonnell Douglas Comput. Sys. Co.*, 986 F.2d 607, 609 (1st Cir. 1993) (determining that a Chapter 93A claim may trigger a contractual conflicts analysis where it is essentially an "embroidered" contract claim), and whether the actionable conduct took place "primarily and substantially" in Massachusetts, *see Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 669 (S.D.N.Y. 2012) (applying Massachusetts law). The conduct which the Plaintiffs allege violates Chapter 93A, and by extension Chapter 176D, is a mix of tort and contract claims, which sounds more in tort than contract, and the relationship between the parties and the acts alleged in the Complaint occurred primarily in Massachusetts. As such, similar to the negligence claim, the Court would find that Massachusetts has a "substantial relationship" to the transaction and a materially greater interest than New York with respect to a tort claim and, therefore, Massachusetts law appropriately applies.

The Plaintiffs allege that Marsh breached the Engagement Agreement by:

(a) reducing the Policy coverage limits without authorization; and

(b) failing to

> (1) advise GlassHouse or Wellington that binding the Tail would affect the $15 million limits of liability for claims asserted between April 11, 2014 and the Initial Policy End Date;

> (2) use best efforts to place insurance for GlassHouse, after GlassHouse authorized Marsh to bind certain coverage for it;

> (3) assist GlassHouse in assessing its risks and in developing insurance specifications which Marsh would submit to insurers;

> (4) assist GlassHouse in evaluating the options received from insurers;

> (5) deliver confirmation of coverage once it was placed;

> (6) review policies and endorsements for conformity with the agreed upon coverage;

> (7) provide coverage summaries;

> (8) evaluate coverage applicability on Marsh placed business.

Compl. ¶ 120. The Plaintiffs further allege that Marsh violated the covenant of good faith and fair dealing inherent in the contract by procuring the Tail coverage in a manner that reduced, rather than enhanced, coverage available under the Policy. *Id.* at ¶ 121.

The Plaintiffs also argue Wellington is entitled to recover for breach of contract against Marsh as a third party beneficiary because the unauthorized reduction in liability coverage by Marsh damaged both the insured party, GlassHouse, and the intended beneficiaries, the Trustee and Wellington, by: (i) frustrating their efforts to settle their claims against the Directors and Officers for a significantly greater recovery and forcing them to file suit against AIG to obtain redress because of its refusal to honor the original $15 million Policy limit; (ii) diminishing the value of the Estate's potential claims against the Directors and Officers; and (iii) reducing the available Side B(i) coverage for the claims against the Debtor in the bankruptcy. Further, the

Plaintiffs argue that Marsh's actions resulted in a reduction of the value of Wellington's collateral. The Plaintiffs assert that, if Marsh hadn't acted to bind the Tail, the Plaintiffs would have had the benefit of an additional $10 million of coverage to satisfy claims against the Insureds filed by Wellington and the Estate.

Marsh argues that the breach of contract claim fails because the Complaint lacks factual allegations to support that Wellington is a "third-party beneficiary" entitled to bring direct claims against Marsh under either the Engagement Agreement or Policy because Wellington is a "complete stranger to both." Def. Br. 1. It is undisputed that Wellington is not a named party to the Engagement Agreement. Additionally, Marsh asserts that Wellington is neither a named additional insured nor named beneficiary of the Policy and that there is no language in the contract or other circumstances alleged relative to the history between the parties that would support an inference that Wellington was an intended third-party beneficiary of the Engagement Agreement or the Policy.

Marsh claims that the Trustee and Wellington, to the extent Wellington could establish that it was a third party beneficiary entitled to enforce the Engagement Agreement, also have failed to plead plausible claims for breach of contract and negligence because there are insufficient allegations that Marsh's conduct in reducing the Policy coverage for claims asserted between April 11, 2014 and the Initial Policy End Date caused damage to either the Debtor or Wellington. Marsh asserts that the Estate and Wellington alleged only that they possessed potential (now settled) claims against insureds under the Policy and that is not enough to set forth a facially plausible claim. Instead, Marsh contends the Trustee must have pleaded facts demonstrating that there was a claim by the Debtor against its Directors and Officers that resulted in a "Loss" on the part of the Directors and Officers for which AIG denied coverage

above $5 million, because of the reduction in the Policy's limits. Marsh states that, without such

damages allegations, the breach of contract (and negligence) claims must fail. Marsh asserts that,

at the time of the filing of the Complaint, any claims against the Directors and Officers are either

time barred or the subject of releases given by Wellington and the Trustee on behalf of the Estate

in the Settlement. Further, Marsh argues that the Trustee's related damages theory attempting to

link Marsh's conduct to a diminution in the Debtor's indemnification rights under the Policy's

Side B coverage similarly must fail, because the Complaint does not allege a specific payment by

GlassHouse to a third-party claimant or to the Directors and Officers for which GlassHouse has

not been indemnified.

As discussed in the choice of law analysis, *supra*, the elements of a breach of contract

claim under New York law are: "(1) a contract; (2) performance of the contract by one party; (3)

breach by the other party; and (4) damages." *First Inv'rs Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d

162, 168 (2d Cir. 1998).[9]  In order to recover for breach of contract as a third party beneficiary,

the alleged beneficiary must demonstrate that the parties to the contract intended to confer a

benefit on it. *See Subaru Distrib. Corp.*, 425 F.3d at 124. The Court of Appeals for the Second

Circuit has recognized that the Restatement (Second) of Contracts has been adopted by New

York courts as being a correct statement of New York law regarding whether a third party is an

intended (as opposed to incidental) beneficiary of a contract. *Id.* ("The New York Court of

---

[9] In addition to their breach of contract claims, the Plaintiffs have alleged breach of the implied covenant of good faith and fair dealing as a component of the breach of contract claim. Under New York law, "implicit in every contract is a promise of good faith and fair dealing which is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreements." *See Skillgames, LLC v. Brody*, 767 N.Y.S.2d 418, 423 (N.Y. App. Div. 2003). As the breach of the implied covenant claim is premised on the same set of facts as those underlying a claim for breach of contract, such claim rises and falls with the breach of contract claim in this matter.

Appeals has adopted Restatement (2d) of Contracts § 302 as an accurate statement of New York

third-party-beneficiary law.") (citations omitted). Section 302 of the restatement defines an

"intended beneficiary" as follows:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a
> promise is an intended beneficiary if recognition of a right to performance in the
> beneficiary is appropriate to effectuate the intention of the parties and either (a) the
> performance of the promise will satisfy an obligation of the promisee to pay money
> to the beneficiary; or (b) the circumstances indicate that the promisee intends to
> give the beneficiary the benefit of the promised performance. (2) An incidental
> beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302; *see also Trans–Orient Marine Corp.*, 925 F.2d at 573

(concluding that "[a]n intended third party beneficiary will be found when it is appropriate to

recognize a right to performance in the third party and the circumstances indicate that the

promisee intends to give the third party the benefit of the promised performance."). Further,

under the test outlined in the Restatement (Second) of Contracts and followed by New York

courts, a plaintiff claiming third party beneficiary status must allege: "(1) the existence of a valid

and binding contract between other parties, (2) that the contract was intended for his benefit and

(3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the

assumption by the contracting parties of a duty to compensate him if the benefit is lost." *Fishbein*

*v. Miranda*, 670 F. Supp. 2d 264, 274 (S.D.N.Y. 2009), *aff'd sub nom. Silverman v. Teamsters*

*Local 210 Affiliated Health & Ins. Fund*, 761 F.3d 277 (2d Cir. 2014).

When recognizing a third party's right to enforce a contract, New York courts look to

whether "no one other than the third party can recover if the promisor breaches the contract or

that the language of the contract otherwise clearly evidences an intent to permit enforcement by

the third party, as by fixing the rate or price at which the third party can obtain services or goods,

even though there was no duty of the promisee to the third party." *Fourth Ocean Putnam Corp.*,

485 N.E.2d at 212 (internal citations omitted). If there is no clear intent evidenced in the

language of the contract, "[t]here is considerable dispute concerning whether it is appropriate to

consider extrinsic evidence" regarding third-party beneficiary status. *Piccoli A/S v. Calvin Klein

Jeanswear Co.*, 19 F. Supp. 2d 157, 164, n.41 (S.D.N.Y. 1998) (citations omitted); *compare

Subaru Distribs. Corp.*, 425 F.3d at 124 (quoting Restatement (2d) of Contracts § 302, Reporter's

Note, comment a, and stating that "'[a] court in determining the parties' intention should

consider the circumstances surrounding the transaction as well as the actual language of the

contract.'") *with Synovus Bank*, 487 F. Supp. 2d at 368 (stating that "New York law requires that

the parties' intent to benefit a third-party be shown on the face of the contract."). Recognizing

the dispute, coupled with the fact that "it is well-settled that the obligation to perform to the

third-party beneficiary need not be expressly stated in the contract," *Trans–Orient Marine Corp.*,

925 F.2d at 573 and the restatement's express language, the Court will carefully consider

whether allegations proffered regarding surrounding circumstances could support a plausibly

pleaded third party beneficiary claim in the present case. Here, the parties disagree as to whether

the Plaintiffs have alleged facts sufficient to demonstrate the existence of an enforceable contract

between Marsh and Wellington as a third party beneficiary or whether the Plaintiffs were

damaged by Marsh's conduct, and neither party has cited case law in support of their respective

positions that specifically align with the facts of this case.

### 1. *Wellington's Third Party Beneficiary Breach of Contract Claim*

#### a. At the Limit of Reasonably Drawn Inferences, Wellington's Allegations are Sufficient to Survive a Motion to Dismiss Regarding Its Third Party Beneficiary Claim

There is no contention that Wellington is the only party that could recover from the

agreement, so the question is whether the language and circumstances of the contract "otherwise

clearly evidences an intent to permit enforcement by the third party, . . . even though there was

no duty of the promisee to the third party." *Fourth Ocean Putnam Corp.*, 485 N.E.2d at 212.

The intent of the contracting parties is the central inquiry in determining whether a nonparty may maintain an action as a third-party beneficiary. *See, e.g., Katz v. Pershing, LLC*, 672 F.3d 64, 73 (1st Cir. 2012) (applying New York law and stating that the contracting parties intent to benefit the third party is an "immutable requirement" of that jurisdiction's law regarding whether a party is a third-party beneficiary). Moreover, it is the promisee's expressed intent which determines whether the beneficiary is entitled to the benefits of the agreement. *Drake v. Drake*, 455 N.Y.S.2d 420, 422 (N.Y. App. Div. 1982) (holding "the intention of the promisee is of primary importance, since the promisee procured the promise by furnishing the consideration therefor.") "To create a third party right to enforce a contract, 'the language of the contract' must 'clearly evidence[ ] an intent to permit enforcement by the third party[.]'" *Consol. Edison, Inc. v. Ne. Utilities*, 426 F.3d 524, 528 (2d Cir. 2005) (quoting *Fourth Ocean Putnam Corp.*, 485 N.E.2d at 212). Many courts interpreting New York law do not look beyond the language of the contract. *See, e.g., Synovus Bank*, 487 F. Supp. 2d at 368 ("While the third-party beneficiary does not have to establish that it is explicitly mentioned in the contract, New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract."); *see also Cauff, Lippman & Co.*, 807 F. Supp. at 1020.

Other courts look beyond the language of the contract in appropriate circumstances. *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 418 (S.D.N.Y. 2010) ("In determining whether there is an intended third party beneficiary, courts should look first at the contractual language itself . . . and where appropriate the surrounding circumstances.") (quotations and citations omitted); *see also Levin v. Tiber Holding Corp.,* 277 F.3d 243, 249 (2d Cir. 2002) ("'Where the terms of the contract necessarily require the promisor to confer a benefit upon a

third person, then the contract contemplates a benefit to that third person, and this is ordinarily

sufficient to justify third-party-beneficiary enforcement of the contract, even though the contract

also works to the advantage of the immediate parties thereto.'") (quoting 22 N.Y. Jur. 2d

Contracts § 304); *Trans-Orient Marine Corp.*, 925 F.2d at 573 (holding that "it is permissible for

the court to look at the surrounding circumstances as well as the agreement" and finding that

party became a third party beneficiary of promise of forbearance "albeit tacitly"). "[W]here a

provision in a contract expressly negates enforcement by third parties, that provision is

controlling." *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 249 (2d Cir. 1988); *see also*

*Mendel v. Henry Phipps Plaza W., Inc.*, 844 N.E.2d 748, 751 (N.Y. 2006) (concluding that

plaintiffs lack standing to bring third party beneficiary action because the agreement at issue

"explicitly negates any intent to permit its enforcement by third parties"). However, where there

is no stated intent one way or another, a contract "does not necessarily preclude proof that

unnamed third-party beneficiaries were intended to be benefited." *Newin Corp. v. Hartford Acc.*

*& Indem. Co.*, 333 N.E.2d 163, 168 (N.Y. 1975) (determining in a case involving indemnity

bonds that the "mere absence in a contract of any provision either excluding or including such

coverage does not necessarily preclude proof that unnamed third-party beneficiaries were

intended to be benefited"); *see also Bayerische Landesbank*, 692 F.3d at 53.

While there is no specific clause in the Engagement Agreement permitting enforcement

by parties damaged by the wrongful conduct of GlassHouse's Directors and Officers, there is

also no clause in the agreement that states that there may be no third party beneficiaries, such

that Wellington is not necessarily precluded from proving that unnamed beneficiaries were

intended to be benefited. *See, e.g., Newin Corp.*, 333 N.E.2d at 168 (noting that on the face of the

pleadings "plaintiffs have sufficiently brought themselves within the class of third party

beneficiaries of the policies, though not named in the bonds") (internal quotations omitted).

"Among the circumstances to be considered is whether manifestation of the intention of the promisor and promisee is sufficient, in a contractual setting, to make reliance by the beneficiary both reasonable and probable." *Fourth Ocean Putnam*, 485 N.E.2d at 212 (quotations omitted).

In cases where New York courts have determined that a third party claimant may assert claims on its own behalf in the context of an insurance broker failing to properly procure insurance, the claimant was known to the insurance agent or there were other circumstances where the intent to benefit the third party was unequivocal. *See Dominion Fin. Corp. v. Asset Indem. Brokerage Corp.*, 874 N.Y.S.2d 115, 116 (N.Y. App. Div. 2009) (holding that a plaintiff in "action against an insurance broker for failure to properly procure insurance . . . alleged facts sufficient to demonstrate that it was an intended beneficiary not only of the surety coverage procured by defendant, in which it was so named, but also of defendant's agreement with its client to procure the surety coverage"); *Multibank, Inc. v. Access Glob. Capital LLC*, No. 650637, 2017 WL 162282, at *9 (N.Y. Sup. Ct. Jan. 9, 2017) (finding that it was "undisputed that [plaintiff] was meant to benefit from the Policy because it is named as an additional insured."); *but see Griffin v. DaVinci Dev., LLC*, 845 N.Y.S.2d 97, 1002-03 (N.Y. App. Div. 2007) (where third-party plaintiff alleged that insurance broker was contracted by third-party defendant to obtain insurance for the third-party plaintiff and such plaintiff was provided certificates of liability insurance, causes of action asserted against insurance broker in a third-party complaint were not sufficiently pleaded because the third party plaintiff was not in privity of contract with the broker and failed to set forth sufficient allegations that there was "fraud, collusion, or other special circumstances" that would have enabled it to recover for its

"pecuniary loss"); *Henry*, 496 N.Y.S.2d at 594 (in the context of failing to procure automobile insurance, finding that broker had no recognized duty to act apart from contract, and the "plaintiff's decedent was neither a party to the contract between the insurance agency and its client nor an intended beneficiary"). In *Dominion Financial Corp.*, the trial court found that the plaintiff had alleged sufficient facts to support its third party beneficiary claim where it was a named beneficiary with respect to the surety coverage procured by the insurance broker. *See Dominion*, 874 N.Y.S.2d at 116. Further, the broker "was aware, from the moment its client contacted it about procuring coverage, that plaintiff was the intended beneficiary of the coverage, and that plaintiff participated on its own behalf in discussions with [the broker] and its client about the coverage to be provided." *Id*.

In this case, Wellington appears to assert that even unknown potential holders of claims against GlassHouse or its Directors and Officers would constitute intended beneficiaries of the agreement between Marsh and GlassHouse that Marsh would procure appropriate coverage for GlassHouse. In support of this proposition, Wellington cites Massachusetts law. Pls. Opp. 22; *see, e.g., Flattery*, 489 N.E.2d at 1262 (applying Massachusetts law and determining in the context of a claim for failure to procure optional insurance coverage that the promisee "achieves . . . protection by entering into a contract the very object of which is the payment, in whole or in part, of judgments against him. The parties to the insurance policy, or, as in this case, to a contract to procure such a policy, intend the injured third-party judgment holder to benefit from their contract."). The Plaintiffs cite no case where New York law has been interpreted to extend third party beneficiary status, generally, to unknown claimants possessing claims that would have been insured under coverage that would have been in place had an insurance broker properly performed its obligations under an agreement to obtain insurance for an insured. New

30

York courts have been reluctant to extend to third parties the right to bring breach of contract claims where those parties have not alleged a clear intent by the contracting parties to benefit a specific party known to the parties and an intention that that party could enforce the contract. *See Henry*, 496 N.Y.S.2d at 594 (applying New York law and concluding that "it has not been the policy of the courts in this state to extend the promisor's responsibility for the breach of a contract to perform professional services to those not parties to the contract"); *see also Ultramares Corp. v. Touche*, 174 N.E. 441, 445 (N.Y. 1931) (limiting liability of accounting professional in the absence of fraud or collusion, solely to the person who contracted for the performance).

Side A coverage under the Policy provides that "[t]his D&O Coverage Section shall pay the Loss of an Individual Insured of the Company arising from a Claim made against such Individual Insured for any Wrongful Act of such Individual Insureds." Ex. 2, D&O Coverage Section, ¶ 1; *see also* Compl. ¶ 33. The language of the Policy makes clear that the Policy was intended to benefit the Company and its Directors and Officers by providing defense and indemnification (to the extent of policy limits as reduced by defense costs) from and against the claims of third parties.[10]

---

[10]  Courts have not viewed D&O insurance policies as primarily benefiting injured third-parties, although indemnification is a component of the coverage. *See Ochs v. Lipson (In re First Cent. Fin. Corp.)*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999). In *In re First Central Financial Corp.*, the bankruptcy court stated for purposes of determining whether a D&O policy is estate property, that:

> D&O policies are obtained for the protection of individual directors and officers. Indemnification coverage does not change this fundamental purpose. There is an important distinction between the individual liability and the reimbursement portions of a D&O policy. The liability portion of the policy provides coverage directly to officers and directors, insuring the individuals from personal loss for claims that are not indemnified by the corporation. Unlike an ordinary liability insurance policy, in which a corporate purchaser obtains primary protection from lawsuits, a corporation does not enjoy direct coverage under a D&O policy. It is insured indirectly for its indemnification obligations.

The Court does not interpret New York law to support a general intent to benefit
unknown claimants in a contract such as the Engagement Agreement and, indeed, the Court
recognizes that "[a]bsent clear contractual language evincing such intent, New York courts have
demonstrated a reluctance to interpret circumstances to construe such an intent," *LaSalle Nat.
Bank v. Ernst & Young LLP*, 729 N.Y.S.2d 671, 676 (N.Y. App. Div. 2001), but in this case the
Plaintiffs have made allegations from which the Court might infer, in examining the surrounding
circumstances, a specific intent by GlassHouse and Marsh to benefit Wellington in connection
with the services to be provided by Marsh in obtaining the Tail even though neither the
Engagement Agreement nor the Policy mentions Wellington and Wellington alleges no
involvement in the drafting or negotiating of either document or the procurement of the Tail.

The Plaintiffs have alleged that Wellington and its potential claims became known to
Marsh at the time that Glasshouse sought Marsh's services in connection with the Tail purchase
because GlassHouse's Directors and Officers sought assurances from Marsh "that their insurance
coverage would be sufficient to pay outstanding creditors," including Wellington, because the
company was "near collapse," Compl. ¶¶ 56–57. At the time of seeking Marsh's guidance
regarding coverage, GlassHouse understood Wellington would be suing it. *Id*. Additionally, at
the time of GlassHouse's purchase of the Tail, GlassHouse informed Marsh that Wellington was
in control of GlassHouse and had commenced secured party asset sales. This specific knowledge
is alleged to be confirmed by an e-mail dated April 11, 2014, the same date the Tail was bound,
in which an employee of Marsh states that an officer of GlassHouse confirmed that Wellington

---

In essence and at its core, a D&O policy remains a safeguard of officer and director
interests and not a vehicle for corporate protection.

*Id*.

"now owned" a majority of GlassHouse "in phased sell off (not done yet but by division)."

Compl. ¶ 52, Ex. 4. The Engagement Agreement was intended to govern the relationship of the

parties with respect to services provided both at the time of execution of that agreement and in

the future. The knowledge and intent of the parties at the time of later transactions, such as in

procuring the Tail, may have been different than when an original services agreement was

executed.

Drawing all reasonable inferences in Wellington's favor, even those at the limits of

reasonableness, the allegations are just enough at this stage of the case to state a third-party

beneficiary claim.[11] Wellington's allegations that, at the time that GlassHouse sought advice

from Marsh, GlassHouse was "near collapse" and "understood that it was likely to be sued by

Wellington," and that its Directors and Officers were acting to "ensure that [Glasshouse's]

insurance coverage would be sufficient to pay outstanding creditors (including Wellington),"

Compl. ¶¶ 56–57, nudge Wellington's third party beneficiary claim "across the line from

conceivable to plausible." *Twombly*, 550 U.S. at 569. The Complaint states barely sufficient

allegations to support a plausible claim that Wellington, as a potential holder of claims against

Glasshouse and its Directors and Officers that was preparing to sue those parties at a time where

the company was "near collapse," was known to Marsh because Wellington's claims and

---

[11] Further, even, as Marsh asserts, despite any purported dispute as to application of New York and Massachusetts law, "'Massachusetts law . . . like New York law comports with the third party beneficiary rules in Restatement (Second) of Contracts § 302,'" Def. Br. 9 n.9 (quoting *Palmer/Kane LLC v. Houghton Mifflin Harcourt Publ'g Co.*, No. 13-11030-GAO, 2014 WL 183774, at *2 (D. Mass. Jan. 16, 2014)), the Court would reach the same conclusion under Massachusetts law. *Flattery*, 489 N.E.2d at 1262 (applying Restatement (Second) of Contracts principles and analyzing "whether the contracting parties intend the injured party to be a beneficiary of their contract," concluding that injured third-party judgment holder was an intended beneficiary of the alleged contract to procure insurance because the plaintiff was intended to benefit from the contract.

GlassHouse's financial difficulties and exposure to the Wellington claims were the reason why

Glasshouse sought Marsh's services at that time.[12] Thus, the Court can reasonably infer from

those allegations that Glasshouse and Marsh intended Wellington to be a beneficiary of Marsh's

services to procure the Tail and maximize coverage under the circumstances, even if those

allegations and the inferences drawn are "doubtful in fact." *Twombly*, 550 U.S. at 569. While

Wellington's claim may not survive a summary judgment motion absent evidence that supports

the broad inferences taken with respect to its allegations, Wellington has stated a plausible claim

as to which it should be entitled to seek discovery and have determined on the merits. *See*

*Twombly*, 550 U.S. at 556 ("[a]sking for plausible grounds to infer an agreement does not impose

a probability requirement at the pleading stage; it simply calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence" in support of a claim). While

presenting a very close call, the request to dismiss Count I as to Wellington as a third party

beneficiary will be denied for the reasons stated above.

---

[12] The same cannot be said with respect to Wellington's other alternative bases for third-party beneficiary standing regarding its secured creditor status and its status as a party in control of GlassHouse because the damages to a controlling shareholder or other controlling party that could be alleged to have arisen from a breach of contract by Marsh are indirect and no different than the damages that are alleged to have been incurred by the Estate, which are the subject of the Trustee's breach of contract claims that have been assigned to Wellington for prosecution.

Similarly, Wellington's bare allegations that Marsh was aware of its secured creditor status do not, alone, support a plausible claim that Wellington may recover as a third party beneficiary on a breach of contract claim based on its secured status because New York courts require a more direct connection. *See Dominion*, 874 N.Y.S.2d at 116 (named beneficiary of surety coverage); *Multibank, Inc.*, 2017 WL 162282, at *9 (named additional insured). Wellington's alleged status as secured creditor in relation to the Policy and its proceeds does not provide it with third party beneficiary status or direct standing without more. Even if Wellington possessed a security interest in the Policy or its proceeds and was a third party beneficiary on the basis of that security interest, Wellington's alleged security interest would not have reached payments that would have been made to third parties for "Wrongful Acts" giving rise to "Claims" under the Policy. Wellington's alleged status as a secured creditor with a security interest in assets of GlassHouse under these circumstances could not be the basis for a claim for damages that would be different than those asserted by the Trustee for damages incurred by GlassHouse.

## 2.  *The Estate's Breach of Contract Claim and Plaintiffs' Damages*

With respect to the Estate's breach of contract claim, there is no dispute that the
Complaint contains sufficient allegations to support the first three elements of a breach of
contract claim under New York law, as (1) the Engagement Agreement was a contract; (2)
GlassHouse performed by paying Marsh's commission; and (3) Marsh allegedly breached the
contract by binding the Tail that reduced the Policy coverage limits without authorization, among
other things. Marsh argues, however, that the Estate's claim and Wellington's claim each fail
with respect to the damages element because the Plaintiffs have not pleaded sufficient facts
demonstrating a concrete injury.

The Plaintiffs assert various theories as to how the Estate and Wellington were each
harmed by Marsh's allegedly unauthorized reduction of the D&O Policy limits. First, the
Plaintiffs allege that, even though they pooled their claims pursuant to the Prosecution
Agreement (which pooled claims presumably refer to the claims for which Side A coverage may
have provided indemnification to satisfy claims against the Directors and Officers), they could
not settle such claims for the amount of their damages above $5 million because of the Tail's $5
million liability limit. Compl. ¶¶ 112–13. As a consequence of the liability limit reduction
effected by the Tail procured by Marsh without authorization, Wellington and the Trustee were
forced to file suit against AIG and resolve such claims against the Individual Insureds as part of
their Settlement with AIG. *Id*. at ¶ 114. This damages theory centers on the argument that the
Estate and Wellington could have recovered more than the amount of the Settlement if Marsh
had appropriately placed the tail period coverage as requested by GlassHouse. Additionally, the
Plaintiffs allege that the Debtor "had a right to indemnification from the Policy under Side B
coverage" for the Estate's claims against the Directors and Officers that was diminished by the

reduction in policy limits, and thus that the Trustee could not "make a claim for indemnification of the tens of millions of dollars of viable Claims filed against Glasshouse." *Id.* at ¶ 115.

Marsh asserts that the Plaintiffs are estopped from asserting damages because direct claims held by the Estate were never brought against the Directors and Officers and such claims were released in the context of the Settlement. In sum, no "Insured" under the Policy has any unsatisfied claim for indemnification under the Policy because all claims against them have been settled. As such, Marsh argues that the Plaintiffs cannot allege that any Insured has been damaged as the result of any act or omission of Marsh and the Plaintiffs have not been damaged because they agreed to the Settlement and released all claims.

All reasonable inferences being drawn in the Plaintiffs' favor, the Plaintiffs have pleaded sufficient facts regarding potential damages stemming from Marsh's alleged failure to procure coverage as requested by GlassHouse in binding the Tail coverage in connection with the Estate's and Wellington's Side A claims under the Policy and the "lost recovery" damages related to the Settlement with respect to both Plaintiffs.

As an initial matter, the Settlement of the underlying claims against the insurer "under circumstances in which the merits of the claim for coverage were equivocal did not break the chain of proximate causation with respect to their claim against their broker for failure to procure appropriate coverage." *Bruckmann, Rosser, Sherrill & Co., L.P. v. Marsh USA, Inc.*, 885 N.Y.S.2d 276, 277 (N.Y. App. Div. 2009); *see also Prime All. Grp., Ltd. v. Affiliated FM Ins. Co.*, 72 N.Y.S.3d 138, 138 (N.Y. App. Div. 2018) (concluding that settlement with insurer does not preclude causes of action to recover damages for failure to procure insurance, but determining that damages recovered must necessarily be reduced by the amount of the settlement, in order to avoid a double recovery). "[U]nder New York law, a party who has

36

engaged a person to act as an insurance broker to procure adequate insurance is entitled to

recover damages from the broker [under a breach of contract theory] if the policy obtained does

not cover a loss for which the broker contracted to provide insurance, and the insurance company

refuses to cover the loss." *Hous. Cas. Co. v. Cavan Corp. of NY*, 76 N.Y.S.3d 39, 41 (N.Y. App.

Div. 2018).

The Plaintiffs allege that they were unable to compromise with the Insureds for an

amount closer to their actual damages because AIG would not honor the $15 million limit of

liability under the Policy. The Policy appears on its face to provide coverage for claims that were

asserted by Wellington and clearly contemplates that GlassHouse's bankruptcy estate could have

had claims against an Insured for which there would have been coverage, notwithstanding the

"insured versus insured" provisions of the Policy. Even if the Plaintiffs are precluded from

bringing claims against the Individual Insureds because of releases given in connection with the

Settlement, that does not limit the Plaintiffs' claims against Marsh for breach of contract to

recover "lost recovery" damages. *See, e.g., Coastal Power Int'l, Ltd. v. Transcon. Capital Corp.*,

10 F. Supp. 2d 345, 364 (S.D.N.Y. 1998) (internal quotations and citations omitted), *aff'd*, 182

F.3d 163 (2d Cir. 1999) ("If the fact of damage is established, the nonbreaching party may

recover general damages[,] which are the natural and probable consequence of the breach[,] as

well as special or consequential damages—damages which arise from special circumstances that

make them probable, although they would be unusual apart from such circumstances.").

Settlement of the Plaintiff's claims against the Directors and Officers and AIG does not

preclude damages that may be asserted against Marsh.[13] *See, e.g., Prime All. Grp.*, 72 N.Y.S.3d

---

[13] Other settlement structures may have been attempted to achieve the same result. For example, the
Directors and Officers may have agreed to judgments in amounts exceeding available coverage, but
limited recovery for amounts in excess of the settlement amount with AIG to amounts recovered from

at 138; *Bruckmann*, 885 N.Y.S.2d at 277. While the Court recognizes that there is some risk to

Marsh that litigating the underlying D&O claims in a subsequent suit seeking to recover "lost

recovery" damages after the Directors and Officers have obtained releases may affect the defense

of that case and that the Directors and Officers will be subject to the burdens of discovery and

trial after settling with the Plaintiffs, there are risks to both sides in the "trial within a trial"

construct. *See Estate of Re v. Kornstein Veisz & Wexler*, 958 F. Supp. 907, 920 (S.D.N.Y. 1997)

(to prevail on a professional malpractice theory, a party must demonstrate not only negligence,

but that the party would have prevailed in the absence of counsel's negligence); *Alva v. Hurley,

Fox, Selig, Caprari & Kelleher*, 593 N.Y.S.2d 728, 732 (N.Y. Sup. Ct. 1993) (finding that the

"trial within a trial" approach to legal malpractice cases does not limit the proof malpractice

defendants may offer in mitigation of plaintiff's damages, cutting against potential prejudice).

      Lost recovery damages have been recognized in tort cases, such as malpractice actions

against professionals. *See, e.g., Estate of Re*, 958 F. Supp. at 920 (holding that, under New York

law, "[t]o prevail in a claim of legal malpractice, plaintiffs must establish: (1) the existence of an

attorney-client relationship; (2) negligence on the part of the attorney or some other conduct in

breach of that relationship; (3) that the attorney's conduct was the proximate cause of injury to

the plaintiff; and (4) that but for the alleged malpractice the plaintiff would have been successful

in the underlying action.") (quotations omitted). In order to prevail on a malpractice damages

theory, a party must demonstrate not only the professional's negligence, but that the party would

have prevailed in the absence of counsel's negligence. *See id*.; *see also Alva,* 593 N.Y.S.2d at

732.

      While the actual amount of any claim against the Directors and Officers has not been

---

assigned claims against Marsh.

definitively established, the Plaintiffs have alleged that the Estate and Wellington each suffered

loss of recovery damages exceeding the amount recovered through the Settlement. The Plaintiffs,

therefore, have pleaded enough at this stage to have the opportunity to discover and present

evidence supporting the elements of their breach of contract claim and the extent to which their

damages exceeded the amounts paid by AIG and would have been covered under Side A of the

Policy. *See, e.g., Hous. Cas. Co.*, 76 N.Y.S.3d at 41. Further, the Estate has alleged that it has a

damages claim against Marsh for commissions paid for services that were not properly rendered.

The Trustee also argues that the reduction in Policy coverage under the Tail diminished

GlassHouse's ability to seek Side B(i) indemnification coverage for proofs of claim totaling $45

million, resulting in damage to the Estate. Compl. ¶¶ 49, 115. However, other than referencing

the claims register generally, there are no specific claims alleged as to which coverage would

have been afforded under Side B to reimburse the Debtor for amounts paid by the Debtor on

account of those claims, other than Wellington's $12 million claim. There is no allegation in the

Complaint from which the Court can reasonably infer that the Trustee or any creditors provided

notice of these potential claims to AIG. Additionally, the releases given as part of the Settlement

are relevant in limiting potential damages arising from a decrease in Side B coverage as no

Director or Officer may now seek indemnification from the Debtor that would have been insured

under Side B and all related proofs of claim have been resolved. Finally, there are no allegations

that any other proof of claim would have been within the coverage provided by the Policy.

Accordingly, the Plaintiffs have not sufficiently alleged damages arising from any breach of

contract relating to any Side B claim.

The allegations in the Complaint with respect to damages sustained by the Plaintiffs other

than arising from a reduction in Side B coverage are sufficient to state a plausible breach of

contract claim as to the Plaintiffs. Accordingly, the Court denies the Motion in part as to Count I

with respect to the breach of contract claim asserted by Plaintiffs to recover "lost recovery

damages" and refund of commission alleged to have resulted from the reduction of policy limits

with respect to Side A coverage under the Policy.

### D.  **Negligence (Count II)**

Marsh contends the Plaintiffs cannot maintain a cause of action for negligence because (i)

it did not owe Wellington a duty of care, and (ii) the Plaintiffs have not pleaded plausible

damages claims because (a) there are insufficient allegations that Marsh's actions in reducing the

Policy coverage for claims asserted between April 11, 2014 and the Initial Policy End Date, for

conduct prior to April 11, 2014, caused the Plaintiffs damage and (b) the Plaintiffs are estopped

from asserting additional damages against Marsh after entering into the Settlement, pursuant to

which the Plaintiffs settled all claims that could have resulted in damages that could have been

causally connected to acts or omissions of Marsh. Marsh further asserts that the allegation that

the Plaintiffs possessed a potential claim against insureds under the Policy is not enough to set

forth a facially plausible claim, stating that, without allegations of specific harm that there had

been an asserted claim against GlassHouse's Directors and Officers which resulted in a "Loss"

for which AIG denied coverage in excess of the modified $5 million coverage limits, the

negligence claims must fail. Further, Marsh argues that the Trustee's related damage theory

attempting to link Marsh's conduct to a diminution in GlassHouse's indemnification rights under

the Policy's Side B coverage similarly must fail, because the Complaint does not allege a

payment by GlassHouse to a third-party claimant or to the Directors and Officers that has not

been reimbursed.

The Plaintiffs submit that (i) Marsh owed GlassHouse a duty to act with reasonable care

and diligence in advising it with respect to procurement of coverage and obtaining coverage consistent with the instructions given by GlassHouse and (ii) Marsh owed Wellington the same duty as an intended, foreseeable third party beneficiary of the Engagement Agreement and the Policy and because of Wellington's position as a potential plaintiff and as a secured party with respect to collateral that included the insurance policy. Applying Massachusetts law, the Plaintiffs have alleged sufficient facts supporting a plausible negligence claim by the Estate, but not as to Wellington.

Negligence requires both the existence of negligence (duty and breach) and harm causally connected to the negligent conduct. *See Cannon v. Sears, Roebuck and Co.*, 374 N.E.2d 582, 584 (Mass. 1978) (holding that "[a] negligence action may not be maintained unless one has suffered injury or damage"). In order to prevail on a negligence claim, "the plaintiffs must show that the defendants owed them a duty of care." *Spinner v. Nutt*, 631 N.E.2d 542, 552 (Mass. 1994); *Flattery*, 489 N.E.2d at 1259 (determining that defendant insurance agent liable to third-party injured driver for promise to obtain optional liability coverage "only if [the agent] violated a duty to the plaintiff imposed by law"). The "well settled rule (is) that an insurance agent or broker who, with a view to compensation for his services, undertakes to procure insurance for another, and through his fault and neglect fails to do so, will be held liable for any damage resulting therefrom[.]" *Rae*, 435 N.E.2d at 631 (internal quotations omitted). Further, under appropriate circumstances, "a claim in tort may arise from a contractual relationship and may be available to persons who are not parties to the contract." *Parent v. Stone & Webster Eng'g Corp.*, 556 N.E.2d 1009, 1012 (Mass. 1990) (allowing injured electrician's negligence claim to proceed against company which installed distribution panel without proper warning label under contract with the plaintiff's employer).

1. *Wellington's Negligence Claim*

a. Foreseeable Reliance and Duty Owed by Marsh

A professional typically does not owe a duty of care to a noncontractual third party.[14]

*See, e.g., Meridian at Windchime, Inc. v. Earth Tech, Inc.*, 960 N.E.2d 344, 350 (Mass. App. Ct.

2012). In order for a duty of care to arise in a negligence claim involving pecuniary loss[15] by a

noncontractual third party, there must be foreseeable reliance on the defendant's services. *See*

*Flattery*, 489 N.E.2d at 1260. More specifically, recovery is "limited to instances where the

defendant knew that the plaintiff would rely on his services." *Id.*; *see also Quigley, Jr. v. Bay*

*State Graphics, Inc.*, 693 N.E.2d 1368, 1372 (Mass. 1998) (absent "foreseeable reliance on the

promised services being performed by someone, we have never held that 'a promisor of services

---

[14] Additionally, "[t]here is no general duty of an insurance agent to ensure that the insurance policies procured by him provide coverage that is adequate for the needs of the insured." *Martinonis v. Utica Nat'l Ins. Grp.,* 840 N.E.2d 994, 996 (Mass. 2006). "Nevertheless, in an action against the agent for negligence, the insured may show that special circumstances prevailed that gave rise to a duty on the part of the agent to ensure that adequate insurance was obtained." *Id.* Similarly, there may be special circumstances which would create a duty on the part of the agent to explain the significance of policy provisions. *See generally id.* at 996–97 (while there may be no general duty to explain the type of insurance involved, insurance agent may be found to have additional duties when specifically questioned by the insured as to the appropriate level of insurance).

[15] Massachusetts law distinguishes the duty owed by a professional to a third party for personal injuries from that owed to such a third party for pecuniary loss. *See, e.g., Nycal Corp.,* 688 N.E.2d at 1370; *Fleet Nat'l Bank v. Gloucester Corp.,* No. CIV. A. 92-11812, 1994 WL 924308, at *3 (D. Mass. Aug. 8, 1994) (when considering duty of care owed to persons not in privity or parties to contract, Massachusetts courts "routinely distinguish between personal injury cases and cases involving strictly pecuniary loss"). The Plaintiffs' negligence claim falls under the latter category.

Marsh has not asserted that the economic loss doctrine applies and as such the Court has not considered the application of the doctrine and its exceptions. *See, e.g., Passatempo v. McMenimen,* 960 N.E.2d 275, 294 (Mass. 2012) (recognizing that while law restricts liability for negligently caused economic harm generally, there are certain circumstances where courts have carved out exceptions and upheld recovery for economic losses, including where the "pecuniary loss incurred as a result of an actionable misrepresentation") (internal quotations omitted); *Clark v. Rowe,* 701 N.E.2d 624, 626 (Mass. 1998) (concluding that the economic loss rule has not been applied "to claims of negligence by a fiduciary, such as a lawyer"); *Craig v. Everett M. Brooks Co.,* 222 N.E.2d 752, 755 (Mass. 1967) (in case involving a civil engineer, determining that economic losses can be recovered when connected to the negligent performance of professional duties).

may be liable in tort not only to the promisee but also to potential beneficiaries of the promise'");

*Nycal Corp.*, 688 N.E.2d at 1371; *Rae*, 435 N.E.2d at 631 (holding that a third party may recover

"for the negligent furnishing of services to one not a party to the contract where the defendant

knew that the plaintiff would rely on his services"). In such circumstances, "if the plaintiff's

harm was the foreseeable result of [the defendant]'s negligence, the plaintiff has established a

cause of action in negligence." *Rae*, 435 N.E.2d at 632; *but see, e.g., Nycal Corp.*, 688 N.E.2d

1368 (subsequently clarifying *Rae* and holding that "a defendant must have actual knowledge of

a plaintiff's reliance in order to state a claim against it" and categorizing the "issue of an

insurance broker's or agent's negligence in failing to procure an insurance policy for a potential

insured [as a] special category of cases, [in which the Supreme Judicial Court] has followed the

general rule to permit a potential insured to recover in tort for the negligence")*; Flattery*, 489

N.E.2d at 1260 (recognizing foreseeable reliance where promised insurance was mandated by

statute but not recognizing foreseeable reliance where insurance optional); *Couillard v. Pick*, 493

N.E.2d 865, 866 (Mass. 1986) (same).

Applying Massachusetts law, courts have found that a third party may "recover in tort for

the failure of an insurance agent to perform his duty to obtain an insurance policy." *Rae*, 435

N.E.2d at 631 ("Massachusetts law . . . clearly permits a potential insured . . . to recover in tort

for the failure of an insurance agent to perform his duty to obtain an insurance policy"); *see also

Fin. Res. Network, Inc. v. Brown & Brown, Inc.*, 754 F. Supp. 2d 128, 155–156 (D. Mass. 2010)

(concluding that "an insurance broker's failure to procure coverage may support a breach of

contract claim, . . . as well as a negligence claim," but ultimately finding that negligent

misrepresentation and fraud claims at issue were time barred); *Campione v. Wilson*, 661 N.E.2d

658, 661 (Mass. 1996) (overturning dismissal of negligence claims where plaintiffs brought suit

43

in reliance on an assignment and their status as third-party beneficiaries of alleged agreements by

insurance brokers to procure additional optional motor vehicle liability coverage); *Int'l Mobiles*

*Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d 122, 124 (Mass. App. Ct. 1990)

(explaining that "a negligence action may be maintained against an insurance agent or broker

who undertakes to procure an insurance policy and fails to do so"). However, the Supreme

Judicial Court has subsequently narrowed its broad proclamation in *Rae* regarding the ability of

potential third parties to recover in tort for the failure of an insurance agent to procure coverage,

recognizing a distinction as to whether there could be foreseeable reliance where insurance was

optional rather than mandated by statute. *See Flattery*, 489 N.E.2d at 1260; *see also Couillard*,

493 N.E.2d at 866. In *Rae*, the Supreme Judicial Court found that a failure of an agent to procure

workers' compensation insurance for employer was negligent and a breach of contract because

failure to obtain insurance caused damage under a third-party beneficiary theory. *Rae*, 435

N.E.2d at 631. The court stated:

> [I]f the plaintiff's harm was the foreseeable result of [defendant's] negligence, the
> plaintiff has established a cause of action in negligence. [Defendant's] conduct
> would constitute the foreseeable cause of the plaintiff's harm unless it appears
> extraordinary that the conduct should have brought about that harm.

*Id*. at 632. In that case, the worker's compensation insurance that the broker failed to procure

was statutorily compelled and, therefore, such conduct leading to harm that "might well have

been the foreseeable consequence of the defendant's negligent conduct [in failure to procure

workers' compensation insurance]." *Id*.

In *Flattery*, the plaintiff, who had recovered an uncollectible judgment against the owner

of an insured vehicle with which he had collided, attempted to bring a negligence claim against

the owner's insurance agent. The plaintiff's tort theory was that the limits on the owner's

optional insurance coverage were inadequate because the agent negligently failed to recommend

to the owner that he purchase optional coverage. The Supreme Judicial Court emphasized that

"foreseeable expectation and reliance" were required for recovery in tort by a third party

beneficiary and held that, unlike in *Rae*, the insurance agent owed the plaintiff no duty of care

because the plaintiff could not have foreseeably relied on the expectation that the vehicle with

which he collided would have coverage in excess of that mandated by statute. *Flattery*, 489

N.E.2d at 1260. Accordingly, the *Flattery* court concluded that the distinction between the

mandatory, statutorily compelled worker's compensation coverage in *Rae* and the optional

automobile coverage in the case before it was fatal to the plaintiff's tort claim. *See id*. The court

suggested that the defendant would had to have had actual knowledge that the third party

plaintiff would be relying on the professional in order for a duty to arise to that plaintiff. *See id.*;

*see also Nycal Corp.*, 688 N.E.2d 1368 (concluding that "a defendant must have actual

knowledge of a plaintiff's reliance in order to state a claim against it").

Here, the Plaintiffs have asserted that Wellington was known to Marsh because

GlassHouse informed Marsh that Wellington had commenced secured party asset sales and "now

owned" a majority of GlassHouse "in phased sell off (not done yet but by division)." Compl. ¶

52; Ex. 4. The "phased sell off" reference, in particular, suggested a recognition that there was a

liquidation and/or wind up of GlassHouse in process as of that date and that Wellington would

also have an interest in the Tail coverage being bound, not just GlassHouse and its Directors and

Officers. As discussed in relation to Wellington's asserted standing as a third party beneficiary

with respect to the breach of contract claim, the Court can only infer from these allegations that

Marsh may have been aware that Wellington had an interest in GlassHouse and the disposition of

its assets. With respect to Wellington's additional allegations that at the time that GlassHouse

sought Marsh's advice to procure the Tail, Glasshouse "understood that it was likely to be sued

by Wellington," and Glasshouse was acting to "ensure that [its] insurance coverage would be sufficient to pay outstanding creditors (including Wellington)," the Court can reasonably infer only that Wellington had asserted that it possessed claims against the Directors and Officers of which Marsh was aware because GlassHouse intended to obtain the Tail to benefit Wellington with respect to those claims. Compl. ¶¶ 56–57. As explained above, the Court has held that these allegations, with inferences taken at the outer limits of reasonableness in favor of Wellington, support Wellington's third party beneficiary claim for breach of contract.

With respect to the negligence claim, however, the inferences do not do not support a determination of reasonable foreseeable reliance by Wellington. At first blush, dismissal of Wellington's negligence claim may appear to be incongruous when the Court has determined that Wellington has stated a third party beneficiary breach of contract claim. However, to state a claim for negligence, Wellington must have alleged that it reasonably relied on Marsh and that Marsh was or should have been aware of that reliance. There is no allegation that Wellington knew that GlassHouse intended to seek the Tail to benefit Wellington, that Wellington relied on the services to be provided by Marsh, or that Marsh knew that Wellington would be relying on the services to be provided to Glasshouse by Marsh. *See, e.g., Nycal Corp.*, 688 N.E.2d at 1373 (in a case involving alleged negligent representation by accountants to third parties, noncontractual third parties must demonstrate actual knowledge by the professional that potential third parties would rely on its financial report).

Here, no allegation supports an inference that Wellington had any basis to believe that Marsh knew that Wellington was relying on the services that Marsh would provide to Glasshouse as those services may have related to the claims held by Wellington against GlassHouse's Directors and Officers—even if an inference can be drawn supporting the breach of contract

claim that GlassHouse intended to benefit Wellington. In fact, Wellington specifically alleged

that it only learned of the Tail months later, after litigation had commenced. Compl. ¶ 97. Marsh

did not owe Wellington a duty of care because Wellington could not have foreseeably relied on

any specific expectation regarding the existence of D&O coverage and the services to be

provided by Marsh. The negligence claim must fail as to Wellington on that basis and the Court

dismisses Count II as to Wellington.

### 2.   *The Estate's Negligence Claim*

Marsh asserts that the Estate's negligence claim should be dismissed because the

Plaintiffs have failed to allege a plausible claim for damages to the Estate. As discussed in

connection with the breach of contract claim under New York law, the Plaintiffs have alleged

sufficient facts to support a plausible claim to "lost recovery" damages. Those damages appear to

align with the type of redress that courts have found to be appropriate in the context of cases

involving failure to procure adequate insurance coverage and claims of negligence under

Massachusetts law. *See, e.g., Campione*, 661 N.E.2d at 662–63. The Supreme Judicial Court has

found that in Massachusetts an injured third-party plaintiff may recover from an insurance agent

to the extent a plaintiff shows that its damages were greater than the insurance coverage in place

because of the insurance agent's failure to procure adequate coverage. *See id*.

In *Campione*, the court did not address the reasonable reliance element of the negligence

claim dismissed by the trial court, focusing on the damages element. *See id*. at 662. In overruling

the trial court that the insured had not suffered tangible damages that could be assigned to the

plaintiffs in the case because the underlying claims had not been litigated and reduced to

judgment, the court recognized that had the underlying tort claim been tried, and a judgment

entered in excess of the $500,000 coverage limit afforded by the policy, the insured's resulting

negligence claim against the defendant insurance brokers clearly could have been assigned, and

determined that the same result should apply where claims were settled. *See id*. at 663. The court

concluded that an appropriate measure of damages is the amount that a plaintiff could have

obtained if the insurance agent had not failed to procure appropriate coverage, notwithstanding

the settlement with the insurance carrier. *See id*. To recover against the defendants, however, "in

addition to proving the essential elements of their negligence claim against them, the plaintiffs

would have to establish [the insured party's] fault for the accident . . . and they must prove the

extent to which their damages exceeded the coverage afforded [under the Policy]." *See id*.

Under a "lost recovery" damage theory in the negligence context, the fact that the Estate

settled its claims against the Directors and Officers and AIG does not limit the damages that may

be asserted against Marsh. *See Campione*, 661 N.E.2d at 662–63. Settlements are to be

encouraged and should not leave an insured without recourse against a negligent broker or permit

a negligent broker to leverage settlement of possible claims against it by interjecting those claims

in litigation of underlying claims against the officers and directors and insurers. *See id*.

("acknowledging sensible policy of promoting settlement in appropriate circumstances")

(internal citations omitted). Of course, by electing to settle for an amount for which coverage

was provided under the Policy, the Plaintiffs take on a significant burden of proving the

underlying claims against the Directors and Officers and an amount of "lost recovery" damages.

*See id*. (concluding that "[p]lacing with the plaintiffs the responsibility of proving their assigned

claims in full reduces the risk of collusion, and justifies giving effect to the assignment of the

negligence claims."). As discussed in relation to the contract claims, *supra,* the Court recognizes

that there are risks and burdens associated with a "trial within a trial" necessary to prove lost

recovery damages. Analogizing by reference to malpractice cases in which counsel is alleged to

have failed to provide competent legal services, a plaintiff who claims that his attorney was negligent in the prosecution of a claim will prevail only if she proves by a preponderance of the evidence that she would have obtained a better result had the attorney exercised adequate skill and care. Conducting a trial within a trial is the traditional approach to resolution of professional malpractice claims. *See, e.g., Fishman v. Brooks*, 487 N.E.2d 1377, 1380 (Mass. 1986). Thus, negligence would first need to be established and then the question of whether the plaintiff, if appropriately represented, would have recovered more would need to be determined. *See id*.; *see also St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp. 2d 183, 202 (D. Mass. 2005) (stating that "[o]nce the plaintiff has established negligence, the causation issue is decided by conducting a trial within a trial.") (internal quotations and citations omitted).

The difficulty of a trial within a trial construct and considerations related to involvement of parties that have already obtained releases do not override recognition of a remedy for plaintiffs damaged by the act or omission of an insurance broker and the considerations favoring settlement of underlying liability cases. *See Campione*, 661 N.E.2d at 662–63. In addition to the lost recovery damages, the Estate has alleged that it has also incurred damages in its pursuit of its claims against both AIG and Marsh because AIG would not settle the pooled claims of the Plaintiffs for an amount consistent with the asserted damages, and, therefore, the Plaintiffs have suffered a tangible harm. Compl. ¶¶ 113–14.

The Plaintiffs having alleged facts sufficient to state a plausible claim as to the Estate for negligence under Massachusetts law, the Court denies the motion to dismiss with respect to Count II as to the Estate.

### E.  <u>Violation of Chapter 93A (Count III)</u>

The Plaintiffs allege that Marsh committed "unfair and deceptive act[s] or practice[s]" in violation of Chapter 93A in procuring the Tail by (i) knowingly and without authority eliminating some $10 million in coverage under the Policy, which constituted Wellington's "collateral," (ii) failing to inform GlassHouse about the change and (iii) making false, misleading representations about the original Policy limits remaining unaltered for claims asserted between April 11, 2014 and the Initial Policy End Date.

Marsh argues that the Court must dismiss the Chapter 93A claim because it is derivative of the breach of contract and negligence claims, which are defective, such that the 93A claim must also fail, citing *Pimental v. Wachovia Mortg. Corp.*, 411 F. Supp. 2d 32, 40 (D. Mass. 2006) ("Since [plaintiff] has failed to allege sustainable breach of contract or negligence claims, and the Chapter 93A claim is based upon the previous two claims, there is no basis for finding [defendant] liable under Chapter 93A.") and *Bose Corp. v. Ejaz*, No. 11-10629-DJC, 2011 WL 5402634, at *5 (D. Mass. Nov. 7, 2011). Moreover, even if the Chapter 93A claim could stand independently, Marsh further contends that the Plaintiffs' allegations do not give rise to a Chapter 93A violation because they consist of "garden variety" allegations of negligent miscommunications that resulted in a purchase of insurance coverage that purportedly deviated from GlassHouse's coverage expectations. Marsh submits that, without additional allegations that Marsh deceived GlassHouse or advanced its interests at GlassHouse's expense, the Chapter 93A claim fails as a matter of law on that basis as well. Additionally, Marsh alleges that Wellington did not have a "business relationship" with Marsh that would give rise to an actionable Chapter 93A claim. The Plaintiffs argue that Wellington would only need to demonstrate that the parties were acting in a "business context" to survive dismissal of this count.

Further, Marsh argues that violations of 940 Mass. Code Regs. §§ 3.05(1) and 3.16

alleged by the Plaintiffs do not apply with respect to commercial claims under Chapter 93A and

that Chapter 176D, to the extent it is applicable, does not provide an independent cause of action

against Marsh because the statute is relevant to insurance applications, which Marsh asserts are

not at issue in this matter.

Section 11 of Chapter 93A states in relevant part that: "[a]ny person who engages in the

conduct of any trade or commerce and who suffers any loss of money or property, real or

personal, as a result of the use or employment by another person who engages in any trade or

commerce of an unfair method of competition or an unfair or deceptive act or practice . . . may . .

. bring an action . . . for damages and such equitable relief . . . as the court deems to be necessary

and proper." Mass. Gen. Laws ch. 93A, § 11. An analysis of Chapter 93A, §§ 2(a) and 11

"requires a dual inquiry: first, the court assesses whether the interaction is commercial in nature,

and second, it evaluates whether the parties were both engaged in trade or commerce, and

therefore acting in a business context." *Linkage Corp. v. Trs. of Bos. Univ.*, 679 N.E.2d 191, 206

(Mass. 1997) (internal quotations omitted). The underlying rationale is that Chapter 93A, § 11 is

"not available to parties in a strictly private transaction, where the undertaking is not in the

ordinary course of a trade or business." *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244,

259 (Mass. 2008) (internal quotations omitted).

To maintain a claim under Chapter 93A, a plaintiff need not establish privity of contract,

"'so long as the parties are engaged in more than a minor or insignificant business relationship.'"

*Giuffrida v. High Country Invr.*, 897 N.E.2d 82, 95 (Mass. App. Ct. 2008) (quoting *Standard*

*Register Co. v. Bolton–Emerson, Inc.*, 649 N.E.2d 791, 795 (Mass. App. Ct. 1995)); *see also*

*Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1078 (Mass. App. Ct. 2003)). In

examining whether parties were engaged in "trade or commerce," and therefore acting in a "business context," courts assess "the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties . . . . Other relevant factors are whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons . . . , and whether the participant played an active part in the transaction." *Begelfer v. Najarian*, 409 N.E.2d 167, 176 (Mass. 1980); *see also Milliken*, 887 N.E.2d at 260 (applying the *Begelfer* "business context" test in considering whether the parties were engaged in "trade or commerce" with each other such that the acts or practices complained of occurred in a "business context"). "In general, no commercial relationship exists where the parties only contact occurs in the context of litigation." *John Beaudette, Inc. v. Sentry Ins. A Mut. Co.*, 94 F. Supp. 2d 77, 121 (D. Mass. 1999). The "commercial transaction requirement likewise excludes from its reach 'intra-enterprise' or strictly private transactions between parties in the same venture." *Id.* (citing *Linkage Corp.*, 679 N.E.2d at 207 n.33).

If a sufficient relationship is established, a plaintiff also must establish that the conduct at issue is unfair under the statute. It is well established that "'a practice or act [is] unfair under G.L. c. 93A, § 2, if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.'" *Morrison v. Toys "R" Us, Inc.*, 806 N.E.2d 388, 392 (Mass. 2004) (quoting *Heller Fin. v. Ins. Co. of N. Am.*, 573 N.E.2d 8 (Mass. 1991)). The First Circuit has held that "[C]hapter 93A is intended exclusively for egregious conduct." *AmeriFirst Bank v. TJX Cos. (In re TJX Cos. Retail Sec. Breach Litig.)*, 564 F.3d 489, 497 (1st Cir. 2009). "Moreover, the SJC has repeatedly held that 'mere negligence,' standing alone, is not sufficient for a violation of ch. 93A—something more is required." *Baker v.*

52

*Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014); *see also Thrivent Fin. for Lutherans v.

Strojny*, 882 F. Supp. 2d 260, 271 (D. Mass. 2012) ("[c]laims brought under Mass. Gen. Laws

ch. 93A . . . require more than allegations of negligence."). However, negligent conduct may be

so extreme or egregious as to constitute a violation of § 11 of Chapter 93A as well and, thus, the

scope of the conduct must be examined. *See, e.g., Marram v. Kobrick Offshore Fund, Ltd.*, 809

N.E.2d 1017, 1032 (Mass. 2004).

While the Court can easily hold that the allegations sufficiently state that GlassHouse was

"engaged in trade or commerce" with Marsh and, therefore, those parties were acting in a

"business context," the facts that are alleged do not sufficiently demonstrate a similar

relationship between Marsh and Wellington. Marsh acted as the Debtor's insurance broker, and

any contact between Wellington and Marsh was indirect and does not demonstrate the necessary

business contacts between the parties to sustain a Chapter 93A claim, even though Wellington

has pleaded a plausible claim that it was intended by GlassHouse to be a third-party beneficiary

of the contractual relationship between GlassHouse and Marsh. *See, e.g.*, *Milliken*, 887 N.E.2d at

260 (holding, even assuming that an unsecured creditor's efforts to obtain payment of its trade

debt was "commercial" in nature, that the creditor's contacts, which consisted of debt

restructuring discussions, were not enough to establish that the parties were engaged in trade or

commerce); *Chestnut Hill Dev. Corp. v. Otis Elevator Co.*, 653 F. Supp. 927, 933 (D. Mass.

1987) (finding there were sufficient allegations made to demonstrate that there was an active,

three-way negotiation over the subcontract at issue and that the plaintiff actively participated in

those negotiations). As such, the Court will dismiss Count III as to the 93A claims asserted by

Wellington on that basis alone.

Additionally, the allegations contained in the Complaint do not demonstrate that Marsh's

conduct was so extreme or egregious as to GlassHouse to constitute a direct violation of Chapter 93A. The Plaintiffs' allegations focus more on the detrimental consequences of Marsh's handling of the Tail procurement rather than conduct that was deceitful and egregious. Neither negligence, *see, e.g., Baker*, 771 F.3d at 51, nor breach of contract alone supports a Chapter 93A claim, *see, e.g., Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996).

The Plaintiffs allege that Marsh's subsequent communications provided "false" assurances to GlassHouse that claims noticed prior to the Initial Policy End Date were subject to the original $15 million cap. Compl. ¶¶ 93–96, 106. The Plaintiffs also assert that "Marsh never suggested to anyone at Glasshouse that the purchase of Discovery Period coverage changed existing Policy limits, never received authorization from Glasshouse to reduce the limits of liability on the existing Policy, and never told anyone at Glasshouse in the immediate aftermath of the purchase that it had agreed with AIG to change the existing limits." *Id*. at ¶ 98. There are no allegations that the communications or actions by Marsh between April 11, 2014 and Initial Policy End Date were intended to damage or deceive GlassHouse. Additionally, the allegations in the Complaint do not permit an interference that supports anything more than typical actions for negligence or breach of contract. Compl. ¶¶ 93–94. Accordingly, unless the Plaintiffs have alleged conduct demonstrating an actionable violation of applicable Massachusetts regulations or Chapter 176D as to GlassHouse, this claim also fails as to the Estate.[16]

The Plaintiffs argue that Marsh's conduct violated 940 Mass. Code Regs. §§ 3.05(1) and 3.16, "among others" in support of its Chapter 93A claim, suggesting that violations of the

---

[16]  With respect to Marsh's position that a Chapter 93A claim that is derivative of breach of contract and negligence claims that are defective must also fail, the Court does not need to reach that argument because, as to the Estate, it has determined that there are sufficient factual allegations to sustain both breach of contract and negligence claims.

Attorney General consumer protection regulations are per se violative of Chapter 93A. Marsh

argues that such violations do not apply to commercial claims under Chapter 93A § 11.

Although Chapter "93A does not define what acts and practices are unfair or deceptive, §

2(c) of c. 93A specifically authorizes the Attorney General to promulgate regulations making

these determinations." *Casavant v. Norwegian Cruise Line, Ltd.*, 919 N.E.2d at 169 (Mass. App.

Ct. 2009). While there are courts that have found that regulations promulgated by the Attorney

General are not applicable to the commercial context because they were enacted prior to the

passage of § 11 of Chapter 93A and/or focus on certain disclosure aspects of the regulations

implemented to provide heightened protection to consumers, *see, e.g., Knapp Shoes, Inc. v.

Sylvania Shoe Mfg. Corp.*, 640 N.E.2d 1101, 1104-05 (Mass. 1994) (holding that provisions of

940 Mass. Code Regs. § 3.08(2) apply to a simple breach of warranty and were not applicable to

the commercial context as the regulation was promulgated prior to the enactment of Chapter

93A, § 11 and "contains no language suggesting that it was meant to apply to a broader class of

persons or interest" than consumers and their interests), *DentalNet, Inc. v. Aquino (In re First

New England Dental Ctrs., Inc.)*, 291 B.R. 229, 241 (D. Mass. 2003) (finding that 940 Mass.

Code Regs. § 3.16(2) was not applicable to the business context following "the sound reasoning

of the Court in *Knapp*" and concluding that "the regulations were not meant to apply to mundane

negotiations between businesses and business people"), other Massachusetts courts, *in dicta*,

have held that such provisions would be applicable in the commercial context or distinguished

regulations requiring the heightened disclosures with those subsections that do not require such

disclosure, *see Lily Transp. Corp. v. Royal Institutional Servs., Inc.*, 832 N.E.2d 666, 673–74

(Mass. App. Ct. 2005) (including 940 CMR § 3.16(2) in string citation for the contention that

"actively misleading" a counterparty in a business transaction can violate ch. 93A); *J.E. Pierce*

*Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*, 365 F. Supp. 2d 119, 145 (D. Mass. 2005) (distinguishing regulations requiring the heightened disclosures in order to protect "consumers who may not be attuned to the harsh practices of the business world" with "title 940, section 3.16(3), [which] subsumes substantive violation of laws and regulations within the definition of what acts or practices violate 93A[,]" and determining subsection could apply to both consumer and business claims because it "does not hold businesses to a higher standard of conduct out of concern for consumers, it holds them to a standard of *lawfulness*."). In considering the applicability of 940 Mass. Code Regs. § 3.16 to commercial relationships under § 11 of Chapter 93A, the First Circuit Court of Appeals applied the rationale of the Supreme Judicial Court in *Knapp* to find no merit to the argument that the Attorney General regulation extended to business to business violations of Chapter 93A, stating that:

> In *Knapp*, the SJC held that 940 Mass. Code Regs. § 3.08(2), providing in relevant part that '[i]t shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty,' applies only to consumer claims under ch. 93A. *Knapp*, 640 N.E.2d at 1104. The court reasoned that the other subsections in § 3.08 "use the term 'consumer' to denote the persons protected by their provisions, and concern matters generally involved in consumer transactions." *Id*. at 1105. Even though subsection (2), by its terms, did not limit its application to consumers, the court found that the context of the statute indicated that it did not apply to business-to-business transactions. *Id*. ("Where the bulk of the regulation applies only to consumers and their interests, and subsection (2) contains no language suggesting that it was meant to apply to a broader class of persons or interests, we conclude that the portion of subsection (2) at issue was not intended to encompass a contract dispute between businessmen based on a breach of ... warranty....").
>
> The same reasoning is applicable here. Two of the four subsections of § 3.16 mention 'consumers' and concern consumer protection issues. Subsection (3) makes an act or practice a violation of ch. 93A if '[i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection.' Subsection (4), in similar fashion, makes an act or practice a violation of ch. 93A if '[i]t violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of [ch.] 93A, § 2.' Thus, just as in *Knapp*, '[i]t is reasonably clear that, in drafting the

regulation, the Attorney General had in mind protection for consumers against unfair or deceptive acts or practices.' 640 N.E.2d at 1105[.]

*Baker*, 771 F.3d at 56. The First Circuit found "no meaningful distinction between § 3.16 and § 3.08 that would counsel against applying *Knapp's* reasoning to the former[, but noting that t]his is ultimately an issue for the SJC to resolve. *Id.* at 56–57; *see also Baker v. Goldman Sachs & Co.*, No. 09-10053-PBS, 2013 WL 4780962, at *4 (D. Mass. Sept. 4, 2013) (stating that even if *Lily* creates some ambiguity in state law, a court sitting in diversity is not supposed to create new law and noting that a leading commentator has concluded that "[t]he reasoning of the *Knapp* case suggests that none of the attorney general's regulations will be applied to Section 11 cases, unless and until the attorney general promulgates regulations dealing specifically with business-to-business disputes") (quoting McHugh, Attorney General Regulations Under Chapter 93A § 1.5, Chapter 93A Rights and Remedies (Mass. Continuing Legal Educ. 2010)). After considering *Knapp* and the reasoning in *Baker*, the Court concludes that there is no reason to differentiate amongst the 940 Mass. Code Regs. § 3.16 regulations and holds that those regulations do not apply to commercial disputes. *See, e.g., Caron v. Farmington Nat'l Bank (In re Caron)*, 82 F.3d 7, 9 (1st Cir. 1996) (holding that a federal court must decide an issue regarding the interpretation of a state law according to its anticipation of how the highest state court would rule); *In re Hildebrandt*, 320 B.R. 40, 44 (B.A.P. 1st Cir. 2005). The same analysis applies to 940 Mass. Code Regs. § 3.05(1), which provides: "[n]o claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect." 940 Mass. Code Regs. § 3.05(1). The Court concludes that the regulation also would not extend to the commercial claims at issue in this

matter.[17]

The Plaintiffs also allege that violations of Chapter 93A are separate violations of Chapter 176D § 3, which covers unfair methods of competition and unfair and deceptive acts and practices in the business of insurance. Compl. ¶ 134; *see also* Mass. Gen. Laws ch. 176D, §3. Generally, "[c]hapter 176D prohibits certain unfair acts by insurers related to the investigation, settlement and payment of claims." *U.S. ex rel. Metric Elec., Inc. v. Enviroserve, Inc.*, 301 F. Supp. 2d 56, 69 (D. Mass. 2003). The Plaintiffs point to Marsh's alleged misrepresentations to GlassHouse regarding the limits of liability for the Policy and the Tail as being in contravention of subsections (9)(a) and (11) of section 3 of Chapter 176D related to unfair claim settlement practices and obtaining a commission, respectively. Compl. ¶ 134. Chapter 176D provides in relevant part as follows with respect to unfair claim settlement practices: "An unfair claim settlement practice shall consist of any of the following acts or omissions: (a) [m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue." Mass. Gen. Laws ch. 176D, § 3(9)(a). Further, regarding misrepresentation in insurance applications, the statute provides that: "making false or fraudulent statements or representations on or relative to an application for an insurance policy, for the purpose of obtaining a fee, commission, money, or

---

[17] *See Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.*, 986 F.2d 605, 605–06 (1st Cir. 1993). In *Abruzzi*, a matter where competitor alleged a violation of Chapter 93A because another company allegedly deceptively called its pasta "fresh" under "Mass. Gen. L. ch. 93A, § 2(a) (forbidding 'unfair or deceptive acts or practices in the conduct of any trade or commerce'), § 11 (permitting civil suits by competitors)," the First Circuit did not specifically address the applicability of the 940 Mass. Code Regs. § 3.05(1) in the business context, but appeared to apply it to the context of competing businesses where there were allegations of false advertising to consumers and affirmed the granting of summary judgment for the defendant because the plaintiff did not set forth specific facts which "would permit a factfinder to conclude that the defendants' use of the word 'fresh,' on its pasta labels and in its pasta advertising, had the 'capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect.'" *Id.* Even if there is a further distinction to be drawn regarding suits amongst competitors regarding the application of 940 Mass. Code Regs. § 3.05, it would still not apply as there are no allegations to support such a claim in this case.

other benefit from any insurers, agent, broker, or individual." *Id*. at § 3(11).

"While Mass. Gen. Laws ch. 93A, § 11, does not in so many words incorporate Mass. Gen. Laws ch. 176D § 3(9), it is established law that a violation of the latter statute may constitute actionable conduct under the former." *FundQuest Inc. v. Travelers Cas. & Sur. Co.*, 715 F. Supp. 2d 202, 211 (D. Mass. 2010); *see also Fed. Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 35 (1st Cir. 2007) (noting that "[t]he Massachusetts Supreme Judicial Court has concluded that a violation of General Laws chapter 176D, § 3, which defines unfair claim settlement practices in the insurance industry, is evidence of an unfair business practice under chapter 93A, § 2, which would give rise to a cause of action under chapter 93A, § 11"). While a plaintiff may allude to conduct that is impermissible under Chapter 176D to maintain a claim under chapter 93A §§ 2 and 11, the inverse is not true and violations of Chapter 93A are not independent violations of Chapter 176D.

Further, even if the Plaintiffs had intended to argue that Marsh's conduct violated Chapter 176D to support their Chapter 93A claim, unlike in the consumer context, violations of Chapter 176D, do not give rise to *per se* liability under Chapter 93A in a commercial relationship because there is no explicit statutory language to that effect in § 11. *See McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 117 (1st Cir. 2014) (concluding that "where the Massachusetts appellate courts have found per se Chapter 93A liability based on a statutory violation, such conclusion, . . . was grounded on explicit statutory language" and that "'[a] consumer asserting a claim under [Chapter] 93A, § 9, may recover for violations of [Chapter] 176D, § 3, cl. 9, without regard to whether the violation was unlawful under [Chapter] 93A, § 2, because of the explicit statement to that effect in [Chapter 93A,] § 9'" (quoting *Polaroid Corp. v. Travelers Indem. Co.*, 610 N.E.2d 912, 917 (Mass. 1993))); *FundQuest*, 715 F. Supp. 2d at 211

n.17 (finding that "[s]ection 11 (unlike section 9) does not create an independent right to recover damages for violations of Mass. Gen. Laws ch. 176D § 3(9), that are not also shown to have been in violation of Mass. Gen. Laws ch. 93A, § 2"); *Ora Catering, Inc. v. Northland Ins. Co.*, 57 F. Supp. 3d 102, 110 (D. Mass. 2014) (finding that "[a] violation of Chapter 176D is *not automatically* a violation of Chapter 93A, § 11, [but] may serve as evidence of unfair conduct that *could* be found to violate Chapter 93A, § 11"); *M. DeMatteo Constr. Co. v. Century Indem. Co.*, 182 F. Supp. 2d 146, 160 (D. Mass. 2001) (explaining that "[section] 11 does not grant an independent right to recover for violations of G.L. c. 176D, § 3, cl. 9") (quotations and citations omitted)). Thus, the violations of Chapter 176D do not give rise to automatic liability under Chapter 93A in a commercial context, but, as previously discussed, may serve as evidence of unfair conduct that could be found to violate Chapter 93A.

With respect to the applicability of Chapter 176D to an insurance broker like Marsh, § 1(a) of the statute defines a "person" as "any individual, corporation, association, . . . any other legal entity or self insurer which is engaged in the business of insurance, including agents, brokers, and adjusters, the Massachusetts Insurers Insolvency Fund and any joint underwriting association established pursuant to law."[18] Mass. Gen. Laws ch. 176D, § 1(a). Although the Supreme Judicial Court has not addressed the applicability of whether a broker is a "person" for all purposes under Chapter 176D, it has examined the applicability of Chapter 93A, § 9 and

---

[18]  Chapter 176D, § 2 states:

> No person shall engage in this commonwealth in any trade practice which is defined in this chapter as, or determined pursuant to section six of this chapter to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.

Mass. Gen. Laws ch. 176D, § 2.

Chapter 176D to a consumer suit against the Massachusetts Insurers Insolvency Fund. *See Wheatley v. Mass. Insurers Insolvency Fund*, 925 N.E.2d 9, 19 (Mass. 2010). The SJC determined that the explicit addition of that entity to the definition of "person" under Chapter 176D demonstrated the legislature's intent to subject the insolvency fund to consumer actions. *See id*. By analogy, the inclusion of "broker" in the definition of "person" evidences legislative intent to make brokers subject to actions under Chapter 176D.

Additionally, even though the unfair claims settlement practices statute is primarily applicable to insurers and their failures in the claim settlement process, at least one court has concluded "that there is no reason to exempt the claims settlement process from the duties for which insurance agents could be found liable, as a result of special circumstances." *Schwartz v. Travelers Indem. Co.*, 740 N.E.2d 1039, 1046 (Mass. App. Ct. 2001). Thus, if there is the potential for imposition of liability on a broker for breach of contract or negligence in obtaining coverage and establishing policy limits, which is the case with respect to the Estate in this matter, the Plaintiffs should be able to provide evidence regarding this Count. The same is true for the misrepresentation in insurance application provision under § 3(11). Accordingly, drawing all favorable inferences for the Plaintiffs, they have pleaded sufficient facts to support a plausible claim by the Estate under Count III under Chapter 93A, when viewed in conjunction with potential violations under Chapter 176D, and the Court denies the Motion with respect to that component of the Count asserted on behalf of the Estate, but grants the Motion with respect to the remainder of Count III.

### III.    CONCLUSION

For all the foregoing reasons, the Court shall enter an order granting in part and denying in part the Defendant's Motion. The Court denies dismissal of Count I as to both Plaintiffs and

Counts II as to the Estate. The Court also denies dismissal of Count III as to the Estate, but only with respect to the Chapter 93A claim asserted in connection to the potential violations under Chapter 176D. The Court grants dismissal of Counts II and III as to the claims asserted by Wellington and Count III as to the remaining Chapter 93A claims asserted by the Estate. A separate order will issue consistent with this decision.

Dated: May 31, 2019                                         By the Court,

_____
Christopher J. Panos
United States Bankruptcy Judge