**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 7 |
| GLASSHOUSE TECHNOLOGIES, INC., | ) | Case No. 14-41352-CJP |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| JONATHAN R. GOLDSMITH, TRUSTEE | ) | |
| IN BANKRUPTCY FOR GLASSHOUSE | ) | |
| TECHNOLOGIES, INC., AND WF FUND | ) | |
| IV LIMITED PARTNERSHIP (c/o/b as | ) | AP No. 17-04022-CJP |
| WELLINGTON FINANCIAL LP, | ) | |
| WELLINGTON FINANCIAL FUND III, | ) | |
| AND WELLINGTON FINANCIAL | ) | |
| FUND IV), | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARSH USA, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

Before the Court is the Motion for Summary Judgment [Dkt. No. 114] (the "Motion")

filed by the defendant, Marsh USA, Inc. ("Marsh" or the "Defendant"), the prepetition insurance

broker of the debtor GlassHouse Technologies, Inc. ("GlassHouse" or the "Debtor").[1]  Pursuant

to Fed. R. Civ. P. 56, as made applicable to this proceeding by Fed. R. Bankr. P. 7056, Marsh

requests that judgment enter in its favor on all remaining counts of the complaint (the

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C.
§§ 101, *et seq.*, as amended (the "Bankruptcy Code").

"Complaint") filed by the plaintiffs, Jonathan R. Goldsmith, the Chapter 7 trustee appointed in

the Debtor's case (the "Trustee"), and WF Fund IV Limited Partnership c/o/b Wellington

Financial LP, Wellington Financial Fund III, and Wellington Financial Fund IV (collectively,

"Wellington," and together with the Trustee, the "Plaintiffs").  In support of its Motion, Marsh

filed a memorandum of law with accompanying exhibits [Dkt. No. 115] (the "Defendant's

Memorandum"), a Statement of Undisputed Material Facts [Dkt. No. 116] (the "Defendant's

Statement"), and the affidavit of Jonathan I. Handler [Dkt. No. 117].  The Plaintiffs filed an

opposition to the Motion, with exhibits [Dkt. No. 121] (the "Plaintiffs' Opposition"), a Statement

of Material Facts and Response to Defendant's Statement of Material Facts [Dkt. No. 122]

("Plaintiffs' Statement"), and the affidavits of David Olsky [Dkt. No. 123], Jonathan Goldsmith

[Dkt. No. 124], Mark McQueen [Dkt. No. 125], and Alex Fooksman [Dkt. No. 126].  Thereafter,

Marsh filed a reply memorandum with further exhibits attached [Dkt. No. 129] ("Defendant's

Reply").  I held a hearing on the Motion and associated pleadings, after which the parties filed

supplemental briefing.

GlassHouse filed a petition for relief under Chapter 7 of the Bankruptcy Code on June 16,

2014 (the "Petition Date").  The Plaintiffs in this adversary proceeding are the Trustee, as the

representative of GlassHouse's bankruptcy estate (the "Estate"), and Wellington, a creditor of

GlassHouse that was assigned the Estate's claims against Marsh, among others, pursuant to a

Settlement and Joint Prosecution Agreement [Dkt. No. 95] (the "Prosecution Agreement").

Under the Prosecution Agreement, which was approved by the Court (Hoffman, J.) with certain

modifications, the Plaintiffs agreed to pool various causes of action against GlassHouse's

directors and officers ("Directors and Officers" or "D&Os"), its insurers, American International

Group, Inc. and certain of its subsidiaries (collectively, "AIG"), and Marsh that Wellington

would prosecute.[2]  The Plaintiffs agreed to divide any recoveries on account of Estate claims and any direct claims possessed by Wellington.  *See* Ord. dated 7/31/2015, 3, ¶ 3 [Dkt. No. 173].

In their Complaint, the Plaintiffs asserted three counts—breach of contract (Count I), negligence (Count II), and violations of Mass. Gen. Laws ch. 93A, §§ 2 and 11 ("Chapter 93A") and ch. 176D, § 3 ("Chapter 176D") (Count III).  The claims in those counts arose from Marsh's alleged acts and omissions in procuring extended discovery period coverage (the "Tail") with respect to GlassHouse's D&O liability insurance policy, which the Plaintiffs contend resulted in an unauthorized reduction of the aggregate liability limit for claims noticed prior to the expiration of the original policy.  Marsh filed a motion to dismiss that I granted in part, dismissing Counts II and III asserted by Wellington, and filed a request for reconsideration that I granted, dismissing Count III as to the Chapter 93A claims asserted by the Trustee.  *See In re GlassHouse Techs, Inc*., 604 B.R. 600, 643 (Bankr. D. Mass. 2019); Ord. dated 5/12/2020 [Dkt. No. 96].  The remaining claims with respect to which Marsh now seeks summary judgment are breach of contract asserted by both the Trustee and Wellington (as a third-party beneficiary) (Count I) and the negligence claims asserted by the Estate (Count II).

For the reasons set forth below, I GRANT the Motion and will enter summary judgment in favor of Marsh on all remaining counts of the Complaint.

## FACTUAL BACKGROUND[3]

### A.    Relationships of the Parties

GlassHouse, which previously provided information technology, infrastructure consulting,

---

[2] *See* Ord. dated 7/31/2015 [Dkt. No. 173].

[3] While I summarize certain background facts here that are not subject to genuine dispute based on the record, I also discuss other material facts in subsequent sections of this decision that are not subject to genuine dispute.

and managed services, retained Marsh to act as its insurance broker for purposes of obtaining a

number of lines of coverage, including D&O insurance.  Pls.' Stmt. p. 28, ¶ 4.[4]  The parties

executed an engagement letter dated April 24, 2013 (the "Engagement Agreement").  Def.'s Ex.

1; Pls.' Stmt. p. 28, ¶ 5.  GlassHouse's primary contacts for communications with Marsh were

Jeffrey Wakely ("Wakely")[5], Chief Financial Officer  ("CFO") of GlassHouse, and Mark

Chiplock ("Chiplock")[6], Vice President of Finance.  The Engagement Agreement does not

contain an express disclaimer of third-party beneficiaries, but does not reference Wellington or

of any class or category of potential third-party beneficiaries.  Def.'s Ex. 1.[7]

Wellington did not take part in either the drafting or negotiation of the Engagement

Agreement and did not become aware of its terms at any time until it filed suit against the

---

[4] Citations to "Def.'s Ex. ___" refer to exhibits attached to the Defendant's Memorandum and references
to the Defendant's Statement shall be identified as "Def.'s Stmt. ¶ ___."  All references to "Pls.' Ex. ___"
refer to exhibits attached to the Plaintiff's Opposition, and references to Plaintiff's Statement shall be
identified as "Pls.' Stmt. ¶ ___."  Where I have designated a page number in the Plaintiffs' Statement
along with a paragraph number, it is in reference to part II of their filing, which is dedicated to responding
to the numbered paragraphs the Defendant's Statement.

[5] Wakely had 30 years of public accounting and corporate finance experience.  9/23/2020 Wakely Dep.,
156:15-25, 7:1-14, 8:6-12.  His responsibilities at Glasshouse included financial reporting and
GlassHouse's insurance program.  10/5/2020 Wakely Dep. (Def.'s Ex. 3), 45:9-13.  Wakely also had
previous responsibilities with respect to insurance programs, including D&O liability insurance ("D&O
insurance"), while working at other companies.  10/5/2020 Wakely Dep., 45:22-46:12; Pls.' Stmt. ¶¶ 1, 2.
Wakely testified that he had no memory of purchasing "tail" coverage for D&O insurance in his prior
positions.  10/5/2020 Wakely Dep., 46:13-21.

[6] Chiplock had 20 years of corporate accounting and finance experience when he joined GlassHouse in
2012.  Def.'s Stmt. ¶ 3; Pls.' Stmt. p. 28, ¶ 3.  His areas of responsibility at GlassHouse included
accounting operations, financial planning and analysis, cash management, and treasury, including the
company's insurance program.  9/3/2020 Chiplock Dep., 11:18-12:24.  At GlassHouse, Chiplock reported
to Wakely.  Id. at 13:5-7.  Chiplock also had experience managing insurance portfolios prior to working at
GlassHouse.  Id. at 83:21-85:13; Pls.' Stmt. p. 28, ¶ 3.  Chiplock testified that he had no experience with
placing "tail" coverage for D&O liability policies.  Pls.' Stmt. ¶ 57.  9/3/2020 Chiplock Dep. 91:8-14.

[7] Wellington asserts, without reference to the record, that the "parties expected third parties to benefit
from services" and argues that because Marsh appears to admit this fact because Marsh argues that
individual insureds had potential claims pursuant to the Engagement Agreement that could be assigned,
despite the fact that they were not signatories to the Engagement Agreement.  Pls.' Stmt. pp. 28-29, ¶ 6.)

GlassHouse D&Os on May 28, 2014.  9/2/2020 Netterfield Dep. (Def.'s Ex. 16), 251:14-253:25.[8]

Wellington also had no communication with Marsh at any time before GlassHouse purchased the

Tail, but Wellington was aware that Marsh provided insurance brokerage services to GlassHouse.

*Id.*; 10/1/2020 Petri Dep. (Def.'s Ex. 2), 89:15-17; Pls.' Stmt. p. 29, ¶ 8.  When Marsh and

GlassHouse entered into the Engagement Agreement in 2013, Marsh did not intend that the

agreement or Marsh's services thereunder would be for Wellington's benefit. Def.'s Stmt. ¶ 9;

10/1/2020 Petri Dep., 179:16-180:9.  There is no evidence that GlassHouse intended that the

Engagement Agreement would benefit Wellington when it was signed.  Def.'s Stmt. ¶ 10.  While

Wellington contends that the evidence shows that Marsh became aware Wellington could benefit

from a tail policy, Wellington points to no evidence in the record that there were any discussions

between Marsh and GlassHouse regarding Wellington at the time that the Engagement Agreement

was signed or that GlassHouse had a specific intent to benefit Wellington at that time, only

Chiplock's testimony that he *would* have made Marsh aware Wellington would be the third party

beneficiary of the Tail.  Pls.' Stmt. p. 30-31 ¶¶ 9-10.

The Engagement Agreement includes the following provision in paragraph 5 of the terms

and conditions entitled "Your Responsibilities":

> You shall be solely responsible for the accuracy and completeness of all
> information that you furnish to Marsh and/or insurers, and you shall sign any
> required application for insurance. Marsh shall not be responsible to verify the
> accuracy or completeness of any information that you provide, and Marsh shall be
> entitled to rely on that information.  Marsh shall have no liability for any errors,
> deficiencies or omissions in any Services provided to you, including the
> placement of insurance on your behalf, that are based on inaccurate or incomplete
> information provided to Marsh.  You understand that the failure to provide all
> necessary information to an insurer, whether intentional or by error, could result

---

[8] Where Wellington has admitted and denied a stated material fact, but the denial relates only to a fact or
clarification that is not material, I accept the undisputed portion of the stated fact as not being subject to a
genuine dispute.  Here, Wellington does not dispute the statement, but points to deposition testimony that
it became aware that Marsh was providing brokerage services to GlassHouse.  Pls.' Stmt. p. 29, ¶ 8.

in the impairment or voiding of coverage.  You will review all policy documents
provided to you by Marsh.

Def.'s Ex. 1 ¶ 5.  In paragraph 7, entitled "Disclaimers; Limitation of Liability," the Engagement

Agreement provides in part: "In no event shall either party to this Agreement be liable for any

indirect, special, incidental, consequential or punitive damages or for any lost profits arising out

of or relating to any services provided by Marsh or its affiliates."  *Id.* at ¶ 7.  Paragraph 7 also

specifies that GlassHouse acknowledges that Marsh, in performing services for GlassHouse, was

not acting as a fiduciary,[9] "except to the extent required by applicable law."  *Id.*

GlassHouse executives understood they had an obligation to review policy-related

documents provided by Marsh and acknowledged that they would have raised it with Marsh if

they had read something in such a document that conflicted with the coverage they believed they

were purchasing, though Wakely testified that he did not recall reviewing every single policy

document provided, and believed there was a difference between his review of them and

understanding all the details.  9/23/2020 Wakely Dep. (Def.'s Ex. 15), 72:4-73:10 78:5-11.  *See
also* 10/12/2020 Sharp Dep. (Def.'s Ex. 11), 175:7-14.

### B.    The D&O Policy

Based on the parties' rights and responsibilities outlined in the Engagement Agreement,

Marsh procured D&O insurance coverage for GlassHouse from AIG[10] for the period June 1,

2013 through June 1, 2014 (the "Policy").  Def.'s Ex. 12.  Under the terms of the Policy:

---

[9] Wellington denies this fact as recited by Marsh because in another section of paragraph 7, the
Engagement Agreement says that "Marsh will not be responsible for the adequacy or effectiveness of any
insurance programs or policies implemented by another broker, or any acts or omissions occurring prior
to Marsh's engagement."  Pls.' Stmt. p. 32, ¶ 13; Ex. 1 ¶ 7.  However,  the document speaks for itself and
both parties have accurately quoted the Engagement Agreement.

[10] The company that provided the D&O coverage was Chartis/National Union Fire Insurance Company of
Pittsburgh, PA, a subsidiary of AIG.

> If during the **Policy Period** or during the **Discovery Period** (if applicable) the
> **Insureds** shall become aware of any circumstances which may reasonably be
> expected to give rise to a **Claim** being made against the **Insureds** and shall give
> written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations
> anticipated and the reasons for anticipating such a **Claim**, with full particulars as to
> dates, persons and entities involved, then any **Claim** which is subsequently
> made against the **Insureds** and reported to the **Insurer** alleging, arising out of,
> based upon or attributed to such circumstances or alleging any **Wrongful Act**
> which is the same as or is a **Related Wrongful Act** to that alleged or contained in
> such circumstances, shall be considered made at the time such notice of such
> circumstances was given.

Def.'s Ex. 12, MARSH-00004521, at ¶ 6(c).[11]

The Policy's "Change in Control of Named Entity" provision (referred to herein as the

"change of control" or "change in control" provision) provides in relevant part as follows:

> If during the **Policy Period**:
>
> (a) The **Named Entity** shall consolidate with or merge into, or sell all or
>     substantially all of its assets to any other person or entity or group of persons
>     or entities acting in concert; or
> (b) Any person or entity or group of persons or entities acting in concert shall
>     acquire **Management Control** of the **Named Entity**;
>
> (either of the above events herein referred to as the "**Transaction**"),
>
> then this policy shall continue in full force and effect as to **Wrongful Acts**
> occurring prior to the effective time of the **Transaction**, but there shall be no
> coverage afforded by any provision of this policy for any actual or alleged
> **Wrongful Act** occurring after the effective time of the **Transaction**.

Def.'s Ex. 12, MARSH-00004523, at ¶ 9.

The Policy contained "Side A" and "Side B" coverage in the D&O Coverage section,

which covered claims first made during either the "Policy Period" or the "Discovery Period."

Def.'s Ex. 12, MARSH-00004526, at ¶ 1.  "Side A" covered "Individual Insureds"[12] for

---

[11] This version of the Policy is the complete version that the parties relied upon in discovery, including
any subsequently added endorsements.  I have included Marsh's Bates stamp designations for clarity.

[12] "Individual Insureds," are defined as "Executives" or "Employees" of the "Company" or "Outside
Entity Executives."  Def.'s Ex. 12, MARSH-00004529, at ¶ 2(s).

"Claims"[13] made for any "Wrongful Acts"[14], except or to the extent that GlassHouse indemnified

any Individual Insured, and any Individual Insured was obligated to advance any defense costs of

that claim.  *Id.* at MARSH-00004526, at ¶ 1.  "Side B" covered "Loss"[15] of the Company arising

from either a claim made against the company or a claim made against any executive, employee,

or outside entity executive for any wrongful act, however in the case of coverage for a claim

made against any Individual Insured, only to the extent GlassHouse indemnified that individual

for the loss.  *Id.* at MARSH-00004526, at ¶ 1.  AIG agreed to advance defense costs of any such

claim prior to its final disposition, as outlined in another clause of the D&O coverage section of

the policy.  *Id.*  The "Company," is defined as the named entity on the declarations page of the

Policy, GlassHouse, and its subsidiaries.  *Id.* at MARSH-00004518, at ¶ 2(b).  In the event of a

bankruptcy filed by GlassHouse, "the term 'Company' shall also mean the resulting debtor-in-

possession[,]" but excludes a bankruptcy trustee.  *Id.* at MARSH-00004518, at ¶ 2(b); MARSH-

00004532-33, at ¶ 4(i).  The consequence of this provision is that the "insured versus insured"

exception from coverage under the Policy does not exclude claims against D&Os that would be

---

[13] The term "Claim" is defined, in part, as "a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations)"; "a civil, criminal administrative, regulatory or arbitration proceeding for monetary or non-monetary relief…"; and "a civil, criminal, administrative or regulatory investigation of an **Individual Insured**[.]"  Def.'s Ex. 12, MARSH-00004527, at ¶ 2(b).

[14] "Wrongful Acts" were considered (1) any breach of duty, neglect, error, misstatement, misleading statement, omission or act with respect to any Executive or Employee of GlassHouse or its subsidiaries in their capacities in those roles or any matter claimed against an Executive or Employee solely by reason of their status of employment; (2) GlassHouse or its subsidiaries own breach of duty, neglect, error, misstatement, misleading statement, omission, or act; or (3) any breach of duty, neglect, error, misstatement, misleading statement, omission or act by an Outside Entity Executive acting in that capacity.  Def.'s Ex. 12, MARSH-00004530-31, ¶ 2(cc).

[15] "Loss" is generally defined, in part, as damages, judgments, settlements, pre-judgment and post-judgment interests, though the definition contains exclusions for civil or criminal fines or penalties, taxes, and any matters for which the Insureds are not financial liable or have legal recourse.  Def.'s Ex. 12, MARSH-0004529, at ¶ 2(u).

brought by the Trustee.

### C.      GlassHouse's Purchase of D&O Tail Coverage

In late March 2014, GlassHouse's management and representatives of Marsh, and AIG discussed the purchase of D&O tail coverage.  Def.'s Ex. 17; Pls.' Stmt. ¶ 19.  On March 24, 2014, Craig Netterfield, on behalf of Wellington, sent an email to Wakely seeking information about GlassHouse's existing D&O coverage and inquiries regarding the purchase of tail coverage. Def.'s Ex. 7.; Pls.' Stmt. ¶ 20.  Later that same day, Wakely forwarded the GlassHouse D&O insurance binder to Netterfield and wrote: "yes, I believe the thought is we would buy a tail."  *Id.* On March 28, 2014, Marsh facilitated a conference call between GlassHouse through Wakely and Chiplock, Kerri Petri and Shawn Donaher from Marsh, and two underwriters from AIG, Steve Maggiacomo and Steve Shapiro (the "March 28th Call").  Def.'s Ex. 18-19; Pls.' Stmt. ¶ 69.  The purpose of March 28th Call, according to Marsh, was for the GlassHouse executives to discuss the company's need for tail coverage under the Policy and to provide AIG information necessary for it to underwrite that coverage.  Def.'s Exs. 18-19.; Pls.' Stmt. ¶ 21.  During the March 28th Call, Wakely described GlassHouse's financial situation and made reference to Wellington Financial LP, which he described as GlassHouse's senior secured lender.  Def.'s Stmt. ¶ 21; Pls.' Stmt. p. 36, ¶ 21; Def.'s Ex. 18; 9/3/2020 Chiplock Dep. (Def.'s Ex. 8), 57:14– 60:20.

As reflected in the notes taken by Petri, a Marsh client advisor, and by underwriters at AIG, Wakely and Chiplock disclosed on the phone to AIG and Marsh that Glasshouse UK had failed to remit VAT taxes to "HMRC" (the British Revenue and Customs service), and that HMRC had instituted a wind-up proceeding against Glasshouse UK, such that Glasshouse UK had been placed into a receivership.  Def.'s Ex. 18-19; 10/1/2020 Petri Dep., 75:12-84:18; Pls.'

Exs. 45, 165.  Wakely and Chiplock further disclosed to them that Wellington was the sole senior secured debt holder with $13 million in debt, Glasshouse's assets were being sold in a UCC-9 sale, and that Glasshouse was "forced" into its present position "given the Wellington situation."  Def.'s Ex. 18-19; 10/1/2020 Petri Dep., 75:12-84:18. Pls.' Exs. 45, 165.

Shortly following that meeting, Marsh obtained quotes from AIG at GlassHouse's direction for tail coverage of varying terms (3 or 6 years) and coverage limits ($5 million to $15 million).  Def.'s Exs. 20-23;  Pls.' Stmt., p. 36-37, ¶ 22.  Marsh perceived that GlassHouse's primary concern was how much the Tail was going to cost, not the amount or period of coverage. 9/3/2020 Chiplock Dep., 160:8-15; Pls.' Stmt., p. 36-37, ¶ 22.  During the March 28th Call, GlassHouse advised Marsh of ongoing UCC Article 9 sales of its assets and indicated an expectation that it would liquidate all or substantially all of its assets.  Def.'s Ex. 18; Pls.' Stmt., p. 37, ¶ 23.  Marsh was concerned that the change of control provision of the Policy was implicated by the transactions where Article 9 secured party sales were being initiated (apparently with GlassHouse's cooperation) that resulted in the sale of a substantial portion of GlassHouse's assets.  Def.'s Ex. 20; 10/1/2020 Petri Dep., 72:22-74:7, 135:21-136:9.  Under the terms of the change in control provision, if that provision were triggered, then the Policy – which had an existing expiration date of June 1, 2014 – would immediately be placed into "runoff" on the date of that change in control.  Def.'s Ex. 12, MARSH-4523, at ¶ 9.  Focusing on potential claims occurring after a change in control, Petri advised GlassHouse that the purpose of the Tail was to cover "winding down activities" so that there would be no gap with coverage that was already in place.  Pls.' Ex. 72.

There is no evidence that GlassHouse ever communicated to Marsh that it believed the April 2014 sale of GlassHouse's assets would not trigger the change in control provision in the

Policy, nor is there evidence that GlassHouse's representatives expressed any confusion or lack of understanding about the meaning of the provision. 10/5/2020 Wakely Dep., 121:21-122:1, 115:7-119:4; 9/3/2020 Chiplock Dep., 144:13-19; 10/1/2020 Petri Dep., 112:7-113:7. The Trustee and Wellington assert that Marsh failed to properly advise GlassHouse of the details of the change in control provisions and that the secured party sales of GlassHouse's assets to multiple buyers would not have triggered the change in control provisions. Pls.' Stmt., pp. 38-39, ¶¶ 25-26. McQueen Aff. ¶ 5; 10/1/2020 Petri Dep., 123:22-125:20, Pls.' Ex. 64. Marsh understood that Wellington was conducting a "phased sell off" of Glasshouse's assets. Pls.' Ex. 64; 10/1/2020 Petri Dep., 123:18-24.

By April 11, 2014, most of GlassHouse's assets had been sold by a number of Article 9 sales. Def.'s Ex. 24, at p. 11; Pls.' Stmt. p. 39, ¶ 27. On April 14, 2014, Chiplock sent an email to Petri at Marsh, directing her to bind a three-year, $5 million D&O Tail on GlassHouse's behalf, which Marsh did, effective April 11, 2014. Def.'s Ex. 25. Marsh added "Endorsement #13" (the "Endorsement") to the Policy to reflect the purchase of the Tail. Def.'s Ex. 14. Paragraph 3 of the Tail specified that the change of control provision of the Policy's General Terms and Conditions was deleted in its entirety. *See id*. at ¶ 3. The Tail provided a period of three years during which GlassHouse could report to AIG claims made against it after the "change in control" but relating to wrongful acts occurring prior to that date and, during that same period, GlassHouse could also report claims made arising from wrongful acts committed after the change in control but occurring during the three-year period. 10/1/2020 Petri Dep., 173:16-23; Def.'s Ex. 14.

Wakely and Chiplock understood that Marsh's binding of a Tail on April 11, 2014 would provide additional coverage that would supplement, and not replace, the $15 million under the

Policy for claims reported through June 1, 2014.  9/3/2020 Chiplock Dep., 52:16-57:7, 116:7-22,

133:4-13, 144:24-150:11; 9/23/2020 Wakely Dep., 85:18-89:12; 10/5/2020 Wakely Dep., 123:9-

125:9.  Marsh never advised GlassHouse in writing that that by binding the Tail, it would

decrease coverage under the Policy for claims made after April 11, 2015 from $15 million to $5

million.  9/23/2020 Wakely Dep., 91;16-92:1; 10/5/2020 Wakely Dep., 123:9-125:9; Olsky Aff. ¶

3.  Several emails from Marsh may have contributed to Wakely's and Chiplock's

misunderstanding regarding coverage limits.  In describing how the Runoff Period would work

under the Policy if there were a change in control, Petri wrote:

> At [the Change in Control], then the policy will continue in full force for Wrongful
> Acts that occur prior to the transaction but there is no coverage for alleged
> wrongful acts occurring after the effective time of the transaction . . . . The
> automatic runoff period will extend to June 1st, which is the natural expiration of
> the current policy. However, there will be no coverage for any of the winding
> down activities post transaction.

Pls.' Ex. 72.  Petri concluded her email: "The cleanest way to confirm coverage post transaction

for winding down activities is to bind the tail policy today . . . . If there is a delay in purchasing

post transaction and after June 1st there is a potential for claim allocation issues

(covered/uncovered) as well as the likely potential of having to pay more premium for a runoff."

*Id.*  In Petri's absence, in response to questions presented by Wakely to Marsh, Bethany

Greenwood provided similar advice.  Pls.' Ex. 65; 9/30/2020 Greenwood Dep., 36:7-38:7 (Pls.'

Ex. Greenwood Dep.); 10/5/2020 Wakely Dep., 114:6-118:4.  In her email to Wakely,

Greenwood did not specifically mention any reduction in the limits of liability for claims reported

prior to June 1, 2014 and recommended binding immediately to "avoid any material change in

risk between now and June 1st. . . ."  Pls.' Ex. 65.  At her deposition, Greenwood did not

remember whether any advice had been provided by Marsh regarding the reduction in those

limits.  9/30/2020 Greenwood Dep., 36:20-37:6.

Petri testified that she reviewed the structure of the coverage with Chiplock, but she does

not know that she "specifically used [the] words" that the $15 million in coverage through June 1,

2014 would no longer be in effect." 10/1/2020 Petri Dep., 111:4-112: 23.   Marsh asserts that the

change of coverage should have been clear to GlassHouse from the conversations and emails

describing the Tail and its coverage limits and reporting period.   Marsh also points to discussions

regarding whether a return premium would be due to GlassHouse after the Tail had been bound as

evidence that GlassHouse had to have understood that there would be a reduction in coverage to

result in a return premium.   10/5/2020 Wakely Dep., 154:7-24; Pls.' Ex. 65.

> **D.      GlassHouse knew that Wellington was likely to assert claims against it
> and its D&Os Before Binding the Tail**

In the first week of April 2014, GlassHouse had a basis to believe that it might be sued by

Wellington.   Compl. ¶ 56; *see also* Def.'s Ex. 4, at 1; Def.'s Ex. 5; Def.'s Ex. 6; Def.'s Ex. 7;

10/5/2020 Wakely Dep., 87:17-88:13, 93:6-9, and 131:23-134:11; Pls.' Stmt., p. 43, ¶ 40.   On

April 3, 2014, GlassHouse's counsel and Wellington's counsel spoke, and that same day,

GlassHouse's counsel emailed Wakely with a summary of the call where he stated that

comments made by the Wellington's attorneys led the GlassHouse's counsel "to have continuing

concerns that Wellington has plans to sue the board[.]"  Def.'s Ex. 4; Pls.' Stmt., p. 43 ¶ 41.

GlassHouse's counsel understood from that meeting that if the board of directors did not

cooperate with Wellington's demands to satisfy its liens, Wellington would likely sue.  Def.'s

Ex. 4; Pls.' Stmt., p. 43 ¶ 41.   The following day, Wakely emailed GlassHouse CEO Stephen

Sharp to convey GlassHouse's counsel's concerns regarding the possibility of Wellington suing

the board and to relay AIG's initial quote for purchase of the Tail.  Def.'s Ex. 5.  AIG's initial

quote was for a $295,000 premium to purchase a six-year tail at the existing level of $15 million

in coverage. *Id*. On April 5, 2014, Sharp wrote to the GlassHouse board of directors[16] to convey that Wellington had rejected GlassHouse's proposed release of claims by Wellington against GlassHouse, and that Wellington's behavior "make[s] me think that Wellington may be considering some kind of litigation against [GlassHouse]." Def.'s Ex. 6. In relaying the $295,000 premium cost from AIG, Sharp noted that GlassHouse "can't afford to pay this, nor would Wellington sanction this expense." *Id.*

GlassHouse was aware that it was best practice to disclose possible forthcoming claims that would be material to insurance coverage to Marsh as its broker, in addition to disclosure of such information being required by the Engagement Agreement. 10/5/2020 Wakely Dep., 69:9-11, 84:19-24, 85:9-17; 9/3/2020 Chiplock Dep., 119:16-19, 120:16-19. GlassHouse also understood that Marsh would rely on the information provided by GlassHouse, and it was not Marsh's responsibility to make an assessment or determine whether GlassHouse had withheld any information. 10/5/2020 Wakely Dep., 76:12-18. Marsh asserts that the record reflects that at no time prior to May 9, 2014 did GlassHouse disclose to Marsh that GlassHouse believed it was likely to be sued by Wellington. 10/5/2020 Wakely Dep., 209:23-211:5; Ex 9; 1/11/2017 Wakely Dep., 20:5-11; 10/1/2020 Petri Dep., 83:6-20, 88:23-89:11, 174:11-175:1; 9/30/2020 Donaher Dep. (Def.'s Ex. 10), 60:3-6. Although it appears from the testimony of Wakely, Chiplock, and Petri that GlassHouse never expressly informed Marsh of this belief, the Plaintiffs assert that GlassHouse believed that it was essential to keep the $15 million in D&O coverage under the Policy in place through the original expiration date of the Policy, i.e., June 1, 2014, due to the possibility of Wellington filing suit. 9/3/2020 Chiplock Dep., 254:25-255:23; 10/5/2020 Wakely Dep., 207:2-208:2; 10/1/2020 Petri Dep., 178:11-16. Wakely and Chiplock testified in

---

[16] Sharp sent his email to Robert Davoli, Charlie Lax, Colin Bryant, and Louis Volpe. Def.'s Ex. 6.

2020 that (a) they believed in 2014 that the purchase of the Tail had no effect on the availability of $15 million in coverage under the Policy for claims made after April 11, 2014, and (b) that they never shared this belief with Marsh.  10/5/2020 Wakely Dep., 124:18-21; 9/3/2020 Chiplock Dep., 220:16-221:21.

In response to a question whether AIG would have been interested in "whether there were any potential claims out there against Glasshouse" in underwriting tail coverage, Wakely testified at his deposition that he "would assume so, yes" and that he assumed that such a discussion took place during the March 28th Call.  10/5/2020 Wakely Dep., 107:4-23.  Wakley testified that he "would have updated" the underwriters on GlassHouse's situation as of that time.  *Id*.  Wakely had no specific recollection of informing Marsh about any potential D&O claim by Wellington.  *Id*.  Petri testified that at no time prior to the purchase of the Tail did Wakely, Chiplock or anyone from GlassHouse advise her that they were concerned that Wellington may assert a D&O claim.  10/1/2020 Petri Dep., 83:6-24-84:1-4.  Contemporaneous notes of the March 28th Call taken by Petri and the AIG underwriters do not reference any discussion of Wellington asserting such a claim.  Def.'s Exs. 18, 19.  Based on GlassHouse's situation described on the call, AIG recognized that GlassHouse generally posed a heightened risk for claims against GlassHouse and its D&Os[17], but the testimony of representatives of Marsh and AIG and the contemporaneous notes do not show that GlassHouse made Marsh or AIG aware of any specific threatened claim by Wellington.

**E.     The Final Tail Endorsement and Marsh's Summary**

Ultimately, in May of 2014, GlassHouse purchased a 3-year Tail with $15 million of coverage.  On May 1, 2014, Marsh sent Chiplock the final Tail Endorsement along with a formal

---

[17] *See* 11/5/2020 Maggiacomo Dep. (Pls.' Ex. Maggiacomo Dep.), 63:19-65:2, 79:7-80:15.

cover letter by email, the body of which directed Chiplock to the attached letter "for your review and file." Def.'s Ex. 13; Pls.' Stmt., p. 46, ¶ 49. The cover letter states: "We have reviewed the endorsements and found them to be consistent with the negotiated terms." Def.'s Ex. 13, p. 7. The letter describes the Tail as follows: "Endorsement #13: Amends the policy to provide a period of three (3) years in which to give written notice to the Company of any claim(s) against the Insured during the Extended Reporting Period for any Wrongful Act(s) occurring on or prior to April 11, 2014." Def.'s Ex. 13.

Reading that language at his deposition, with the benefit of hindsight, Wakely understood the Endorsement to mean that a claim made against GlassHouse between April 11, 2014 and June 1, 2014, based on conduct before April 11, 2014 would be covered by the $5 million Tail only, and not by the $15 million original Policy limits. 10/5/2020 Wakely Dep., 160:23-161:15. Wakely did not have that understanding in April of 2014. *Id.* Wakely also testified that the document is consistent with his understanding at the time that GlassHouse was purchasing overlapping coverage between April 11, 2014 and June 1, 2014. That is, the existing $15 million policy would cover the pre-April 11, 2014 acts through June 1, 2014 and the Tail would be supplementing with $5 million Wind-down coverage for claims noticed after June 1, 2014. 10/5/2020 Wakely Dep., 213:7-217:19; Pls.' Exs. 63, 65, 68. The Endorsement makes no specific reference to the existing declarations page or policy period, but did reference the deletion of the change in control provision and noted that the coverage afforded by the Endorsement shall be applicable only to certain of the Coverage Sections in the Policy: "D&O Coverage Section. Marsh's cover letter to Chiplock advised that "[i]t is important that you review the enclosed endorsements and advise us at your  earliest opportunity of anything which you believe is not in accordance with the  negotiated coverage and terms." Def.'s Ex. 13,

MARSH 00309.

The same day he received the email, cover letter, and Endorsement from Marsh, Chiplock

forwarded them to Wakely, to the GlassHouse CEO, and to three members of the  Company's

board.  Def.'s Ex. 14.  GlassHouse never contacted Marsh to indicate that the Tail Endorsement

was inconsistent with the coverage the company believed it had directed Marsh to place.

10/1/2020 Petri Dep., 183:22-184:4.

### F. <u>Wellington's Demand Letter, GlassHouse's Lawsuit, and a Settlement</u>

Following the purchase of the Tail with the Endorsement added to the Policy, on May 9,

2014, Wellington sent a letter to certain current and former D&Os of GlassHouse that conveyed

Wellington's objection to certain payments being made to GlassHouse management and reserved

"its rights to pursue recovery of these, and any other improper payments, from individual board

or management members responsible for authorizing them."  Def.'s Ex. 28; Def.'s Stmt. ¶ 54;

Pls.' Stmt., p. 48 ¶ 54.  The letter also indicated Wellington reserved its rights to pursue claims

against GlassHouse's board or management "who participated in, or had knowledge of, any

misleading financial information relied upon by Wellington in providing financing to

GlassHouse."  *Id.*  Wakely transmitted that demand letter on May 14, 2014 to Marsh, and in his

message, stated that "I think this [letter] may be benign but wanted to give you notice."  Def.'s

Ex. 28; Def.'s Stmt. ¶ 55; Pls.' Stmt., p. 48 ¶ 55.  Marsh notified AIG of the claim that same day.

Def.'s Ex. 29; Def.'s Stmt. ¶ 55; Pls.' Stmt., p. 48 ¶ 55.  On May 19, 2014, Wellington's outside

counsel wrote to various current and former GlassHouse executives and board members to notify

them that Wellington had a claim against those individuals and intended to file suit by June 1,

2014.  Def.'s Ex. 33; Def.'s Stmt. ¶ 56Pls.' Stmt., p. 48 ¶ 56.  After receiving the Wellington

demand letter, Petri informed Wakely that a $5 million coverage limit applied to any Wellington

claim because it was noticed after April 11, 2014.  9/23/2020 Wakely Dep., 87:24-88:13; 10/1/2020 Petri Dep., 160:8-161:17; Pls.' Ex. 111.  Wakely testified that he had understood that the $15 million coverage limits would apply for claims reported through June 1, 2014, and I infer from his testimony that he was surprised by what Petri told him. 10/5/2020 Wakely Dep., 204;7-22; 9/23/2020 Wakely Dep., 86:5-88:13.

On May 27, 2014, GlassHouse filed suit in the United States District Court for the District of Massachusetts against four current or former GlassHouse D&Os.  Def.'s Stmt. ¶ 57; Pls.' Stmt. p. 49, ¶ 57.  On June 16, 2014, GlassHouse filed its Chapter 7 bankruptcy petition. AIG sent Wakely a reservation of rights letter with respect to the Wellington claims on July 8, 2014.  Def.'s Ex. 30.  Soon thereafter, the Trustee brought an adversary proceeding against Wellington on December 9, 2014.  Def.'s Ex. 31.  The Court approved a settlement agreement between the Trustee and Wellington on July 30, 2015, wherein the Trustee assigned to Wellington the Estate's purported claims against the current or former D&Os of GlassHouse and the Debtor's purported claim against AIG and Marsh.  Def.'s Stmt. ¶ 61; Pls.' Stmt., p. 49, ¶ 61. The parties also agreed to allocate any amounts recovered, less attorneys' fees, on any claims against the GlassHouse directors and officers, AIG, and/or Marsh, with 82 percent of those amounts to Wellington and 18 percent to the Trustee.  *Id*.; *see also* Def.'s Ex. 31.

On August 7, 2015, Wellington and the Trustee filed a twelve-count complaint against AIG, primarily based on the contention that GlassHouse allegedly owed no debt to AIG and that AIG was wrongfully attempting to reduce its liability limits under the Policy.  Def.'s Ex. 27.  On March 10, 2016, the Trustee and Wellington entered into a global settlement with AIG and current and former directors and officers of GlassHouse wherein AIG paid the Trustee and Wellington $6 million and the parties exchanged mutual releases, Wellington dismissed the

action against the directors and officers, and Wellington and the Trustee dismissed their claims

against AIG.  Def.'s Ex. 32.  Wellington and the Trustee did not receive an assignment of rights

from the settling directors and officers and there was no agreement for judgment against those

directors and officers in an amount that exceeded the settlement amount.  Under the terms of the

settlement, the D&Os and AIG received complete releases from Wellington and the Estate.

Def.'s Ex. 32.

## DISCUSSION

### I.   Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); Fed. R. Bankr. P. 7056 (applying Civil Procedure Rule 56 to adversary

proceedings); *see Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 763 (1st Cir. 1994)

(explaining "[i]t is apodictic that summary judgment should be bestowed only when no genuine

issue of material fact exists and the movant has successfully demonstrated an entitlement to

judgment as a matter of law").  To establish that it is entitled to summary judgment, a party may

show that the adverse party lacks sufficient admissible evidence to meet its burden of proof at

trial.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A

"principal purpose[] of the summary judgment rule is to isolate and dispose of factually

unsupported claims or defenses[.]"  *Celotex*, 477 U.S. at 323-24 (interpreting prior, but

substantively similar version of Rule 56).  "[W]here the non[-]moving party will bear the burden

of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support

an essential element of the non[-]moving party's claim."  *Bay v. Times Mirror Magazines, Inc.*,

936 F.2d 112, 116 (2d Cir. 1991).  Alternatively, "[t]he movant may affirmatively produce

evidence that negates an essential element of the non-moving party's claim." *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000). A non-movant "cannot ward off summary judgment with proffers that depend . . . on arrant speculation, optimistic surmise, or farfetched inference." *Lang v. Wal-Mart Stores East, L.P.*, 813 F.3d 447, 460 (1st Cir. 2016) (internal quotations omitted).. An inquiring court is not obliged either "to draw *unreasonable* inferences or credit bald assertions [or] empty conclusions . . . ." *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007).

**II.**     **The Estate's Breach of Contract Claim**

The Plaintiffs claim that Marsh breached the Engagement Agreement by:

(a) reducing the Policy coverage limits without authorization; and

(b) failing to:

> (1) advise GlassHouse or Wellington that binding the Tail would affect the $15 million limits of liability for claims asserted between April 11, 2014 and the Initial Policy End Date;
>
> (2) use best efforts to place insurance for GlassHouse, after GlassHouse authorized Marsh to bind certain coverage for it;
>
> (3) assist GlassHouse in assessing its risks and in developing insurance specifications which Marsh would submit to insurers;
>
> (4) assist GlassHouse in evaluating the options received from insurers;
>
> (5) deliver confirmation of coverage once it was placed;
>
> (6) review policies and endorsements for conformity with the agreed upon coverage;
>
> (7) provide coverage summaries;
>
> (8) evaluate coverage applicability on Marsh placed business.

Compl. ¶ 120.

The elements of a breach of contract claim under New York law[18] are: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Inv'rs Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (quoting *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir. 1994).[19]  The Trustee stands in the shoes of GlassHouse as a party to the Engagement Agreement, and Marsh has available to it all defenses that it might have asserted against GlassHouse.  *See Buchwald v. The Renco Group, Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 757-58 (Bankr. S.D.N.Y. 2009) (citing *Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 356-57 (3d Cir. 2001) ("[I]n actions brought by the trustee as successor to the debtor's interest under section 541, the trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor.  Likewise, the trustee is subject to defenses that could be asserted against the debtor….")) (internal quotations omitted).

The Plaintiffs assert that the record demonstrates that Marsh breached the Engagement Agreement by failing to properly advise GlassHouse during the process of procuring the Tail by: misconstruing the change of control provision in the Policy and recommending a Tail that would reduce Policy coverage limits for claims reported prior to June 1, 2014, failing to effectively

---

[18] I have determined that New York law applies to the Estate's breach of contract claim.  *See In re GlassHouse Techs., Inc.*, 604 B.R. at 617.

[19] In addition to their breach of contract claims, the Plaintiffs have alleged breach of the implied covenant of good faith and fair dealing as a component of the breach of contract claim.  Under New York law, "implicit in every contract is a promise of good faith and fair dealing which is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreements."  *See Skillgames, LLC v. Brody*, 1 A.D.3d 247, 252 (N.Y. App. Div. 2003).  As the breach of the implied covenant claim is premised on the same set of facts as those underlying a claim for breach of contract, such claim rises and falls with the breach of contract claim in this matter.  *See Benihana of Tokyo, LLC v. Angelo, Gordon, & Co., L.P.*, 259 F. Supp. 3d 16, 38 (S.D.N.Y. 2017) ("[W]hen a plaintiff claims a breach of the implied covenant of good faith and fair dealing based on the same facts as a breach of contract claim and seeking identical damages for the breach, the claim for the breach of the covenant of good faith and fair dealing must be dismissed as duplicative of the breach of contract claim.").

inform GlassHouse of the reduction of coverage limits, failing to advise GlassHouse to provide

AIG with a "notice of circumstances" relating to the possible claims associated with the unpaid

UK taxes, and failing to procure a Tail on the terms instructed or required by GlassHouse.

Marsh denies that it breached its contract with GlassHouse and asserts that it procured the Tail

exactly as instructed after communications with executives of GlassHouse.  Marsh also asserts

that GlassHouse breached material terms of the Engagement Agreement by (i) failing to inform

Marsh that Wellington had threatened a claim against GlassHouse and its directors and officers

and (ii) failing to review information provided by Marsh and communicate immediately with

Marsh if the Tail policy was different than had been authorized by GlassHouse.  Marsh further

argues that the disclaimer of liability provision found in the Engagement Agreement protects

Marsh from any liability arising from its services to the extent such services were based on

misinformation provided by GlassHouse.

A. **A genuine issue of material fact may exist as to whether Marsh breached
   its agreement with GlassHouse to provide advice**

The summary judgment record shows that representatives of Marsh and GlassHouse

engaged in a flurry of activity precipitated by Wellington's anticipated Article 9 sales of

GlassHouse's assets.  GlassHouse was focused on winding down its affairs and obtaining

funding for wind down expenses.  The GlassHouse board and executives identified "tail

coverage" for the Policy as a priority wind down item.  It is not disputed that Marsh's

representatives advised GlassHouse that the change in control provision of the Policy may have

been triggered by the secured party sale transactions that were contemplated to occur in April

2014.  It appears that Marsh perceived that GlassHouse's primary concern  was to obtain

coverage for acts that might occur after any change in control during the wind down.  Petri

understood that GlassHouse was asking Marsh to obtain proposals for tail coverage, but that cost

was a significant issue.  Inferences can be drawn from Wakely and Chiplock's testimony to
demonstrate that GlassHouse was concerned about both coverage for claims that may have arisen
from acts that occurred before, but would be made and reported after, the secured party sales and
for claims that might arise from acts after those sales.  Wakely and Chiplock appear to have had
a different perception of the coverage that they were asking Marsh to obtain for GlassHouse than
was understood by Petri.  After exploring different coverage and price options, GlassHouse
instructed Marsh to bind the Tail.

Wakely and Chiplock testified that they understood that the existing coverage limits
would remain in place through the June 1, 2014 expiration of the reporting period under the
Policy and that the Tail simply added $5 million in coverage for acts after April 14, 2014 through
the end of the reporting period for the Tail.  Petri testified that it was unusual, in her experience,
for coverage limits to be reduced in procuring a policy tail.  10/1/2020 Petri Dep., 185:14-186:3.
She conceded that she may not have expressly stated that the $15 million coverage limits would
no longer be in effect, but testified that she reviewed the structure of the coverage to be bound
with Chiplock.  10/1/2020 Petri Dep., 111:4-112:23.  While Marsh asserts that the change of
coverage should have been clear to GlassHouse from conversations and emails describing the
Tail and its coverage limits and reporting period (and whether a return premium would be
generated), a genuine dispute of a material fact appears to exist as to whether Marsh properly
advised GlassHouse regarding the necessity and advantages or disadvantages of obtaining the
Tail.

While Marsh executed GlassHouse's instructions in binding the Tail, there is a genuine
dispute about whether those instructions were appropriately informed and understood.  As
discussed above, the Greenwood message to Wakely did not specifically mention any reduction

in the limits of liability for claims reported prior to June 1, 2014 and recommended binding

immediately to "**avoid any material change in risk between now and June 1st**. . . ."  Pls.' Ex.

65 (emphasis added).  While Greenwood may have been focusing on specific unidentified risks

that may not have been understood by Wakely, there certainly would be a material change in risk

to GlassHouse and other insureds under the Policy if the policy limits were reduced by $10

million prior to June 1, 2014.  GlassHouse may have avoided the perceived risk associated with

possibly triggering the change of control provision by binding the Tail, but it and the other

insureds became exposed to the risk of liability in excess of $5 million, and, by extension, a

future bankruptcy trustee would be exposed to the risk that negligence claims held by a

bankruptcy estate against D&Os would exceed that coverage.   Pls.' Stmt. ¶ 78 (citing, *inter alia*,

Pls.' Ex. 72).[20]  *See, e.g., Rozner v. Resolute Paper Prods. Corp.,* 37 A.D.2d 396, 397 (2d Cir.

1971) ("A contract may create a duty, not otherwise existing, from which negligence may arise,

but the negligence arises not because of a breach in the contract but because of

a failure to perform the contractual duty with due care."); *Landon v. Kroll Laboratory*

*Specialists, Inc.,* 91 A.D.3d 79, 83 (N.Y. Sup. Ct. 2011) ("The very nature of a contractual

obligation, and the public interest in seeing it performed with reasonable care, may give rise to a

duty of reasonable care in performance of the contract obligations, and the breach of that

independent duty will give rise to a tort claim.") (quoting N.Y. Univ. v. Continental Ins. Co., 87

N.Y.2d 308, 316 (N.Y. 1995)).  An inference may be made from the record that even Marsh was

---

[20] Earlier, in response to a question on the pricing of $5 million and $15 million Tail, Petri assured
Chiplock in writing that if a change in control occurred, claims made through June 1, 2014 on the D&O
Coverage that arose from acts that occurred prior to the purported Change in Control would still have a
$15 million limit of liability through June 1, 2014 (the "Runoff Coverage").  While it appears that Petri
was answering a question about the terms of a tail policy <u>and</u> addressing how Runoff Coverage would
work under the existing policy if there were to be a change in control, Wakely references this
communication to support his belief that Petri confirmed that $15 million coverage limits would remain in
place until June 1, 2014 after the Tail was purchased.  10/5/2020 Wakely Dep., 123:24-125:16.

not clear as to the limits of liability after the purchase of the Tail.  When GlassHouse sent Marsh

a copy of the May 9, 2014 letter from Wellington threatening claims, Marsh sent a copy to AIG.

10/5/2020 Wakely Dep., 175:1-24; Pls.' Ex. 75.  In the email and letter sent to AIG in response

to the claim, Marsh identified a $15 million limit of liability on the claim <u>after</u> the Tail had been

purchased.  10/1/2020 Petri Dep., 155:9-157:4; Pls.' Ex. 106; 10/5/2020 Wakely Dep., 175:1-24;

Pls.' Ex. 75.

> **B.  Is there a genuine issue of material fact regarding whether, at the time
> GlassHouse was seeking advice and binding the Tail, GlassHouse failed to
> inform Marsh of a claim known to GlassHouse threatened by
> <u>Wellington?</u>**

Even though a genuine issue of material fact appears to exist with respect to whether

Marsh breached the Engagement Agreement by failing to advise and properly inform

GlassHouse in connection with obtaining the Tail, such a breach may be excused if GlassHouse

failed to perform a material requirement of that contract.  *See Wechsler v. Hunt Health Sys., Ltd.,*

330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004) (under New York law, "[w]hen one party commits a

material breach, the other party is relieved, or excused, from its further performance

obligations.").  Petri testified that Marsh would not have bound the Tail on those terms had

GlassHouse provided notice that Wellington intended to assert claims against GlassHouse and its

D&Os.  No evidence in the record rebuts her testimony, and common sense supports Petri's

statements that, if Marsh had been notified of such a threatened claim, Marsh would have

provided different advice and the underwriting of a tail would have been entirely different.

Notice of the threatened claim may have also provided sufficient basis for a "notice of

circumstances" that could have provided the basis for coverage within the reporting period for

the Policy at the $15 million limit.[21]  Consequently, the issue of whether Marsh had information

---

[21] *See* Def.'s Ex. 12, MARSH-00004521, at § 6(c) (the Policy's General Terms and Conditions), which

from which it should have understood that a threatened claim for which coverage would be provided by the Policy is material. The parties do not appear to seriously disagree with that conclusion,[22] but vigorously disagree as to whether notice of such a possible claim was provided.

In the section titled "Your Responsibilities," the Engagement Agreement states that GlassHouse is "solely responsible for the accuracy and completeness of all information that you furnish to Marsh and/or insurers" and that "Marsh shall not be responsible to verify the accuracy or completeness of any information that you provide" and "shall be entitled to rely on that information." Def.'s Ex. 1 ¶ 5. That paragraph then clearly states: "Marsh shall have no liability

---

states:

> If during the Policy Period . . . the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, <u>then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or is a Related Wrongful Act to that alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.</u>

(emphasis supplied).

[22] GlassHouse does contend that, even if it were to be determined that GlassHouse breached the Engagement Agreement, this issue would not be appropriate for summary judgment because whether a breach of a contract is "material" "is a question of fact ordinarily to be decided by a jury or the finder of fact." *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 340 (D. Mass. 2010) (citation and quotations omitted) (describing Massachusetts law). "Whether a failure to perform constitutes a 'material breach' turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016) (citation omitted). A material breach must "'go to the root of the agreement between the parties.'" *Id.* (citing *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (holding that a material breach did not occur where the defendant failed to pay the defendant residuals under the contract because the breach occurred after a lengthy period of performance). In this case, since information regarding the threatened Wellington claim cannot be genuinely disputed to be material to the advice that was sought from Marsh regarding the purchase of a tail policy, no reasonable factfinder could conclude that this "breach" would be immaterial if proven.

26

for any errors, deficiencies or omissions in any Services provided to you, including the

placement of insurance on your behalf, that are based on inaccurate or incomplete information

provided to Marsh." *Id.* Finally, this provision provides, "[GlassHouse] understand[s] that the

failure to provide all necessary information to an insurer, whether intentional or by error, could

result in the impairment or voiding of coverage." *Id.*

Deposition testimony shows that GlassHouse's management had a general awareness that

it should inform Marsh of potential claims in procuring the Tail and believes that it would have

followed a practice of identifying potential claims to Marsh. 10/5/2020 Wakely Dep., 69:9-11;

84:19-24; 85:15-17. *See also* 9/3/2020 Chiplock Dep., 119:16-19; 120:16-19. It is not genuinely

disputed that Marsh provided general information about the fact that it was winding down

because of the exercise of rights by Wellington, its senior secured lender, and that its issues

included potential liabilities arising from the liquidation of its UK subsidiary and unpaid VAT

and or PAYE taxes and other amounts that may have been owed to governmental authorities in

the UK by that subsidiary.[23] The real dispute is whether GlassHouse advised Marsh that

Wellington had threatened that it may assert claims against GlassHouse and its D&Os for which

there may be coverage under the Policy.

By the first week of April 2014, GlassHouse understood that it was a real possibility that

it and its D&Os would be sued by Wellington. Def.'s Exs. 4, 5. *See also* 9/23/2020 Wakely

---

[23] "PAYE" (or "Pay As You Earn"), much like U.S. withholdings of employees' social security, FICA, and other income taxes, are amounts that U.K. employers are statutorily required withholdings from employee paychecks as advances on income tax and insurance. Pls.' Stmt. ¶ 31. In 2009, Glasshouse UK inherited a liability to HMRC for the prior unremitted PAYE withholdings of a company that it had acquired, and then in 2010 and 2011,Glasshouse UK defaulted on its own PAYE obligations, growing the arrears balance to 1.4 million pounds in 2012. *Id.* at ¶ 32. In addition to the PAYE taxes owed, Glasshouse UK had other outstanding arrears to HMRC for unremitted VAT tax withholdings that Glasshouse UK had collected from its customers. *Id.* at ¶ 47.

Dep., 77:6-80:7, 87:17-88:13, 93:6-9; 10/5/2020 Wakely Dep., 131:23-134:11; Ex. 6.; Ex. 7.

While the "threat" of possible claims conveyed by Wellington's counsel during the April 3, 2014

telephone call with GlassHouse's counsel may not have constituted a "Claim" under the Policy,

GlassHouse's perception that there was a significant risk of future D&O claims was certainly

relevant to coverage advice being sought from Marsh and the purchase of a "tail" for the Policy.[24]

The Plaintiffs assert that the summary judgment record demonstrates a genuine issue of material

fact as to whether GlassHouse notified Marsh that Wellington had threatened to assert claims

that would be covered by the Policy.  Marsh asserts that the evidence in the summary judgment

record does not demonstrate that any information was conveyed to Marsh about the threatened

Wellington claim.  No documentary evidence directly shows that GlassHouse notified Marsh of

the threatened claims, and Wakely and Chiplock testified that they have no actual recollection of

anyone providing such information, but rather rely on their belief that they would have conveyed

that information.  After testifying at an earlier Rule 2004 examination that he had no knowledge

of anyone conveying information to Marsh regarding the threatened Wellington claim, Wakley

later testified at a deposition that he believed such information had been conveyed.  Marsh

argues that any such belief or reliance on a belief about general business practices is insufficient

to create a genuine issue of material fact where other evidence is to the contrary.

Although the Plaintiffs reference in a conclusory fashion that GlassHouse generally

informed Marsh of their potential exposure, including the possibility of a claim by Wellington,

prior to purchasing the Tail, the actual record in much more nuanced and conflicting.[25]  The best

---

[24] The Policy defines a "Claim" as a "written demand for monetary or non-monetary relief," of a
proceeding or regulatory investigation.  Def.'s Ex. 12, MARSH-00004527, ¶ 2(b).  Even if there was not
a Claim, the communication may have allowed GlassHouse to have provided a notice of circumstances
that would be expected to give rise to a claim.  *Id*. at MARSH-00004521, ¶ 6(c).

[25] *See, e.g.*, Pls.' Stmt.¶ 104 ("DLA Piper's concerns about Wellington's forthcoming suit were conveyed

evidence in the record that GlassHouse provided information about Wellington's threatened

claim or Glasshouse's concerns about that claim is found in Wakely's deposition testimony:

> Q. …And was there a concern on or around April 3rd of 2014 that Wellington
> was potentially going to sue directors and officers?
>
> A. Yes.
>
> Q. And was that communicated to Marsh?
>
> A. I believe so, yes.
>
> Q. And was that communicated on or around April 3rd of 2014?
>
> A. I can't remember specifically. I -- I don't know.
>
> Q. Was this communicated before the tail was purchased?
>
> A. Yes.
>
> Q. And again, what advice was provided to you, if any, from Marsh about filing a
> notice of circumstances?
>
> A. I don't remember such a discussion.

9/23/2020 Wakely Dep., 79:16-80:7.

Marsh points to other evidence to place in question the probative value of that testimony.

Wakely also testified that he had no recollection that he or anyone else at GlassHouse notified

Marsh of Wellington's threatened claim or GlassHouse's concerns about that claim:

---

to Marsh."); Pls.' Opp., 22 (citing Pls.' Stmt. ¶ 104). Notably, Marsh responded directly to Plaintiff's contention in its Reply Memorandum, stating:

> Of the two references to Wakely's testimony, neither mentions conveying DLA's
> concerns to Marsh; to the extent Wakely addresses the general topic he says he 'can't
> remember specifically' communicating this to Marsh. (Ex. 35, Deposition of Jeffrey
> Wakely, Sept. 23, 2020, at 79:8-25.) Of the four references to Chiplock's testimony, not
> one of them says anything about DLA's concerns let alone conveying them to Marsh. In
> fact there is no testimony from Chiplock confirming that (1) he was ever aware of DLA's
> concerns, or (2) he ever conveyed any information to Marsh about a prospective claim by
> Wellington.

Def.'s Reply, 18.

Q:      Right, but your own lawyers told you at the beginning of April that they were having serious continuing concerns about Wellington suing the directors and officers of GlassHouse, right?

A:      Right, yeah.

Q:      So much so, you then reported that to Mr. Sharp [GlassHouse's then-CEO], right?

A:      Yes.

Q:      And you reported that to the [GlassHouse] board of directors, right?

A:      Yes.

Q:      And you said that you got a number of other red flags going back at least as early as March 23 of 2014, right?

A:      Yes.

Q:      But you never brought any of that – to your recollection, as you sit here today, you have no recollection of bringing any of that information to Marsh's attention before April 11, when the tail was placed, right?

A:      Yeah, I don't remember if I did or if I didn't.

Q:      But you have no affirmative recollection of doing so?

A:      Right.

Q:      And you don't recall seeing any communications or hearing of any communications from anyone else at GlassHouse to Marsh to that effect, right?

A:      Correct.

10/5/2020 Wakely Dep., 209:23-211:5.

Similarly, Wellington's counsel asked Wakely if he "[made] Marsh aware of potential claims by Wellington prior to the purchase of Tail Coverage?", to which Wakely responded, "Not that I remember."  1/11/2017 Wakely Dep., 20:5-8.  Wellington's counsel then asked, "Are you aware of anyone else at GlassHouse who did?" and Wakely responded, "No, I'm not."  *Id.* at 20:9-11.

Marsh's primary contact with GlassHouse, Petri, testified that prior to procurement of the

Tail, there was no indication from GlassHouse that Wellington was likely to sue GlassHouse's

D&Os. 10/1/2020 Petri Dep., 83:10-20.  She was later asked about that testimony:

> Q:      Do you have any doubt or question in your mind about your answer to that
> question?
>
> A:      I don't.
>
> Q:      Now, given the passage of time, and obviously you don't remember some
> other issues, why is it that your recollection on that particular issue is so clear?
>
> A:      Because we probably all wouldn't be here today.  If there was in fact a
> claim or a circumstance that we believed or that GlassHouse believed could give
> rise or was a claim, then that would have been likely notice to the policy, and
> therefore the course of action would have been different in terms of next steps
> from there.

*Id.* at 174:11-175:1.[26]

GlassHouse appears to have considered it essential that the $15 million of coverage under

the Policy remain in place through the original claims reporting period ending on June 1, 2014

because it was concerned about being sued by Wellington.  However, GlassHouse did not

communicate that directly to Marsh:

> Q:      . . . there's no dispute, Mr. Chiplock, that the existing D&O policy had
> $15 million in coverage, right?
>
> A:      Right.
>
> Q:      And there's no dispute that there was a change-in-control event on April
> 11, 2014, right?
>
> A:      Right.
>
> Q:      And there's no dispute that you authorized Marsh to buy a $5 million
> three-year tail policy off of a claims-made D&O policy, right?
>
> A:      Right.

---

[26] *See also* 9/30/2020 Donaher Dep., 60:3-6 ("Q: Was there any discussion between GlassHouse and
Marsh about Wellington suing the GlassHouse directors and officers?  A: No.").

Q:      And there's also no dispute that you have no recollection of ever saying anything to Marsh to the effect that the company absolutely required that $15 million in coverage remain in effect for post-change-in-control claims based on pre-change-in-control conduct.  Right?

A:      Yes.  I can't specifically remember that.

9/3/2020 Chiplock Dep., 254:25-255:23; *see also* 10/5/2020 Wakely Dep., 207:2-208:2 (Wakely confirming he has no recollection of telling Marsh about the importance of keeping $15 million in coverage in place).  Petri also was clear on this point:

Q:      Did anyone from GlassHouse ever tell Marsh during this process that it was essential to GlassHouse that it retain $15 million in D&O coverage through June 1, 2014, regardless of the terms of the tail that was placed?

A:      No, not in any of my conversations.

10/1/2020 Petri Dep., 178:11-16.

Wakely and Chiplock testified that they believed that the Tail had no impact on the existing coverage.  There is no evidence in the record that either shared that belief with Marsh.  It is not even apparent from the record that the GlassHouse executives discussed their understanding of the Tail among themselves.  As Wakely put it, "I think we all assumed since Wellington . . . subsequently came and alleged wrongful acts that were prior to the transaction, that the $15 million still stood."  10/5/2020 Wakely Dep., 124:18-21.  Chiplock confirmed that he had a similar understanding and that he never discussed his belief with others at GlassHouse or with Marsh:

Q:      Do you remember having any discussion internally at GlassHouse about that interpretation that you just gave us . . . ?

A:      I don't recall specifically, no.

Q:      Do you remember having any discussion with anyone at Marsh about that particular interpretation . . .?

A:      Again, not specifically, no.

9/3/2020 Chiplock Dep., 221:12-21.[27]

The Plaintiffs also cite to Wakely and Chiplock's testimony to support an argument that

GlassHouse had a policy and practice such that they would have conveyed information regarding

potential claims to Marsh.[28]  The Plaintiffs contend that evidence of such a practice creates a

genuine issue of material fact as to whether information was conveyed in this case consistent

with that practice.  In this case, the record provides insufficient evidence to establish the

existence of a practice sufficient to satisfy Fed. R. Evid. 406 and constitute probative admissible

evidence that should be considered in opposition to a motion for summary judgment.  Fed. R.

Evid. 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to

prove that on a particular occasion the person or organization acted in accordance with the habit

or routine practice.").

> Although there are no "precise standards" for determining whether a behavior
> pattern has matured into a habit, two factors are considered controlling as a rule:
> "adequacy of sampling and uniformity of response." . These factors focus on
> whether the behavior at issue "occurred with sufficient regularity making it more
> probable than not that it would be carried out in every instance or in most
> instances."  It is essential, therefore, that the regularity of the conduct alleged to
> be habitual rest on an analysis of instances " 'numerous enough to [support] an
> inference of systematic conduct' and to establish 'one's regular response to a
> repeated specific situation.' "

*U.S. v. Newman*, 982 F.2d 665, 668 (1st Cir. 1992) (citations omitted).

---

[27] Wakely did testify that it was his practice to advise the company's insurance broker to the extent he saw something in the insurance documentation that he "either … didn't understand or that did not comport with [his] belief of what it was that the company was purchasing…."  10/5/2020 Wakely Dep., 77:14-20.

[28] 9/3/2020 Chiplock Dep., 223:1-20; 108:7-11 ("Q. So is it fair to say that if you had been aware of potential claims, that's likely the kind of information that you would have provided? A. Yes."), 119:11-19 ("Q: Did you have a general practice at GlassHouse that if something came to your attention that might result in a claim against the company, that it ought to be relayed to Marsh? A. I believe, yes, we had a general policy that based on the relationship we had with Marsh, if we were aware of a potential claim, we would let them know.")).

The Plaintiffs have cited no evidence that could serve as foundation of adequacy of sampling or uniformity of response to demonstrate the admissibility of Chiplock and Wakley's statements as evidence of a regular practice or habit that could prove that they provided Marsh with information regarding Wellington's threatened claims prior to purchasing the Tail.

Where a witness professes no real memory and merely testifies to a belief, no credibility assessment is necessary. After repeatedly testifying that he had no specific recollection of anyone at GlassHouse providing specific information about Wellington's threatened claims for which there could be coverage under the Policy and as to which GlassHouse had determined it was essential that the existing coverage limits under the Policy would apply, Wakely's testimony that he "believed" that information regarding the claims threatened or alluded to on the call between Wellington's and GlassHouse's counsel had been conveyed to Marsh barely qualifies as a scintilla of evidence based on a potentially self-serving belief that is not supported by other facts in the record. Both Wakely and Chiplock repeatedly testified that they had no specific recollection that information about the threatened Wellington claim had been conveyed to Marsh. Petri and Donaher were clear in their testimony that no information had been provided, and the notes from the March 28th Call with the AIG underwriters provide further evidence that those threatened claims were not discussed during that call.

The First Circuit Court of Appeals has held that:

> It is common ground that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough to ward off summary judgment. Where the plaintiff has the burden of proof, "there must be evidence on which the [factfinder] could reasonably find for the plaintiff." There is no such evidence here—and generalized conclusions, such as [the plaintiff] has proffered, cannot fill the void. .

*Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 380–81 (1st Cir. 2018) (alterations in original) (citations omitted). *See also DePoutot v. Raffeally*, 424 F.3d 112, 117 (1st Cir. 2005) ("[f]actual

specificity is required; a conglomeration of 'conclusory allegations, improbable inferences, and unsupported speculation' is insufficient" to ward off summary judgment.) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

"[T]he nonmoving party must, with respect to each issue on which it would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in its favor. Such a showing requires more than the frenzied brandishing of a cardboard sword. The nonmovant must point to materials of evidentiary quality, and such materials must frame an issue of fact that is more than merely colorable*." Irobe*, 890 F.3d at 377 (quotation marks, alterations, and citations omitted).  The evidentiary quality of such materials, particularly on a dispositive issue, must be "significantly probative."  *Id.* at 377 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "A court need not 'take at face value' a party's 'subjective beliefs,' even if offered in the form of testimony, if those subjective beliefs are 'conclusory,' 'self-serving,' and lack factual support in the record."  *Id.* at 381 (*quoting Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 47 n.1 (1st Cir. 2008).  "An issue is 'genuine' when a rational factfinder could resolve it [in] either direction … [a] fact is 'material' when its (non)existence could change a case's outcome."  *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir. 2018) (citing *Borges ex rel S.M.B.W v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).   As non-moving parties who have the burden of proof, the Plaintiffs must show that "a trier of fact could reasonably resolve that issue in [their] favor" by "point[ing] to materials of evidentiary quality and such materials must frame an issue of fact that is more than "merely colorable." *Irobe*, 890 F.3d at 377 (internal quotations and citations omitted).

Drawing all reasonable inferences in favor of the Plaintiffs, I conclude that, on this record, the Plaintiffs have not demonstrated that a reasonable factfinder could determine that

GlassHouse provided information regarding the threatened Wellington claim prior to binding the

Tail. *See id*. at 381. As such, there is no genuine triable issue with regard to these facts, and I

must conclude that GlassHouse did not provide any information regarding the threatened

Wellington claims to Marsh–only information regarding the governmental obligations of its UK

subsidiary and general information regarding the formal liquidation of the UK subsidiary and the

wind down of GlassHouse and secured party sales of its assets.

### C. Was the failure to disclose the threatened claim a material breach that would excuse performance or require enforcement of the disclaimer of liability in the Engagement Agreement?

The Engagement Agreement provides that GlassHouse was "solely responsible for the

accuracy and completeness of all information that [GlassHouse] furnish[ed] to Marsh." Def.'s

Ex. 1 ¶ 5. It further states that "Marsh shall not be responsible to verify the accuracy or

completeness of any information [GlassHouse] provid[ed], and [that] Marsh shall be entitled to

rely on that information." *Id.* Petri emphasized that Marsh was dependent on GlassHouse for

correct information:

> Q:     To what extent does Marsh rely on its clients to provide it with accurate and complete information?
>
> A:     Fully. I would say particularly for private companies, where all of their information is held privately, as opposed to a public company, where there's a lot of information in the public domain.
>
> Q:     Does that reliance include information about potential or threatened claims?
>
> A:     It does.

10/1/2020 Petri Dep., 175:21-176:7. GlassHouse failed to provide Marsh with full and accurate

information regarding the threatened Wellington claims, GlassHouse's concerns regarding those

claims, and the need to maintain $15 million in coverage for pre-secured party sale conduct that

could be the subject of claims noticed prior to June 1, 2014.

"Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Process Am., Inc.*, 839 F.3d at 136; *see also Markham Gardens L.P. v. 511 9th LLC*, 38 Misc. 3d 325, 331 (N.Y. Sup. Ct. 2012) ("When one party commits a material breach of a contract, the other party to the contract is relieved, or excused, from further performance under the contract"). "'[A] party who has materially breached a contract is not entitled to recover damages for the other party's subsequent nonperformance of the contract, since the latter party's performance is excused'—in other words, the first party to 'commit[ ] a material breach cannot enforce the contract.'" *Cole Mech. Corp. v. Nat'l Grange Mut. Ins. Co.*, 06 Civ. 2875 (LAK)(HBP), 2010 WL 11586687, at *4 (S.D.N.Y. Feb. 24, 2010) (quoting Samuel Williston & Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2006)).

GlassHouse's failure to inform Marsh about the threatened Wellington claims, the clear concern of GlassHouse's counsel and some of its D&Os about the threatened claims shown in the record, and the need to maintain $15 million in coverage for pre-change secured party sale conduct are all actions that breached paragraph 5 of the Engagement Agreement.[29]  This breach was material given that the record demonstrates, through unrefuted testimony, the direct impact that this information would have had on Marsh's advice.  "Whether a failure to perform constitutes a 'material breach' turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which

---

[29] Def.'s Exs. 1, 3 ("You shall be solely responsible for the accuracy and completeness of all information that you furnish to Marsh and/or insurers … [.]  Marsh shall not be responsible to verify the accuracy or completeness of any information that you provide, and Marsh shall be entitled to rely on that information.")

the injured party has benefitted under the contract." *Process Am., Inc.*, 839 F.3d at 136 (citation

omitted).  For a breach to be material, it must "go to the root of the agreement between the

parties." *Id.*  (citation omitted) (holding that a material breach did not occur where the defendant

failed to pay the defendant residuals under the contract because the breach occurred after a

lengthy period of performance); *Nolan v. Sam Fox Publ'g Co.*, 499 F.2d 1394 (2d Cir. 1974) (a

breach in which one party paid approximately a quarter of the royalties due to the other party

was not so substantial as to permit rescission); *Chapman v. Davis*, 165 N.Y.S.3d 818, at *6 (N.Y.

Just. Ct. 2022) (A material breach is one "that substantially defeats the purpose of an agreement

in such a fundamental way as to defeat the object of the parties in making the contract, and

otherwise occurs where a party fails to perform a substantial part of the agreement, the

performance of which was the initial inducement for entering the agreement") (internal

quotations and citations omitted).

Even if genuine issues of material fact exist as to whether Petri and Marsh were wrong

about whether the change in control provision of the Policy would have been triggered and

whether Marsh failed to adequately confirm the reduction in policy limits at the time GlassHouse

purchased the Tail, I agree with Petri's assessment that "we probably all wouldn't be here

today," *see* 10/1/2020 Petri Dep., 174:11-175:1, had GlassHouse provided the information that it

obtained from the April 3, 2014 telephone call between its attorneys and Wellington's attorneys

regarding threatened claims, and, as a result, the breach by GlassHouse is material.  Where

evidence concerning the materiality of a breach is clear and substantially uncontradicted, the

question of materiality can be a matter of law for the Court to decide.  *See Cont'l Ins. Co. v. RLI

Ins. Co.*, 161 A.D.2d 385, 387–88 (N.Y. App. Div. 1990) (reversing grant of summary judgment

because "[i]t is only where the evidence concerning the materiality is clear and substantially

uncontradicted that the question is a matter of law for the court to decide”); *Process Plants Corp. v. Beneficial Nat’l Life Ins. Co.*, 53 A.D.2d 214, 216 (N.Y. Sup. Ct. 1976) (“Ordinarily, the question of materiality of misrepresentation [in the formation of a contract] is a question of fact for the jury. However, where the evidence concerning the materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine.”) *aff’d* 42 N.Y.2d 928 (N.Y. 1977); *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.,* 361 F.Supp.2d 283, 295 (S.D.N.Y. 2005) (“there may be circumstances in which the question of materiality is a question of law for the judge.”); *Robert Cohn Assocs., Inc. v. Kosich,* No. 3535-07, 2008 WL 9349431, at *3 (N.Y. Sup. Ct. April 11, 2008) (“Whether a given set of facts constitutes a material breach of a contract is a question of law to be decided by the Court.”).  *But see In re Residential Capital, LLC*, 533 B.R. 379, 404-05 (Bankr. S.D.N.Y. 2015) (“The question of materiality, although it may be appropriately decided as a matter of law in certain circumstances, is more commonly considered a mixed question of law and fact, or primarily a question of fact, consistent with the wavering and blurred line that divides the material breach from the trivial. … Thus, the materiality of a party's breach is not properly disposed of by summary judgment.”) (citations and quotations omitted); *Merill Lynch & Co. Inc v. Allegheny Energy, Inc.,* 500 F.3d 171, 186 (2d Cir. 2007) (“The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain”, the court noting that failure to substantially perform is synonymous with a party committing material breach of a contract).

GlassHouse’s failure to provide complete information is directly relevant to advice that it sought from Marsh and went to the root of the Engagement Agreement as it related to Marsh’s advice on suitable coverage.  The uncontroverted evidence demonstrates that, had Marsh known

that Wellington had threatened to sue GlassHouse and its D&Os, Marsh would have provided

different advice and would not have bound the Tail with AIG.  *See* 10/1/2020 Petri Dep., 175:4-

20.  GlassHouse's breach excused Marsh from performance because Marsh was asked to perform

its services without the benefit of material information known to GlassHouse.[30]

Further, in these circumstances, the disclaimer provision in the Engagement Agreement

operates to protect Marsh from contractual liability.  Under New York law, courts must enforce

contractual limitations or disclaimers of liability between sophisticated commercial parties.  *See,*

*e.g., Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (1995)

("Freedom of contract prevails in an arm's length transaction between sophisticated parties such

as these, and in the absence of countervailing public policy concerns there is no reason to relieve

them of the consequences of their bargain.").  The Engagement Agreement's disclaimer

provision operates to disclaim liability for the advice provided to GlassHouse.  GlassHouse had

an obligation to provide Marsh with complete and accurate information, which included

---

[30] The Plaintiffs contend that Marsh breached the Engagement Agreement because it should have advised
GlassHouse to provide AIG a "Notice of Circumstances" when it learned the details of its winddown and
the tax issues of its UK subsidiary.  They argue that, had such a notice been provided, any later "Claim"
asserted by Wellington would have related back to the Notice of Circumstances and coverage would have
been available at the $15 million limits (or presumably the Tail would have been underwritten
differently).  Absent evidence that GlassHouse informed Marsh of the claims threatened by Wellington
beginning with the April 3, 2014 call among counsel, there is no evidence that GlassHouse provided
information to Marsh that D&Os may have provided false reporting to Wellington or engaged in any act
or omission that could have given rise to a claim for which coverage would have been provided under the
Policy.  The Plaintiffs have not argued that the Policy would have provided coverage for personal
statutory liability for unpaid taxes.  The Plaintiffs merely point to the general understanding expressed by
the AIG underwriters that, as a general assessment, there is a greater risk of claims being made against
insureds in liquidation situations by creditors and an acknowledgment by Marsh that Marsh was aware of
"accounting issues" in the UK.  *See* 9/30/2020 Donaher Dep., 42:12-17 (when asked in an email, *See* Pl.
Ex. 40, about the reason for a call with GlassHouse in February, 2014, Donaher references "that UK
accounting error thing and termination of the UK head").  Plaintiffs point to no evidence in the record that
could establish that the unpaid taxes in the UK–whether or not resulting from an accounting error–would
ripen into a covered claim under the Policy.  The Policy provides no coverage for personal liability on
unpaid taxes and contains an insured vs. insured exception that would preclude claims by GlassHouse
against D&Os that may be responsible for any "accounting" errors.

information on potential claims and any resulting specific coverage needs; GlassHouse had

reason to believe that Wellington was going to file a lawsuit against it and that it therefore

needed to keep $15 million in coverage in place for claims related to any conduct that predated

the change in control; GlassHouse failed to disclose this information to Marsh when Marsh was

advising Glasshouse and placing the Tail.  Accordingly, Marsh can have no liability to the

Trustee for any purported "deficiencies" in Marsh's provision of services to GlassHouse,

including placement of the Tail, all of which were "based on inaccurate or incomplete

information provided to Marsh" by GlassHouse.  Def.'s Ex. 1 ¶ 5.[31]

### III.   **Wellington's Third-Party Beneficiary Claim**

"A third-party beneficiary of a contract has no greater rights than the promisee." *Aretakis*

*v. Fed. Express Corp.*, No. 10 Civ. 1696(JSF)(KNF), 2011 WL 1226278, at *6 (S.D.N.Y. Feb.

28, 2011) (citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 375 (1990)), *report &*

*recommendation adopted by* 2011 WL 1197596 (S.D.N.Y. Mar. 25, 2011) (third party seeking

damages arising from the late delivery of a packages limited by the $100 damages limitation

provided in the contract between the carrier and the sender); *accord Ball Banking Corp. v. UPG,*

*Inc.,* 985 F.2d 685, 697 (2d Cir. 1994); *Publishers Consortium Inc., v Arsenal Pulp Press (In re*

*Publishers Consortium, Inc.)*, 345 Fed. Appx. 710, 712 (2d Cir. 2009); *Dunning v. Leavitt,* 85

N.Y. 30, 35 (1881); *Saska v. Metro. Museum of Art,* 42 Misc. 3d 548, 559 (Sup. Ct. N.Y. 2013).

Here, Wellington can assert no greater claims than the Trustee.  Even if I were to determine that

Wellington was a third-party beneficiary of the agreements between Marsh and GlassHouse,

summary judgment must enter in favor of Marsh because, as discussed in detail above, the

---

[31] Since there are two bases on which the breach of contract claim fails, it is unnecessary to reach any
issues related to the claim of breach of the implied covenant of good faith and fair dealing.  *See supra*
note 19.

material breach of the Engagement Agreement by GlassHouse excused performance by Marsh.

Had I not determined that summary judgment will enter with respect to the Trustee's breach of contract claim, I would enter summary judgment against Wellington on its third-party beneficiary claim. In my decision on Marsh's Motion to Dismiss, I noted that "Wellington's [third party beneficiary] claim may not survive a summary judgment motion absent evidence that supports the broad inferences taken with respect to its allegations." *In re GlassHouse*, 604 B.R. at 627. After the close of fact discovery, on this summary judgment record, there are no material facts in genuine dispute that would establish a third-party beneficiary claim if accepted as true. New York courts have been reluctant to extend to third parties the right to bring breach of contract claims where those parties have not shown a clear intent by the contracting parties to benefit a specific party known to the parties and an intention that that party could enforce the contract.[32] *See Henry v. Michael P. Guastella & Assocs., Inc.,* 496 N.Y.S.2d 591, 594 (N.Y. App. Div. 1985) (applying New York law and concluding that "it has not been the policy of the courts in this state to extend the promisor's responsibility for the breach of a contract to perform professional services to those not parties to the contract"); *see also Ultramares Corp. v. Touche*, 174 N.E. 441, 445 (N.Y. 1931) (limiting liability of accounting professional in the absence of fraud or collusion, solely to the person who contracted for the performance). The record does not contain evidence from which reasonable factfinder could conclude that Wellington is a third-party beneficiary of the Engagement Agreement between Marsh and GlassHouse.[33]

---

[32] As stated above, I have determined that New York law applies to breach of contract and third-party beneficiary claims in this action. *See In re GlassHouse Techs., Inc.*, 604 B.R. at 617.

[33] The Engagement Agreement is the only contract to which Marsh is a party and of which Wellington claims to be an intended beneficiary. *See* Compl. ¶ 122 (asserting that Wellington is "an intended and foreseeable third[-]party beneficiary of the Policy and the engagement agreement between Marsh and GlassHouse."). In oral argument, I raised the question of whether, where an agreement contemplates future brokerage and advisory services, a third-party beneficiary could be intended in relation to specific

Wellington bears the burden of establishing its status as a third-party beneficiary. *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 370–71 (2d Cir. 1995). Under New York law, as the party asserting third party beneficiary rights under a contract, Wellington must establish: "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [Wellington's] benefit and (3) that the benefit to [Wellington] is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [Wellington] if the benefit is lost." *Mendel v. Henry Phipps Plaza W., Inc.*, 844 N.E.2d 748, 751 (N.Y. 2006) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 336 (1983). "To create a third party right to enforce a contract, the language of the contract must clearly evidence an intent to permit enforcement by the third party." *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005) (internal quotation marks and citation omitted).

The intent of the contracting parties is the central inquiry in determining whether a nonparty may maintain an action as a third-party beneficiary. *See, e.g., Katz v. Pershing, LLC*, 672 F.3d 64, 73 (1st Cir. 2012) (applying New York law and stating that the contracting parties' intent to benefit the third party is an "immutable requirement" of that jurisdiction's law regarding whether a party is a third-party beneficiary); *Suffolk Cnty. v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir. 1984) ("It is ancient law in New York that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed.") (internal citation omitted). Many courts interpreting New York law do not look beyond the language of the contract. *See, e.g., Synovus Bank of Tampa Bay v. Valley Nat'l Bank*, 487 F. Supp. 2d 360, 368 (S.D.N.Y. 2007) ("While the third-party beneficiary does

---

services undertaken long after execution of the original services agreement. As will be discussed, the record does not support such a theory in relation to the services provided by Marsh to obtain the Tail.

not have to establish that it is explicitly mentioned in the contract, New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract."); *see also Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*, 807 F. Supp. 1007, 1020 (S.D.N.Y. 1992) (same). There is nothing "on the face" of the Engagement Agreement from which a finder of fact reasonably could conclude that Marsh and GlassHouse intended Wellington to benefit from the agreement. *See generally* Ex. 1. As such, there is no "clear contractual language evincing" Marsh's and GlassHouse's intent to benefit Wellington. *See Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 6 (S.D.N.Y. 2020) (quoting *LaSalle Nat'l Bank v. Earnst & Young LLP*, 285 A.D.2d 101, 108-09 (N.Y. App. Div. 2001) (holding that the language of a contract that explicitly states the names of the parties, and none other, failed to express the requisite intent to benefit a third party such that the third-party could sustain a claim)).

Despite a general reluctance to do so, some courts interpreting New York law look beyond the language of the contract in appropriate circumstances. *Anwar v. Fairfield Greenwich Ltd.,* 728 F. Supp. 2d 372, 418 (S.D.N.Y. 2010) ("In determining whether there is an intended third party beneficiary, courts should look first at the contractual language itself . . . and[,] where appropriate[,] the surrounding circumstances.") (quotations and citations omitted); *see also Levin v. Tiber Holding Corp.*, 277 F.3d 243, 249 (2d Cir. 2002) ("'Where the terms of the contract necessarily require the promisor to confer a benefit upon a third person, then the contract contemplates a benefit to that third person, and this is ordinarily sufficient to justify third-party beneficiary enforcement of the contract, even though the contract also works to the advantage of the immediate parties thereto.'") (quoting 22 N.Y. Jur. 2d Contracts § 304); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d, 566 573 (2d Cir. 1991) (holding that "it is permissible for the court to look at the surrounding circumstances as well as the agreement" and

affirming the district court's finding that party became a third-party beneficiary of promise of forbearance, despite acknowledging that the district court found such intent "tacitly").  "[W]here a provision in a contract expressly negates enforcement by third parties, that provision is controlling."  *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 249 (2d Cir. 1988); *see also Mendel*, 844 N.E.2d at 751 (concluding that plaintiffs lack standing to bring third-party beneficiary action because the agreement at issue "explicitly negates any intent to permit its enforcement by third parties").  However, where there is no stated intent one way or another, a contract "does not necessarily preclude proof that unnamed third-party beneficiaries were intended to be benefited." *Newin Corp. v. Hartford Acc. & Indem. Co.*, 333 N.E.2d 163, 168 (N.Y. 1975) (determining in a case involving indemnity bonds that the "mere absence in a contract of any provision either excluding or including such coverage does not necessarily preclude proof that unnamed third-party beneficiaries were intended to be benefited"); *see also Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012).

While there is no specific clause in the Engagement Agreement that contemplates enforcement by third parties damaged by the wrongful conduct of GlassHouse's D&Os, there is also no clause in the agreement that states that there may be no third-party beneficiaries, such that Wellington is not necessarily precluded from proving that unnamed beneficiaries were intended to be benefited. [34]  *See, e.g., Newin Corp.*, 333 N.E.2d at 168 (noting that on the face of

---

[34] Marsh argues that, even where courts have deemed it appropriate to consider "surrounding circumstances," the circumstances in question are those surrounding the formation of the contract at issue, i.e., the Engagement Agreement, not later-occurring events like performance by the parties pursuant to the contract.  *See, e.g., Subaru Distribs. Corp. v. Subaru of America, Inc.*, 425 F.3d 119, 126 (2d Cir. 2005) (holding, in part, that a six-year gap in time between an initial agreement and a later agreement precluded using the later agreement as evidence of any intent to benefit a third party in the initial agreement).

the pleadings "plaintiffs have sufficiently brought themselves within the class of third party

beneficiaries of the policies, though not named in the bonds") (internal quotations omitted).

"Among the circumstances to be considered is whether manifestation of the intention of the

promisor and promisee is sufficient, in a contractual setting, to make reliance by the beneficiary

both reasonable and probable." *Fourth Ocean Putnam v. Interstate Wrecking Co., Inc.*, 485

N.E.2d 208, 212 (N.Y. 1985) (quotations omitted).  In cases where New York courts have

determined that a third-party claimant may assert claims on its own behalf in the context of an

insurance broker failing to properly procure insurance, the claimant was known to the insurance

agent or there were other circumstances where the intent to benefit the third party was

unequivocal.[35]   In *Dominion Financial Corp.*, the trial court found that the plaintiff had alleged

sufficient facts to support its third-party beneficiary claim where it was a named beneficiary with

respect to the surety coverage procured by the insurance broker.  *See* 874 N.Y.S.2d at 116.

Further, the broker "was aware, from the moment its client contacted it about procuring

coverage, that plaintiff was the intended beneficiary of the coverage, and that plaintiff

---

[35] *See Dominion Fin. Corp. v. Asset Indem. Brokerage Corp.*, 874 N.Y.S.2d 115, 116 (N.Y. App. Div. 2009) (holding that a plaintiff in "action against an insurance broker for failure to properly procure insurance . . . alleged facts sufficient to demonstrate that it was an intended beneficiary not only of the surety coverage procured by defendant, in which it was so named, but also of defendant's agreement with its client to procure the surety coverage"); *Multibank, Inc. v. Access Glob. Capital LLC*, No. 650637/2017, 2017 WL 162282, at *9 (N.Y. App. Div. Jan. 9, 2017) (finding that it was "undisputed that [plaintiff] was meant to benefit from the Policy because it is named as an additional insured."); *but see Griffin v. DaVinci Dev., LLC*, 845 N.Y.S.2d 97, 1002-03 (N.Y. App. Div. 2007) (where third-party plaintiff alleged that insurance broker was contracted by third-party defendant to obtain insurance for the third-party plaintiff and such plaintiff was provided certificates of liability insurance, causes of action asserted against insurance broker in a third-party complaint were not sufficiently pleaded because the third-party plaintiff was not in privity of contract with the broker and failed to set forth sufficient allegations that there was "fraud, collusion, or other special circumstances" that would have enabled it to recover for its "pecuniary loss"); *Henry*, 496 N.Y.S.2d at 594 (in the context of failing to procure automobile insurance, finding that broker had no recognized duty to act apart from contract, and the "plaintiff's decedent was neither a party to the contract between the insurance agency and its client nor an intended beneficiary").

participated on its own behalf in discussions with [the broker] and its client about the coverage to
be provided." *Id.* Other than in these specific circumstances, New York courts have not been
receptive to third-party beneficiary claims against insurance brokers.[36]

Wellington appears to assert that even unknown potential holders of claims against
GlassHouse or its D&Os would constitute intended beneficiaries of the agreement between
Marsh and GlassHouse pursuant to which Marsh would procure for GlassHouse.  The Plaintiffs
cite no case in support of this proposition where New York law has been interpreted to extend
third-party beneficiary status, generally, to unknown claimants possessing claims that would
have been insured under coverage that would have been in place had an insurance broker
properly performed its obligations under an agreement to obtain insurance for an insured.  Side A
coverage under the Policy provides that "[t]his D&O Coverage Section shall pay the Loss of an
Individual Insured of the Company arising from a Claim made against such Individual Insured
for any Wrongful Act of such Individual Insureds[.]" Ex. 12, MARSH-00004526, at ¶ 1; *see also*
Compl. ¶ 33.  The language of the Policy makes clear that the Policy was intended to benefit the
Company and its D&Os by providing defense and indemnification (to the extent of policy limits
as reduced by defense costs) from and against the claims of third parties.[37]  I do not interpret

---

[36] *See, e.g., Griffin*, 845 N.Y.S.2d at 1002; *Henry*, 496 N.Y.S.2d, at 594 ; *Superior Ice Rink, Inc. v. Nescon Contracting Corp.*, 40 A.D.3d 963, 965 (N.Y. App. Div. 2007) (dismissing claims against insurance broker because plaintiff "failed to set forth sufficient allegations in support of its position that it was an intended third-party beneficiary of the contract" between the insured and broker); *Benjamin Shapiro Realty Co., LLC. v. Kemper Nat'l Ins. Cos.*, 303 A.D.2d 245, 246 (N.Y. App. Div. 2003) (affirming summary judgment on claims against insurance broker because there were not "any triable issue presented as to whether plaintiff had enforceable rights as a third-party beneficiary of a contract" between the insured and broker).

[37] Courts have not viewed D&O insurance policies as primarily benefiting injured third parties, although indemnification is a component of the coverage. *See Ochs v. Lipson (In re First Cent. Fin. Corp.)*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999).  In *First Central Financial Corp.*, the bankruptcy court stated for purposes of determining whether a D&O policy is estate property, that:

> D & O policies are obtained for the protection of individual directors and officers.
> Indemnification coverage does not change this fundamental purpose. There is an

New York law to support a general intent to benefit unknown claimants in a contract such as the

Engagement Agreement and recognize that "[a]bsent clear contractual language evincing such

intent, New York courts have demonstrated a reluctance to interpret circumstances to construe

such an intent," *LaSalle Nat. Bank*, 729 N.Y.S.2d at 676.

The Plaintiffs claim that Wellington and its potential claims became known to Marsh

after execution of the Engagement Agreement at the time that Glasshouse sought Marsh's

services in connection with the Tail purchase because GlassHouse's D&Os sought assurances

from Marsh "that their insurance coverage would be sufficient to pay outstanding creditors,"

including Wellington, because the company was "near collapse," Compl. ¶¶ 56–57. As

discussed in relation to the Trustee's breach of contract claim, the record does not support that

broad claim. Certainly, there is evidence in the record that supports that Marsh was informed of

the circumstances involving GlassHouse's UK subsidiary and that GlassHouse's senior secured

lender, Wellington, was in the process of exercising rights that would result in secured-party

sales of substantially all GlassHouse's assets and that GlassHouse would be wound down, there

is still no evidence GlassHouse notified Marsh of Wellington's D&O claims. In an email dated

April 11, 2014, the same date the Tail was bound, an employee of Marsh states that an officer of

GlassHouse confirmed that Wellington "now owned" a majority of GlassHouse "in phased sell

off (not done yet but by division)." Def.'s Ex. 4. But there is no evidence in the record that

---

important distinction between the individual liability and the reimbursement portions of a
D & O policy. The liability portion of the policy provides coverage directly to officers
and directors, insuring the individuals from personal loss for claims that are not
indemnified by the corporation. Unlike an ordinary liability insurance policy, in which a
corporate purchaser obtains primary protection from lawsuits, a corporation does not
enjoy direct coverage under a D & O policy. It is insured indirectly for its
indemnification obligations. In essence and at its core, a D & O policy remains a
safeguard of officer and director interests and not a vehicle for corporate protection.

*Id.*

Marsh was informed that Wellington possessed claims that may be covered under the Policy or

that Marsh and GlassHouse intended the Tail to benefit Wellington.  I have held that no

reasonable fact-finder could find that GlassHouse informed Marsh of any claims threatened

against GlassHouse and its D&Os by Wellington.  Wellington's status as a secured creditor

exercising rights, alone, would not give rise to claims for which there would be coverage under

the Policy.[38]

There is little evidence in the record that could be viewed to demonstrate that even

GlassHouse intended Marsh's services to benefit Wellington.  A reasonable inference from the

record would be that GlassHouse sought to obtain the Tail to provide defense and

indemnification for the benefit of its D&Os.  *See, e.g.*, 10/5/2020 Wakely Dep., 61:7-22

(describing his belief that the purpose of the D&O coverage Marsh obtained for GlassHouse

under the Engagement Agreement was to "protect the directors and officers against claims . . .

.").  Of equal import, there is no evidence that GlassHouse informed Marsh of any intent to

benefit Wellington or that Marsh had that intent.  Petri testified that Marsh did not intend for its

services on behalf of GlassHouse to have benefited Wellington and that GlassHouse never

related any such intent to Marsh:

> Q:      Did anyone, to your knowledge, on the Marsh team ever have an
> understanding that the purpose either of the policy or of the tail or of Marsh's
> work here was designed to provide a benefit directly to Wellington?
>
> MR. OLSKY:  Objection.  Foundation.
>
> Q:      You can answer.

---

[38] Even if Marsh were found to have understood (incorrectly) that Wellington became an "owner" of
GlassHouse, there could be no intent inferred that Marsh and GlassHouse intended to benefit Wellington
as a potential plaintiff in a suit seeking damages against the D&Os.  The "insured vs. insured" exception
under the Policy precluded any coverage for claims brought by GlassHouse, itself, against D&Os, and the
Policy provided defense and indemnification for the D&Os that would provide no direct benefit to an
"owner" independent of claims that it might have in another capacity.

A:      No.

Q:      Did anyone from GlassHouse ever say to anyone from Marsh, to your knowledge, that the placement of the tail or anything else that Marsh was doing on GlassHouse's behalf was being done to provide a direct benefit to Wellington?

MR. OLSKY:  Objection to form and foundation.

Q:      You can answer.

A:      No.

10/1/2020 Petri Dep., 179:16-180:9.

While a third party may sue as a beneficiary on a contract made for its benefit, "an intent to benefit the third party must be shown, and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts." *Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 710 (2018) (emphasis added) (*quoting Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 655 (1976).  There is no evidence in the record through which Wellington could prove that both parties intended the agreement to benefit [Wellington]. *See Cent. Hudson Gas & Elec. Corp.*, 56 F.3d at 370-71 (citing *Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir. 1979)).  Here, there is no manifestation of an intent by the contracting parties to benefit Wellington.  "Nor is there anything in the contract … suggesting that, within the contemplation of the contracting parties, reliance by [Wellington] was reasonable and probable or that [Wellington] in fact relied upon" any provision of the Engagement Agreement.[39]  *Fourth Ocean Putnam Corp.*, 66 N.Y. 2d at 44-45.  At most, Wellington was an incidental beneficiary of

---

[39] It is undisputed that Wellington never saw a copy of the Engagement Agreement or had any involvement in the drafting or negotiating of that document.  Def.'s Stmt. ¶ 8.  It is undisputed that Wellington played no direct role in the procurement of the Tail.  Wellington did not see the Tail endorsement or even know its terms until well after Wellington filed its lawsuit against the D&Os.  *Id.* at ¶ 36.

the Engagement Agreement and any services provided by Marsh in obtaining the Tail.[40]  There

are no genuine issues of material fact that could establish that Wellington was an intended third-

party beneficiary of the Engagement Agreement under New York law.  On this record,

Wellington failed to meet its burden and the strict requirements imposed by New York law to

permit it to enforce Marsh's contractual obligations to GlassHouse.

## IV.    The Estate's Negligence Claim

Massachusetts law applies to the negligence claim asserted against Marsh by the Trustee

on behalf of the bankruptcy estate.[41]  The "well settled rule [is] that an insurance agent or broker

who, with a view to compensation for his services, undertakes to procure insurance for another,

and through his fault and neglect fails to do so, will be held liable for any damage resulting

therefrom[.]" *Rae v. Air-Speed, Inc.*, 435 N.E.2d 628, 631 (Mass. 1982) (internal quotations

omitted).  Negligence requires both the existence of negligence (duty and breach) and harm

causally connected to the negligent conduct.  *See Cannon v. Sears, Roebuck and Co.*, 374 N.E.2d

582, 584 (Mass. 1978) (holding that "[a] negligence action may not be maintained unless one has

suffered injury or damage.").

"There is no general duty of an insurance agent to ensure that the insurance policies

---

[40] "An incidental beneficiary is a third party who may derive benefit from the performance of a contract though he is neither the promisee nor the one to whom performance is to be rendered." *Strauss v. Belle Realty Co.*, 98 A.D.2d 424, 426–27 (N.Y. App. Div. 1983), *aff'd*, 65 N.Y.2d 399 (1985) (internal citation omitted).  While Wellington may indirectly benefit from the Policy, it is not an intended beneficiary possessing the legal rights that come with that status. *Port Chester Elec.*, 40 N.Y.2d at 655 ("It is old law that a third party may sue as a beneficiary on a contract made for his benefit. However, an intent to benefit the third party must be shown, and, absent such intent, the third party is merely an incidental beneficiary with no  right to enforce the particular contracts.") (internal citations omitted). "Even though [Wellington] would stand to gain from the contract's enforcement, it is merely an incidental beneficiary who would 'fortuitously' benefit from [AIG's] agreement to indemnify" GlassHouse's directors and officers. *GDF Int'l, S.A. v. Associated Elec. & Gas Ins. Servs. Ltd.*, No. C 02-02916 CRB, 2003 WL 926790, at *6 (N.D. Cal. Mar. 4, 2003).

[41] *See In re GlassHouse Techs., Inc.*, 604 B.R. at 619.

procured by him provide coverage that is adequate for the needs of the insured." *Martinonis v.*

*Utica Nat'l Ins. Grp.*, 849 N.E.2d 994, 996 (Mass. App. Ct. 2006).  Instead, the broker

"[o]rdinarily . . . assumes only those duties normally found in an agency relationship." *Baldwin*

*Crane & Equip. Corp. v. Riley & Rielly Ins. Agency, Inc.*, 687 N.E.2d 1267, 1270 (Mass. App.

Ct. 1997) (quoting 16A Appleman Insurance L. & Prac. § 8836, at 64-66 (rev. ed. 1981)).

"These duties include the duty to deal in good faith and the duty to carry out instructions, but

does [sic] not include the duty to advise." *RLI Ins. Co. v. Wood Recycling, Inc.*, No. CIV.A.03-

10196-RWZ, 2006 WL 839514, at *8 (D. Mass. Mar. 30, 2006) (citing Appleman, *supra*, §

8836, at 64); s*ee also Guida v. Herbert H. Landy Ins. Agency, Inc.*, No. 12-P- 1214, 2013 WL

3939946, at *4 (Mass. App. Ct. Aug. 1, 2013) (mem.) (citing *Robinson v. Charles A. Flynn Ins.*

*Agency*, 39 Mass. App. Ct. 902, 902–03 (1995)) (Insurance brokers have no general "duty to

investigate [an insured's] needs for particular coverage or to advise about the availability of

appropriate means of coverage for those needs.").[42]

Massachusetts law recognizes that a duty may be assumed and "a duty voluntarily

assumed must be performed with due care." *Mullins v. Pine Manor College*, 449 N.E.2d 331,

336 (Mass. 1983); *see also Mass. Asset Fin. Corp. v. Harter, Secrest & Emery, LLP*, 430 F.3d

59, 62 (1st Cir. 2005) (citing *Wheatley v. Peirce,* 238 N.E.2d 858, 860 (Mass. 1968) ("A person

undertaking a nongratuitous duty, such as one for pay, has a duty to refrain from ordinary

---

[42] New York law is no different.  "Insureds are in a better position to know their personal assets and
abilities to protect themselves more so than general insurance agents or brokers, unless the latter are
informed and asked to advise and act." *Murphy v. Kuhn*, 90 N.Y.2d 266, 273 (1997).  "Insurance agents
or brokers are not personal financial counselors and risk managers, approaching guarantor status." *Id.*
The relationship between a broker and an insured "is an ordinary commercial relationship which does not
usually give rise to a duty to provide ongoing guidance." *Globalnet Fin. Com., Inc. v. Frank Crystal &
Co., Inc.*, No. 03 Civ. 07333 RWS, 2004 WL 1632594, at *6-7 (S.D.N.Y. July 22, 2004) (quoting *M&E
Mfg. Co. Inc. v. Frank H. Reis Inc.*, 258 A.D.2d 9, 11 (N.Y. App. Div. 1999)).

negligence."). A broker may assume duties contractually or by otherwise undertaking performance of services that should have been seen as necessary to protect the interests of the broker's client. *C.f. Thorson v. Mandell*, 525 N.E.2d 375, 378 (Mass. 1988) (identifying this voluntary assumption of a duty as the "good Samaritan" principle, but refusing to apply it to a personal injury case in which the plaintiff asserted that the defendant negligently failed to enforce its policy against gymnastics in its auditorium, the manner in which she was injured because creation of that policy was not an "undertaking to render services for the protection of its users."). "Moreover, assumption of one duty does not necessary infer assumption of ancillary or related duties. That is, a voluntarily assumed duty must be unambiguously assumed by the care giver." *Satchi v. Rheon U.S.A., Inc.*, 255 F. Supp. 3d 253, 260 (D. Mass. 2017) (citing *Smith v. Robertshaw Controls Co.*, 410 F.3d 29, 38 (1st Cir. 2005). "Defining the scope of the duty assumed is a fact-specific inquiry." *Cottam v. CVS Pharmacy*, 764 N.E.2d 814, 821–22 (Mass. 2002).

An insurance broker may be liable for its representations to a client about insurance coverage on which the client justifiably relied, particularly when the relationship between the client and the insurance agent has extended beyond the procurement of a single policy. *See McCue v. Prudential Ins. Co.*, 358 N.E.2d 799, 801 (Mass. 1976) (describing special circumstances). When an insurance agent undertakes to provide advice to a client about coverage, that insurance agent may be liable for advice that is negligently given. *See Bicknell, Inc. v. Havlin*, 402 N.E.2d 116, 119 (Mass. App. Ct. 1980) (affirming jury verdict of negligence against insurance agent for negligent advice on limits  of liability). Whether such circumstances exist are usually an issue to be determined by a factfinder. *See McCue*, 358 N.E.2d at 801 ("Whether the circumstances which create such liability exist is a jury question."); *KleyKamp v.*

*USAA Cas. Ins. Co.,* 17 N.E.3d 1118, at *1 (Mass. App. Ct. Sept. 29, 2014) (mem) ("Whether special circumstances exist is a question of fact.") (citing *McCue*, 358 N.E.2d at 801).

Absent "special circumstances," a commercial insured "should read its policies rather than rely on representations by an agent." *Sarnifil Inc. v. Peerless Ins. Co.*, 636 N.E.2d 247, 254 (Mass. 1994). "Although an insured is entitled to rely on his broker as his agent, an insured cannot abandon all responsibility for ascertaining the terms of the coverage his broker obtained." *Campione v. Wilson*, 661 N.E.2d 658, 665 (Mass.1996). "[A] broker is not generally required to ensure that the policyholder understands 'the full import' of [a] policy provision, and an insured remains responsible for ascertaining the terms of coverage obtained by the broker." *RLI Ins. Co.*, 2006 WL 839514, at *8 (citation omitted); *see also Baldwin Crane & Equip. Corp.*, 687 N.E.2d at 1260 ("It is not tenable to argue that [the broker] had a duty to ensure that [the insureds] understood the full import of the meaning of 'minimum premium.'"); *Epstein v. Nw. Nat'l Ins. Co.*, 166 N.E. 749, 750 (Mass. 1929) (indicating that an insured is presumed to have assented to the terms of a new policy, even if they do not read it or read it without objection, in connection with a policy renewal).

On the other hand, as observed by a New York appellate court applying New York law:

> An insured has a right to look to the expertise of its broker with respect to insurance matters. And, it is no answer for the broker to argue, as an insurer might, that the insured has an obligation to read the policy. It is precisely to perform this service as well as others that the insured pays a commission to the broker. While an insured's failure to read or understand the policy or to comply with its requirements may give rise to a defense of comparative negligence in a malpractice suit against the broker, the insured's conduct does not, as the motion court held, bar such an action.

*Baseball Office of the Comm'r v. Marsh & McLennan, Inc.*, 295 A.D.2d 73, 82 (N.Y. First Dep't. 2002) (citations omitted) (denying the defendant summary judgment in an unrelated case where an insurer changed coverage but the defendant did not specifically inform the insured). The

primary difference between Massachusetts and New York law on this issue is that New York

courts do not require a finding of any "special circumstances" for the commercial insured to rely

on representations by its broker, and the insured may rely on the broker's expertise because such

expertise is precisely that for which the broker is paid.  *Id.*  In Massachusetts, a broker's duty,

absent any "special circumstances," is related to the insured's and broker's existing relationship

and the broker's expertise, and at minimum, establishes "a duty to act reasonably to do what he is

told by his client or to report to the client when he is unable to comply with those instructions."

*Gonzalez v. Arsenault*, No. 00-3498, 2004 WL 2047338, at *5-6 (Mass. Sup. Ct. Sept. 8, 2004)

(mem).  However, Massachusetts courts do acknowledge that a broker's "business is such to carry

with it an implication that he possesses particular skill in effecting insurances, as in (the) case of

an insurance broker, then his principal is justified in relying upon the knowledge which he

professes to possess," and as a result, a broker "is bound to exercise the skill and to use the

knowledge which the business requires."  *Bicknell, Inc. v. Havlin,* 402 N.E.2d 116, 119 (Mass.

App. Ct. 1980) (internal quotations omitted).

Finally, Massachusetts has adopted "comparative negligence" to address negligence that

may be found with respect to a plaintiff's acts or omissions.  Mass. Gen. L. ch 231, § 85.  The

Supreme Judicial Court of Massachusetts has summarized the operation of that statute:

> In a negligence case, the conduct of the plaintiff which will serve to bar recovery
> is governed by statute. Our comparative negligence statute provides that the
> plaintiff's contributory negligence shall not bar recovery if the plaintiff's
> negligence  was not greater than the total amount of negligence attributable to the
> parties against whom recovery is sought. The plaintiff's negligence, if less than
> the amount attributable to the defendant or defendants, only serves to diminish
> recovery by the proportion of negligence attributable to the plaintiff.  Thus, in a
> negligence action, the trier of fact must focus on the conduct of both the
> defendant and the plaintiff in determining the extent of each party's responsibility
> for the plaintiff's injuries. The plaintiff's conduct is not viewed as the sole
> proximate cause of the injury and does not bar recovery completely unless the
> plaintiff is more than fifty per cent responsible for his or her own injuries.

*Colter v. Barber-Greene Co.*, 525 N.E.2d 1305, 1313–14 (Mass. 1988). Courts have applied the

Massachusetts comparative negligence statute in cases involving professional negligence. *See*

*Clark v. Rowe*, 701 N.E.2d 624, 626 (Mass. 1998) (applying the comparative negligence statute

in a malpractice action against a lawyer); *Drown v. Hebert (In re Drown)*, 340 B.R. 428, 441–42

(Bankr. D. Mass. 2006) (discussing cases).

In this case, Marsh had certain duties imposed by law, established by contract, or

assumed. The Plaintiffs assert that genuine disputes of material fact exist as to whether Marsh

breached those duties to GlassHouse by: 1) failing to advise GlassHouse that it should have

provided a notice of circumstance to AIG in relation to the circumstances of the accounting

irregularities and wind up of its UK subsidiary; 2) incorrectly advising that the "change of

control" provision in the Policy would be triggered because of the secured party sales

contemplated in April of 2014; and 3) procuring the Tail for GlassHouse that resulted in a

reduction in coverage without authority from or proper disclosure to GlassHouse. The Plaintiffs

further assert that the estate suffered substantial damage when it had to settle its claims against

D&Os and AIG for $5 million, rather than $15 million that would have been available had Marsh

properly advised GlassHouse and procured coverage as GlassHouse instructed.[43]

---

[43] The Plaintiffs assert that the Policy expressly excluded from the "insured vs. insured" exception claims that might be asserted by the Trustee on behalf of a bankruptcy estate so that coverage was contemplated for negligence claims against D&Os that existed as of the filing of GlassHouse's bankruptcy petition. I have ruled that, in this case, causation was not broken by the fact that the Trustee did not obtain a judgment for an amount higher than the amount paid by AIG to obtain releases in favor of the D&Os and an assignment of claims against Marsh from the D&Os. *See GlassHouse Techs., Inc.*, 604 B.R. at 628. *But see Salvati v. Am. Ins. Co.*, 855 F.3d 40, 48-49 (1st Cir. 2017) (since the defendants never incurred an underlying legal obligation, either by way of contract or judgment, to pay the plaintiff, the indemnification provision in an insurance contract was not triggered and any subsequent refusal to indemnify was not a breach of contract by the insurer); *Salvati v. Fireman's Fund Ins. Co.*, 368 F.Supp.3d 85, 93 (D. Mass. 2019) (precluding the plaintiffs claim, barring litigation of an assignee's claim that the insurer breached excess policy agreements with insured due to First Circuit's determination in *Salvati*¸ 855 F.3d 40). There is a sufficient nexus between the claims asserted by the Trustee arising from that settlement and the rights and claims of the estate as of the filing date such that the Trustee has standing to

Questions of breach, damages, "special circumstances" meriting reliance on a broker's

representation, and causation are typically the province of a factfinder and determined at trial,

but "the question of whether the defendant owed a duty of care in the first instance is an issue

of law, and may be settled on summary judgment" in some cases. *Cracchiolo v. E. Fisheries,*

*Inc.*, 740 F.3d 64, 69–70 (1st Cir. 2014). "Massachusetts courts may also make this

determination after trial, in light of all of the evidence." *Id.* at 69–70 *(*citing *Dos Santos v.*

*Coleta,* 987 N.E.2d 1187, 1197-98 (Mass. 2013) (determining that, despite the open and

obvious danger of a defendant's property condition, a jury was entitled to impose a duty of

care because of the foreseeability of injury)). "To prevail on a negligence claim, a plaintiff

must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant

breached this duty, that damage resulted, and that there was a causal relation between the

breach of the duty and the damage." *Jupin v. Kask,* 849 N.E.2d 829, 834–35 (Mass. 2006).

There is no substantial evidence in the record that GlassHouse provided sufficient

information to Marsh regarding the circumstances of the UK subsidiary such that Marsh should

have identified a "Wrongful Act" that would reasonably be expected to give rise to a "Claim" for

---

assert the negligence claims for damages arising from any "lost recovery" that may be proven. To be
clear, the underlying claims were "Side A" claims under the Policy specifically intended by the terms of
the Policy to benefit a bankruptcy trustee as a claimant seeking to recover against D&Os for negligence in
the performance of their duties to the policy owner (for which coverage would otherwise be excluded by
operation of the "insured vs. insured" clause). The claims against Marsh constitute property of the
bankruptcy estate rooted in the negligence claims against the D&Os and the alleged prepetition acts and
omissions of Marsh relating to the Policy and Tail. Unlike a contractual indemnification obligation of an
insurer, claims held by the estate against Marsh as a broker should be viewed more broadly. While the
Trustee may have been better served to settle the estate's claims against the D&Os and AIG in a different
manner that would include an assignment of claims, such a construct (as approved in *Salvati* in the
context of determining contractual indemnification of an insurer, 855 F.3d at 49) is not necessary to
preserve causation for any lost recovery damages against Marsh. *See, e.g., Campione*, 661 N.E.2d at
662–63; *Gray v. Grain Dealers Mut. Ins. Co.*, 871 F.2d 1128, 1131-33 (D.C. Cir. 1989) (an insured's
release from liability after default judgment did not invalidate an assignment of insured's cause of action
against insurer).

which there would be coverage under the Policy, despite some discussion on these issues at the

March 28th Call.  Def.'s Ex. 12, Marsh-00004521, at ¶ 6(c).  The record shows that by February

27, 2014, Chiplock had informed Donaher and Petri of Marsh about accounting issues at

Glasshouse UK.  9/30/2020 Donaher Dep., 40:24-43:18; Pls.' Ex. 40, 1 (Donaher tells Petri that

forthcoming call may be about "that UK accounting error thing."); Pls.' Ex. 99.

The record contains evidence that GlassHouse provided Marsh with a copy of the UK

wind-down proceeding notice and instructed Marsh not to communicate with AIG regarding the

UK subsidiary issues.  9/30/2020 Donaher Dep., 46:16-49:2, 50:2-53:23, 54:20-55:17; Pls.' Ex.

41; Pls.' Exs. 101, 102.  Donaher also offered to review the notice and "get back to" Chiplock

with Marsh's "recommended action."  9/30/2020 Donaher Dep., 46:16-49:2, 50:2-53:23, 54:20-

55:17; Pls.' Ex. 41 ("We will take a look review [confidentially] and get back to you with our

recommended action.").  Donaher did not recall whether that occurred or what action may have

been recommended, but he recalled that GlassHouse was provided with the opportunity to

discuss directly with AIG its circumstances in the context of a conference call relating to a

possible tail.  9/30/2020 Donaher Dep., 46:16-49:2, 50:2-53:23, 54:20-55:17; Pls.' Exs. 41, 101,

102.  Evidence of the discussions of the general circumstances of the UK subsidiary wind down

and "accounting issues" are not sufficient to support a claim that Marsh was negligent in failing

to advise GlassHouse that it should provide a notice of circumstances to AIG.  *See supra* note 30.

General statements that GlassHouse kept Marsh advised on the circumstances of the UK

subsidiary alone are not sufficient to establish a duty or breach of duty by Marsh with respect to

the UK subsidiary.

On the other hand, there is evidence in the record from which a factfinder could conclude

that Marsh gave advice to GlassHouse that the "change of control" provision would be triggered

by the secured party sales and that could leave a "gap" in coverage for acts occurring after the

perceived change in control.  Whether the change of control provision would have been

implicated by the secured party sale transactions is disputed and not well developed in the

record.  A factfinder could conclude that this advice, if incorrect, oriented GlassHouse toward

the Tail and obscured the distinction between the runoff coverage that would have been available

under the Policy and "tail" coverage for acts after the change of control.  This may have

contributed to confusion with respect to the instructions given by GlassHouse and may have

created or enhanced a duty for Marsh to ensure that the full effect of procuring the Tail was

adequately disclosed and explained to GlassHouse.  The record supports an inference that, under

time pressure in the context of the winddown of GlassHouse's operations, Petri and the

GlassHouse executives were focused on different objectives and there was a failure of

communication.  It seems clear in hindsight that in the context of the GlassHouse winddown and

secured party sales there were two relevant issues: the reporting period for claims arising during

the initial Policy term (and the possibility of a change in control) and coverage for acts occurring

after the Policy term or any change in control.  The specific duty and standard of care in the

industry under these circumstances would normally be established at trial through expert

testimony.

Marsh asserts that GlassHouse's own acts and omissions contributed to any damages that

may have been incurred by GlassHouse or the bankruptcy estate and that recovery would be

foreclosed by those acts and omissions because they were greater than any negligence of Marsh

that could be proven (while denying any negligence).  Marsh primarily focuses on the failure of

Glasshouse to: 1) inform Marsh that maintaining the existing coverage limits was critical

because GlassHouse had concluded that it was likely that Wellington would assert claims against

D&Os for which there would be coverage under the Policy; 2) advise Marsh if it did not believe

that the "change of control" provision would be triggered by the contemplated secured party

transactions; and 3) review the Tail confirmation and promptly inform Marsh if the terms of

coverage conflicted with GlassHouse's understanding regarding the coverage provided by the

Tail.

I have determined that there is no genuine issue of material fact as to whether

GlassHouse informed Marsh that it expected that Wellington would assert claims against the

Ds&Os.  GlassHouse did not.  The Plaintiffs have not cited evidence that would support a

reasonable inference that GlassHouse stated to Marsh that, in light of the anticipated Wellington

claim, it was critical for GlassHouse to maintain existing coverage limits.  I have also determined

that this omission materially breached GlassHouse's contractual obligations so as to excuse

performance by Marsh under the Engagement Agreement.  These determinations also support

that GlassHouse was negligent and breached a contractual duty in seeking advice regarding

obtaining tail coverage.  As discussed above, absent special circumstances, an insurance broker

has no duty to "investigate" whether its client has provided all information necessary to obtain

coverage or whether coverage is adequate.  *See BioChemics, Inc. v. AXIS Reinsurance Co.*, 277

F. Supp. 3d 251, 256 (D. Mass. 2017) (holding that broker was entitled to accept insured's

representation and was "under no duty to ferret out potential claims left unreported") (citing

*Sullivan v. Manhattan Life Ins. Co. of N.Y.*, 626 F.2d 1080, 1082 (1st Cir. 1980) (holding law

does not allow a sophisticated insurance applicant "to leave entirely to the soliciting insurance

agents the burden of affirmatively inquiring whether an express representation of the absence of

[a potential claim] to which the applicant has appended his signature, is false or in need of

explanation or modification")).  This record does not establish "special circumstances," but does

establish that Glasshouse failed to provide information material to the advice for which the

Trustee now seeks to hold Marsh liable.

Whether the comparative negligence of GlassHouse exceeds any negligence of Marsh would normally be determined at trial. *See Marquez v. Home Depot USA, Inc.*, 154 F. Supp. 2d 152, 156 (D. Mass. 2001) ("The question of comparative negligence, like that of breach of duty, is primarily for the factfinder") (citing *Everett v. Bucky Warren, Inc.*, 380 N.E.2d 653, 660 (Mass. 1978); (*Vanalstyne v. Whalen*, 445 N.E.2d 1073, 1080 (Mass. App. Ct. 1983). *See also Tryon v.* Lowell, 565 N.E.2d 456, 458 (Mass. App. Ct. 1991) (leaving issue of comparative negligence to fact finder). In this case, however, where GlassHouse failed to disclose the existence of the Wellington claim and I have concluded that this failure was such that it defeated the very "root of the agreement," *Process Am., Inc.*, 839 F.3d at 136, constituting a material breach, I can only conclude that this omission materially impaired Marsh in the exercise of its duties such that GlassHouse's negligence exceeded any negligence of Marsh–even if Marsh was not correct in its advice regarding the change of control provisions.

Further, it is undisputed that GlassHouse did not raise any issues with Marsh about the terms of the Tail after receiving the related Endorsement and related information. On May 1, 2014, Marsh provided GlassHouse with a copy of the final Tail Endorsement accompanied by a short email and cover letter. Def.'s Ex. 13. The email was addressed to Mark Chiplock and specifically directed him to the attached "formal cover letter for your file and review." *Id.* at 2. The cover letter addressed to Chiplock references the attached endorsements and states: "We have reviewed the endorsements and found them to be consistent with the negotiated terms." *Id.* at 7. The cover letter also tells GlassHouse: "It is important that you review the enclosed endorsements and advise us at your earliest opportunity of anything which you believe is not in accordance with the negotiated coverage and terms." *Id.* The cover letter also summarizes the

Tail:

> • Endorsement #13: Amends the policy to provide a period of three (3) years in which to give written notice to [the insurer] of any claim(s) first made against [GlassHouse] during the Extended Reporting Period [i.e., the 3-year period from April 11, 2014 to April 11, 2017] for any Wrongful Act(s) occurring on or prior to April 11, 2014.

*Id.* That summary indicates that Tail amends the Policy and applies to any claim made against GlassHouse after April 11, 2014 arising from conduct before that date. Paragraph 5 of Endorsement 13 provides: "Solely with respect to the D&O Coverage Section the maximum limit of the Insurer's all Loss arising from coverage as is afforded by this endorsement shall be $5,000,000." Def.'s Ex. 13, at 4. Wakely testified that he now understands the summary provided by Marsh to mean that any claims reported would be subject to the coverage limits of the Tail:

> Q: Do you understand that that language in that sentence [in the cover letter] means that a claim made against GlassHouse between April 11, 2014 and June 1, 2014, based on conduct before April 11, would be covered by the tail?
>
> A: That's the way I read it now, yes.
>
> Q: Now, if you or someone else in authority at GlassHouse had had the opportunity to read this contemporaneously, is it fair to say that it would have struck you, based on your previous testimony, as inconsistent with your understanding of how the tail worked?
>
> A: Yes.
>
> Q: And if that had been the case, would you certainly have raised the issue with Marsh or AIG, or both?
>
> A: Yeah. Yes, I would have.

10/5/2020 Wakely Dep., 160:23-161:15. *See also* 9/3/2020 Chiplock Dep., 250:15-25 (agreeing that "if [the cover letter] was inconsistent with what we thought we were getting, yes, we would have raised the issue immediately"). Marsh asserts that, even if the GlassHouse executives

misunderstood the coverage as explained by Petri, as of May 1, 2014, GlassHouse was on notice

of the terms of the Tail and had an opportunity to correct any variance from the coverage

GlassHouse expected to have been bound.

The record is clear that GlassHouse received the cover letter and endorsement on May 1,

2014. The same day Chiplock received the email, cover letter, and endorsement from Marsh, he

forwarded them to Wakely and three members of the company's board. Def.'s Ex. 14. The

cover letter and endorsement were sent at a time when both Chiplock and Wakely were ending

their employment with GlassHouse, even though they each remained involved for a period of

time. 10/5/2020 Wakely Dep., 45:5-7 (describing beginning his next job in May or June of

2014); 9/3/2020 Chiplock Dep., 250:5-14 (stating that he was not working for GlassHouse on

May 1, and the email containing the cover letter and endorsement was most likely just forwarded

to him, he was unlikely to have read it). When asked if he reviewed the Policy-related

documents provided by Marsh, Wakely responded: ". . . I would certainly review them, yes, to

make sure that it aligned with what we wanted to bind for coverage . . . ." 10/5/2020 Wakely

Dep., 72:21-73:3. Wakely also was asked, "Would you absolutely raise it with the broker if you

read something in a summary document that suggested that the coverage that had been procured

was not consistent with what you thought it was supposed to be?" He responded: "Yeah. I would

think so, yes, absolutely." 10/5/2020 Wakely Dep., 78:5-11; *see also* 10/12/2020 Sharp Dep.,

175:7-14 (confirming that if he had read a summary of the Tail coverage from Marsh and found

it inconsistent with what Wakely and Chiplock had described he would have raised the issue).

Wakely and Chiplock were sophisticated businessmen with prior experience managing corporate

insurance portfolios, but not with "tail" coverage for D&O policies in the context of a wind

down. Def.'s Stmt. ¶¶ 1-3. It appears from the record that Wakely and Chiplock either did not

review the Tail when Marsh forwarded the terms or did not understand the limitations that

resulted from the Tail.  *See, e.g.*, 9/3/2020 Chiplock Dep., 222:3-9 (acknowledging a lack of

recollection of ever having read the Tail endorsement); 10/12/2020 Sharp Dep., 127:18-128:3

(confirming his expectation that Wakely and Chiplock would be "familiar with the terms of the

company's D&O coverage").

In the absence of special circumstances, GlassHouse is required to read the terms of the

Tail endorsement and advise Marsh of any conflict with its expectations regarding coverage.  *See*

*Guida*, 2013 WL 3939946, at *4. ("Most importantly, if the [plaintiffs] had read the policy, they

would have encountered [the] exclusion" that eliminated the coverage they erroneously thought

they had).[44]  It is a reasonable inference from this record that GlassHouse failed to appropriately

read the Tail endorsement and Policy and failed to advise Marsh of discrepancies.  This severs

the causal connection between any negligence by Marsh and the resulting harm and cannot be

found to be a contributing factor to any resulting harm.  *Cf. Id.* (stating that the "failure to read

---

[44] The United States Court of Appeals decision in *Industrial Valley Bank & Trust Co. v. Dilks Agency* aligns with this conclusion.  751 F.2d 637 (3rd Cir. 1985)(applying the law of Pennsylvania). In that case, a bank incurred losses in defending and settling a lawsuit relating to its role as indenture trustee for certain debentures that ultimately became worthless after an underlying default.  *Id.* at 638–39.  The bank then sued its insurance broker, claiming the broker was negligent in switching the bank's errors and omissions insurance policy to a new carrier and thereby creating a "gap" in coverage.  *Id.* at 639.  The bank asserted that the broker was negligent for not informing the bank that by changing carriers the bank "lost continuous coverage for claims made during the term of the [second carrier's] policy but based on circumstances occurring during the term of the [first carrier's] policy."  *Id.* at 639.  The underlying default on the debentures that created liability for the bank allegedly fell into this "gap" in coverage, and the bank alleged that the broker was responsible for the resulting losses.  *Id.*  In reversing the trial court's entry of judgment for the bank, the Third Circuit Court of Appeals noted that even though key bank executives had been aware that a lawsuit might result from a default on the debentures, "no [bank] representative ever informed [the broker] of the circumstances surrounding the . . . default, and the possibility that a claim would be made against [the bank's] errors and omissions policy."  *Id.* at 640.  The broker, "solely as a result of" the bank's failure to disclose this information, "lacked knowledge of the . . . default [and] . . . had no reason to suspect [the bank] needed additional insurance protection . . . ."  *Id.* at 641.  In making that conclusion, the Court overturned the district court's findings as clearly erroneous, as the bank's own negligence contributed to its loss such that the broker could not be found legally responsible for the losses incurred.

the policy severs the causal connection necessary between fault … and the resulting harm[.])

For these reasons, I will enter summary judgment in favor of Marsh as to the negligence claim, Count II.

## **CONCLUSION**

For the reasons stated above, the Court hereby GRANTS the Motion and enters summary judgment in favor of the Defendant, Marsh, on the remaining Breach of Contract (Count I) and Negligence (Count II) counts.  Judgment consistent with these rulings shall enter.

Dated: September 30, 2022                    By the Court,

Christopher J. Panos
United States Bankruptcy Judge